IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HUI MINN LEE,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )      Case No. 1:18-cv-1046
                                 )
MARKET AMERICA, INC.,            )
                                 )
          Defendant.             )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Market America, Inc., (hereinafter the "Company" or "Market America"), by and through its undersigned counsel, and submits this memorandum of law in support of its Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF THE CASE

Plaintiff Hui Minn Lee (hereinafter "Plaintiff," "Lee," or "Nadine Lee") was an employee for the Company from around September 2000 through her termination on October 5, 2017. (Am. Compl. D.E. *4 ¶ 12, 46,53.) Plaintiff contends that she was terminated for discriminatory reasons based on her national origin, age, race and/or was retaliated against for opposing discrimination in the workplace. Lee, subsequent to her termination, filed a charge with

the Equal Employment Opportunity Commission ("EEOC") on March 27, 2018. (Charge of Discrimination, D.E. * 13-1 at 2) The EEOC issued Lee a right to sue letter on September 28, 2018. (Am. Compl. ¶ 10.)

Plaintiff filed her Complaint on December 26, 2018, and an Amended Complaint on March 22, 2019. (Compl. D.E. * 1, Am. Compl. D.E. * 4.) In the Amended Complaint, Plaintiff specifically alleged claims for race discrimination under § 1981 and Title VII, age and national origin discrimination under Title VII, and wrongful termination under state law.

Plaintiff's claims for retaliation under Title VII, racial discrimination under Title VII, and direct claims for discrimination under NC Gen. Stat. 143-422.2, were dismissed by the Court on March 17, 2020, pursuant to the Company's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (D.E. * 18 Order on Motion to Dismiss March 17, 2020 p.1.) The claims that survived were those of racial discrimination under § 1981, age discrimination under Title VII, National Origin Discrimination under Title VII, and wrongful termination under state law (id. at p. 23.)

Defendant filed its Notice of Intent to file Dispositive Motion on May 11, 2021, within 14 days of the close of discovery

on May 4, 2021. (Text Order entered April 29, 2021.) Market America now moves for summary judgment on all claims in their entirety.

## STATEMENT OF FACTS

### I.   Background Information of Market America

Market America is a product brokerage company with an internet one-to-one marketing company, combined, selling consumer products through a sales force and online at SHOP.COM. (Exhibit 1 Position Statement p. 2.) Market America does business in the United States and across the world, including Taiwan, Hong Kong, Singapore, Malaysia, Mexico, Canada, Australia, and the United Kingdom. (id.) Market America's headquarters are in Greensboro, North Carolina (id.) At its office in Greensboro, Market America employs customer service representatives to assist with foreign markets. (id.) Market America provided training to all of its employees through a training department located in Greensboro, of which Plaintiff Hui Minn Lee, was a member. (id.)

### II.   Background and Demographic Information of Nadine Lee

Nadine Lee was born on March 16, 1960. (Exhibit 2 Nadine Lee Dep 9:4-5.) Her background is in chemistry, and she has her master's in chemistry from Auburn University. (Nadine Lee Depo. 20: 3-8.)

3

III. <u>Nadine's Employment with Market America</u>

At Market America, Lee started as a franchise representative. (Lee Depo 21:2-3.) Lee eventually was moved into the training department around 2002. (Lee Dep. 22:20-25, 23:1-4.) According to Lee, her next change of title was not until 2015, when she was changed to a senior training specialist. (Lee Dep. 25:1-6.) The only other title she had was Global Training Projects Manager, the title she held at the time of her termination in 2017. (Lee Dep. 25:13-20.) Despite having the term "manager" in its title, as Global Training Projects Manager, Lee's position was not a management position, and she had no employees reporting to her. (Exhibit 3 Sherry Spesock Dep. 31:15-24.) According to the head of human resource for Market America, there was no distinction between a global training projects manager position and a corporate trainer. (Spesock Dep. 32:10-16.) Lee was the only Mandarin speaker able to conduct trainings while she worked at Market America. (Exhibit 4 Camara Dep. 57:5-11, 20-22.)

At no time did Lee have supervisory authority. (Lee Dep. 33:2-10, 40:13:21.)

IV. <u>Market America's Training Department</u>

The training department under Ms. Camara was diverse, with Henri Hue, a black male, Cherri Walston, a black female, Delia "Abby" Zapata, a Hispanic female, and Nadine Lee, an Asian female.

4

(Spesock Dep. 44:1-15.) The ages of employees in the training department were also diverse, ranging from Delia Zepeda at 23 years old, Henri Hue at 33 years old currently, and Xiuman "Rose" Chaffin, currently 57 years old. (See Exhibit 5 Defendant's Answers to Interrogatory 7.)

As a training specialist with Market America, Lee was to use her knowledge of the Mandarin language to train the Asian Market customer service representatives. (Nadine Lee Dep. 15:11-18.) Lee had no other primary job responsibility other than performing trainings for employees. (Camara Dep. 15:1-8.)

V.  Lee's Interactions with her Managers

Lee would complain to her managers about other employees' work, and did not appreciate the management styles of her direct supervisors at times. (Lee Dep. 28:3-16.) She recorded her and her first training department manager, Amanda Clarida's, conversations in 2013 due to her dislike of Clarida's management style. (Lee Dep. 32:2-8.)

Liliana Camara joined the training department in 2013. (Camara Dep. 29:9-10.) Lee did not have a management role with the Company when Camara was hired. (Camara Dep. 47:10-16.) At the time Camara was hired, Colbert Trotter would assign trainings to Camara directly, not Lee. (Lee Dep. 64:21-23.) Camara was promoted several times within a few years. (Lee Dep. 51:9-12.) Prior to Camara

becoming a manager, Lee had no issues with Camara's treatment of her personally, other than one or two comments about issues with other Asian individuals Camara had interacted with at work. (Lee Dep. 65:7-12.) Lee did not apply for any other positions once she moved to the training department. (Exhibit 5 Defendant Interrogatory Response 4.)

The manager that promoted Liliana Camara to a management was Colbert Trotter, who was in her late 40s or early 50s according to Lee. (Lee Dep. 47:13-16.) When Lee was told she would report to Camara, she was never told it was a demotion of her position; she "assumed" it was a demotion. (Lee Dep. 48:12-21, 75:22-25, 76:2-5.) Lee's title was never changed when Camara became her manager, and Lee's pay remained the same. (Lee Dep. 75:13-21.) Lee never had authority over Liliana Camara to give a performance review. (Lee Dep. 50:6-11.) Colbert Trotter denied the promotion of Camara was related to race or age of either Camara or Lee. (Lee Dep. 52:1-18.)

Lee reported no issues of harassment or discrimination to Amanda Clarida, her first manager in the training department. (30:4-6.) In fact, Market America received no reports of discrimination or harassment from Lee during her employment. (Defendant's Responses to Interrogatory 3.)

When Camara became a manager, Lee complained to Spesock about one isolated incident of something that was said when Camara first started working with Lee, and Lee felt that Camara was referencing Lee's "culture." Lee was advised by Spesock she would need to report to Camara. (Spesock Dep. 40:23-25, 41:1-15.) Spesock addressed the concerns of Lee with Camara. (Spesock Dep. 41:21-25, 42:1-8.)

When Camara came into a management role of the training department in November of 2016, she wanted to create a group, team environment. (Camara Dep. 21: 20-24.) Camara had several meetings with the training section, which included Lee, about the collaboration Camara wanted in the group and cross-training of training specialists. (Camara Dep. 66:20-25, 67:1-24.) The only change to Lee's job description was asking her to upload materials to a database called Confluence, and then sharing a training titled MPCP training with other members of the training department. (Camara Dep 68:23-25, 69:1-25, 70:1-4.) Lee gave Camara resistance from the beginning with any change to workflow or coordination, rejecting constructive criticism or suggestions, to the point that Camara had major issues in communicating with Lee. (Camara Dep 21:12-19.)

7

VI.  <u>Lee's Work Performance Issues</u>

Even Lee confirms that she was told by Camara to be more of a team player with a teamwork mentality. (Lee Dep. 81:5-25.) Camara told Lee that Camara had concerns about how Lee treated prior managers. (Lee Dep. 81:14-20, 82:4-5.)

Lee would refuse to do certain trainings and complain about doing certain trainings that she felt were "beneath her," even when the training was to be in Mandarin. (Lee Dep. 93:11-24, 94:13-22.) Lee even suggested another trainer be hired to take some of her job responsibilities that she did not want to complete, such as the long UnFranchise Services Training classes if they were to be done fully in Mandarin moving forward. (Lee Dep. 107:5-15, 108:18-23.) Lee was so against assisting with certain aspects of the trainings, that she would suggest that individuals who were only 50% fluent in English to join an English training so that Lee would not have to do the long training in Mandarin. (Lee Dep. 112:18-25, 113:13-22.) Camara recalled two specific incidences when Lee refused to conduct new-hire training in Mandarin for U.S. customer service representatives who spoke predominantly Mandarin and could not understand the English training. (Camara Dep. 19:6-2, 20 11:3-25.)

Because of Lee's pushback, Market America used another employee, Rose Chaffin, to translate the training class for the

8

Mandarin speaking individuals. (Lee Dep. 114:19-25.) Within the department, Lee's refusal to be a team player required the other team members to make up the difference. (Camara Dep. 42:11-24.) The final straw was the reports of training in Mandarin not being done properly when Lee actually did a Mandarin training. (Camara Dep. 40:18-22.) The substandard trainings completed by Lee affected the quality of training and quality of customer service representatives for the Company. (Camara Dep. 41:18-24.)

Camara spoke to Lee on several occasions, asking her to work together with the team, and conduct the trainings in Mandarin if needed. (Camara Dep. 35:13-19, 36:1-8.) There were no write-ups or reprimands to Lee. (Camara Dep. 36:13-19.) Despite this, it was a known issue between Camara and her supervisor, Sherry Spesock, that Lee was not working well with the training team. (Camara Dep. 36:20-25, 37:1-4.)

VII. Lee's Termination

In October of 2017, Camara and Spesock met together and made the decision to terminate Lee. (Camara Dep. 77:1-7.) In the meeting where Lee was terminated, Camara also repeated that the reason for Lee's termination was that Lee was not a team player. (Lee Dep. 115:13-18, Camara Dep. 78:20-25, 79:1-2.) Camara herself confirmed the reason she ultimately decided to terminate Lee was because it got to the point where Lee was refusing to do parts of the job

that only made sense for Lee to do, and Camara felt she was having to force Lee to do the trainings in Mandarin. (Camara Dep. 39:24-25, 40:1-12, Spesock Dep. 22:9-15.) Spesock confirms that Lee was terminated because of her performance issues with Camara, and her title was eliminated. (Spesock Dep. 37:10-20.) No one was specifically hired to fill the title of "Global Training Projects Manager" after Lee's termination. (Spesock Dep. 29:8-10.)

    VIII.    <u>Lee's Replacement</u>

    Lee was replaced by Rose, who was bilingual. (Camara Dep. 81:15-17.) Rose was hired because she showed initiative and a want-to-work attitude, an example being her attendance of both the Mandarin and English UnFranchise Services Training, which found the deficiencies in Lee's Mandarin training. (Camara. Dep 82:1-20, Spesock Dep 23:8-12.) Rose was not given the exact same title as Lee, but was doing 70 to 80 percent of Lee's responsibilities, and took on participating in Confluence. (Camara Dep. 83:13-21, 86:3-10.) Spesock, as human resource manager, had the understanding that Rose Chaffin would be taking Lee's position and job responsibilities. (Spesock Dep. 26:4-12.) Rose also had teaching experience and a good work ethic, which was the basis for Camara's hiring. (Camara Dep. 89:18-25, 90:1-6, Spesock Dep 24:9-25.)

<u>QUESTIONS PRESENTED</u>

1. Whether the Court should dismiss Plaintiff's claim for Age and National Origin discrimination under Title VII (Am. Compl. Count Three p. 12.)

2. Whether the Court should dismiss Plaintiff's claim for Race Discrimination under § 1981, under the same analysis as the Title VII claims (Am. Compl. Count Two p. 12.)

3. Whether the Court should dismiss the Wrongful termination of Lee by Company in violation of North Carolina public policy under the same analysis of Title VII. (Am. Compl. Count Four p. 13.)

<u>STANDARD OF REVIEW</u>

Summary judgment is proper if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party establishes the absence of a genuine issue of fact, the non-moving party must affirmatively show genuine facts exist for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted). When reviewing a motion for summary judgment, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th

11

Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996). The judicial inquiry on summary judgment "thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof. . . that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). *Matias v. Elon Univ.*, No. 1:17CV398, 2018 WL 6173460, at *2 (M.D.N.C. Nov. 26, 2018), aff'd, 780 F. App'x 28 (4th Cir. 2019).

<u>ARGUMENT</u>

I.   THE TITLE VII CLAIMS OF PLAINTIFF SHOULD BE DISMISSED BY THIS COURT.

Plaintiff's Title VII claims for discrimination based upon national origin and age should be dismissed because her job performance was substandard, and she was replaced by an individual in the same class. To bring a Title VII claim, a plaintiff may establish through direct or circumstantial evidence that his protected status, though not the sole reason, was a "motivating factor" in his employment termination. See *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir.2005). Alternatively, he may use the burden-shifting proof scheme established by the Supreme Court in *McDonnell Douglas*. Id. *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 845 (M.D.N.C. 2013).

12

For the reasons outlined below, Plaintiff has no evidence of direct discrimination, and fails to prove her prima facie case. Even if she could prove a prima facie case of discrimination, Market America had a legitimate reason for terminating Lee. For those reasons as outlined below, this case must be dismissed in its entirety.

1) <u>Plaintiff has No Evidence of Direct Discrimination</u>

Plaintiff has no evidence of direct discrimination by Market America or its managers. "Direct evidence is 'evidence that the employer announced, admitted, or otherwise unmistakably indicated that [the forbidden consideration] was a determining factor.' " *Gaines v. McDonald*, 152 F. Supp. 3d 464, 470 (M.D.N.C. 2015), *judgment entered*, No. 1:14-CV-90, 2015 WL 9461485 (M.D.N.C. Dec. 23, 2015), *quoting Stover v. Lincoln Publ'g, Inc.*, 73 F.3d 358, 1995 WL 764180, at *2 (4th Cir.1995). No inference is required for direct evidence of discrimination. *Castaneda v. NASA Hosp., LLC*, No. 5:12-CV-667-D, 2014 WL 3563350, at *2 (E.D.N.C. July 18, 2014). This would include a statement from the Company's direct decision maker of termination due to race, national origin, or age. *id.*

Isolated, discriminatory statements of a decision maker must be close in time to the adverse employment action to support a claim for direct discrimination. *Gaines,* 152 F. Supp 3d at 470.

13

This closeness in time usually means that at the time of the termination, the reason for termination was given as a discriminatory reason, like being too old for the job. *Loveless v. John's Ford, Inc*., 232 F. App'x 229, 234 (4th Cir. 2007).

Here, Plaintiff alleges comments regarding her "culture" by Liliana Camara on or about December 8, 2016, 8 months prior to her termination, and a comment by Sherry Spesock about surviving a hostile work environment also in December of 2016. (*see* Exhibit 6 Plaintiff Response to Interrogatory 12.) This time period is well over the recency requirements for direct discrimination. These statements are not direct statements as an explanation of an adverse employment action of termination in this case, but are instead isolated alleged comments to end a heated discussion. (id.) Just as in *Gaines,* the Court must find there is no direct evidence of discrimination in this case.

2) Plaintiff's Claims Fail Under the *McDonnel-Douglas* Analysis.

Since there is no direct evidence of discrimination, Plaintiff must use the *McDonnell-Douglas* framework. Under the *McDonnell-Douglas* analysis, the plaintiff must first establish the prima facie case of discrimination, and once that is established, the burden shifts to the defendant to rebut the presumption of discrimination established by the plaintiff in its prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133,

14

142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The defendant rebuts the presumption of discrimination by establishing some legitimate and non-discriminatory basis for the termination of the plaintiff. *Id.* Once the Company establishes a legitimate reason for termination, the burden then returns to the plaintiff, who must show that the reason for termination was not a legitimate reason, but mere pretext. *Bibichev v. Triad Int'l Maint. Corp.,* 951 F. Supp. 2d 839, 845–46 (M.D.N.C. 2013).

A. Plaintiff has not proven her *prima facie* case and therefore these claims must be dismissed.

Plaintiff cannot establish her prima facie case because she was not performing to the legitimate expectations of Market America, was replaced by someone in the same class of national origin and age, and was terminated for a legitimate reason. Generally in her prima facie case, Plaintiff must prove the following: (1) she belongs to a protected class; (2) she was terminated or experienced some other adverse employment action; (3) her job performance met the employer's legitimate expectations at the time of her termination, and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 846 (M.D.N.C. 2013). "[Plaintiff]'s own naked opinion, without more, is not enough to establish a prima facie case of age

15

discrimination." *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988).

Market America does not dispute that Lee is a member of the protected classes of race, national origin, and age. Market America also does not dispute that Lee was terminated. Therefore, the first two elements of the prima facie case will not be addressed here. However, for the reasons outlined below, Plaintiff fails to meet her burden under prong three and four, and therefore her case must be dismissed.

### i. Plaintiff was not performing her job to the legitimate standards of Market America.

Plaintiff failed to properly perform her job functions. When an employee fails to present evidence that she was performing job duties at a level reasonably requested by the employer or similar to other employees, the employee cannot carry her burden of proof. *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1317 (4th Cir. 1993), *holding modified by Stokes v. Westinghouse Savannah River Co.,* 206 F.3d 420 (4th Cir. 2000)

In *Mitchell*, a reduction in force and performance based-termination case, the employee disagreed with the Company's statements that he was a poor performer, pointing to positive ratings given to him. However, the Court, despite these positive reviews, found that the employee failed to show initiative, did not make out-of-state visits as suggested, and was generally

16

resistant to any change in his workflow, and these items were legitimate bases for termination. *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316-17 (4th Cir. 1993), *holding modified by Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000).

Just as in *Mitchell,* Plaintiff's perception of her job performance is not relevant in determining her job performance; the only relevant information is the employer's expectations at the time of termination. *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 846-47 (M.D.N.C. 2013). In *Bibichev,* the Court granted summary judgment on plaintiff's ADEA claim even where the last performance review was a positive one because the review was completed by a prior team leader that did not supervise plaintiff, and the employer presented other evidence separate from a performance review showing plaintiff's inadequate job performance. *Id.* More specifically, the plaintiff in *Bibichev* had "created the potential for significant damage. . . , failed to perform work timely, and photographed a superior. . . and recorded her telephone calls in her office in violation of company policy." *Id.*

Here, the Plaintiff created significant damage to the call centers by failing to train individuals. At least seven new employees were known to be affected by this inadequate training, where their primary language would make it difficult for the corporate office to even become aware of the improper training.

17

(Camara Dep. 19:6-2, 20 11:3-25.) She also failed to move and adapt her training materials to be digitally placed on the Confluence training platform for use by all employees as requested by Camara. (Camara Dep.55:4-15.) Lee would repeatedly attempt to maintain her status quo of work and refuse to coordinate trainings when requested by Ms. Camara, her direct supervisor. Lee gave Camara resistance from the beginning with any change to workflow or and rejected suggestions from her manager.(Camara Dep 21:12-19.) Camara recalled two other specific incidences when Lee refused to conduct new-hire training in Mandarin for U.S. customer service representatives who spoke predominantly Mandarin and could not understand the English training. (Camara Dep. 19:6-2, 20 11:3-25.) Even Lee confirms that Camara told Lee she needed to be more of a team player with a teamwork mentality. (Lee Dep. 81:5-25.)

Lee had a history of issues and complaints about her supervisors. (Lee Dep. 28:3-16.) Just like in *Bibichev,* the last performance review of Plaintiff here was completed by someone who did not directly supervise Lee, based upon discussions with the prior manager. (Deposition of Sherry Spesock 11:20-24, 12:1-9.) Spesock confirmed the review of Lee's job performance completed in 2017 was not a complete review because Spesock could not "give a true evaluation for her in the interim." (Spesock Dep. 16:6-10.) However, Spesock's personal observations of Lee from June of 2016

18

were not positive, noting that Lee was not willing to do additional work and quick to leave her post. (Spesock Dep. 18:3-13.)

While the end-of-year reviews appear positive, the testimony from the two managers above Lee confirm that her work performance was below standard, at a minimum for the final year she worked at Market America, 2017. Despite the pattern of poor communication, when Lee's direct supervisor learned the actual trainings completed were not conveying appropriate information, Camara, as manager, knew there needed to be a change. (Camara Dep 20:21-25.) Lee would refuse to do certain trainings and complain about doing certain trainings that she felt were "beneath her," even when the training was to be in Mandarin. (Lee Dep. 93:11-24, 94:13-22.) Lee in her personal notes even suggested another trainer be hired to take some of her job responsibilities that she did not want to complete, such as the long UnFranchise Services Training classes, if they were to be done fully in Mandarin moving forward and suggested to Camara another trainer be hired to do it. (Lee Dep. 107:5-15, 108:18-23.) Lee was so against assisting with certain aspects of the trainings, that she would suggest that individuals who were only 50% fluent in English to join an English training so that Lee would not have to do the long training in Mandarin. Lee would then suggest she do only a few hours with the Mandarin speaking employee after the full training course was complete,

19

thereby extending training time. (Lee Dep. 112:18-25, 113:13-22.) Lee's attitude degraded so badly that in February of 2017, she suggested that Market America hire another training specialist to complete parts of her job, specifically completing a Mandarin language training:

> I -- I agree to do that training during February's meeting already. I didn't say that I don't want to do it. I just suggest her that she need to hire one more trainer if this become regular.

(Lee Dep. 107:11-15.) Even after this comment, Lee continued to push off work, letting the Global Director of Account Services know in July of 2017, that Lee does not have time to train her employees, and she should find someone within the Account Services department to assist. (Exhibit 7 MA 281 Email from Brandi Foster dated June 22, 2017.) This all culminated in Rose Chaffin confirming that Lee's trainings were lacking information and inconsistent with the English training. (Camara Dep. 20:22-25, 21:1-7, 22:5-13, 24:8-10, 58:8-25.) When plaintiff's own statements do not establish age discrimination as a basis for her termination, summary judgment is proper. *Swaim v. Westchester Acad., Inc.,* No. CIV. 1:01CV00242, 2002 WL 31163776, at *3 (M.D.N.C. June 6, 2002). Based on this consistent pattern of poor performance and refusal to work with others or adapt, Ms. Lee was not working to the standards of any employee in the workplace.

Most importantly, Lee's own testimony establishes her lack of performing to standard. Therefore, summary judgment is proper as Lee cannot prove a prima facie case.

    ii. <u>Plaintiff was not replaced by an individual outside of her protective class.</u>

Lee was replaced by an individual within her protected class of age and national origin, and therefore this case must be dismissed. "[A] plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class." *Brown v. McLean,* 159 F.3d 898, 905 (4th Cir. 1998) (in context of sex discrimination). This requirement spans across claims for discrimination based upon race[1], national origin, and age. *Valcarcel v. ABM Indus./Diversico Indus.,* No. 1:17-CV-00735, 2019 WL 2410802, at *3 (M.D.N.C. June 7, 2019)(national origin), *Collins v. TIAA-CREF,* No. 306CV304RJC, 2009 WL 3077555, at *6 (W.D.N.C. Sept. 23, 2009), *aff'd,* 386 F. App'x 409 (4th Cir. 2010) (race) *Swaim v. Westchester Acad., Inc., No*. CIV. 1:01CV00242, 2002 WL 31163776, at *2 (M.D.N.C. June 6, 2002) (age). When a company replaces a terminated employee with someone within their protected class, it tends to show that the reason or terminating the employee was not motivated by discrimination. *Miles v. Dell,*

---

[1] As noted in the procedural history, the race discrimination claim under Title VII was dismissed at an earlier stage of this litigation(D.E.*18.), but continues under the § 1981 claim frame work that uses the *McDonnell-Douglas* analysis.

*Inc.,* 429 F.3d 480, 488 (4th Cir. 2005). The inference of unlawful age discrimination "cannot be drawn from the replacement of one worker with another worker insignificantly younger." *Swaim v. Westchester Acad., Inc., No*. CIV. 1:01CV00242, 2002 WL 31163776, at *2 (M.D.N.C. June 6, 2002), quoting *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308 (1996). While there is no bright line rule, 9 years of an age difference has been found to be insignificant. *Buckner v. Lew,* No. 5:13-CV-199-FL, 2014 WL 1118428, at *3 (E.D.N.C. Mar. 20, 2014). While there are certain limited exceptions to the general rule regarding replacement of an employee, none of those even remotely apply in this case. An employee can still pursue a prima facie case of discrimination even if their replacement is of similar age, if a significant lapse in time occurred between replacement and termination, they are replaced by someone much younger though in the same class, or the hiring of someone else is to disguise discrimination. *See Miles v. Dell, Inc.,* 429 F.3d 480, 486 (4th Cir. 2005).

Here, none of the above exceptions apply. The training department of Market America under Ms. Camara was diverse, with Henri Hue, a black male, Cherri Walston, a black female, Delia "Abby" Zapata, a Hispanic female, and Nadine Lee, an Asian female. (Spesock Dep. 44:1-15.) The age of employees in the training

22

department were also diverse, ranging from Delia Zepeda at 23 years old, Henri Hue at 33 years old currently, and Xiuman "Rose" Chaffin currently 57 years old. (See Defendant's Answers to Interrogatory 7.) Lee was replaced by Rose, who was bilingual in Mandarin and English. (Camara Dep. 81:15-17.) Rose was not given the exact same title as Lee, but was doing 70 to 80 percent of Lee's responsibilities, and took on participating in Confluence. (Camara Dep. 83:13-21, 86:3-10.) Spesock, as human resource manager, had the understanding that Rose Chaffin would be taking Lee's position and job responsibilities. (Spesock Dep. 26:4-12.) No one was specifically hired to fill the title of "global training projects manager" after Lee's termination from that role, and that job title, but Rose's duties as an employee replaced those responsibilities of Lee. (Spesock Dep. 29:8-10, 32:24-25, 33:1-5.) More importantly, the offer to transfer Rose Chaffin to the training department occurred the exact same day that Lee was terminated on October 5, 2017. (Exhibit 8 Email dated October 5, 2017 MA566.) The specific request for transfer of Rose Chaffin on October 5, 2017, confirms she was to replace Nadine Lee. (id.) Rose Chaffin identifies herself as Asian. (Exhibit 9 MA567 Employee HR Action Form.) Rose Chaffin was born in May of 1963. (Exhibit 10 MA607 Background Check Form.) Plaintiff Lee was born March of 1960, making both within the protected class of age as well. (Exhibit 11

MA 346 Enrollment/Payroll Form.) While both in the protected class of age, Lee was less than three years older than Rose.

Because both Rose, the replacement for Lee, and Lee were of Asian national origin, and of similar age within the protected class, Lee cannot establish a prima facie case of discrimination and summary judgment should be granted.

B. Market America had a legitimate basis to terminate Plaintiff's employment.

When an employee continuously refuses to conform his work to the employer's standards, continuously insisting their work is beyond reproach, an employer may terminate that employee in lieu of substituting the employee's standards of performance. *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 847 (M.D.N.C. 2013). Here, the burden is on Market America to only produce a legitimate reason for termination. *St. Mary's Honor Ctr v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Market America, if the Court even gets to this analysis, "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992). A pattern of unsatisfactory work performance is a legitimate reason for termination. *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 847 (M.D.N.C. 2013).

Here, in the meeting where Lee was terminated, Lee confirmed Camara's reason to terminate was because Lee was not a team player. (Lee Dep. 115:13-18, Camara Dep. 78:20-25, 79:1-2.) Camara herself confirmed the reason she ultimately decided to terminate Lee was because it got to the point where Lee was refusing to do parts of the job that only made sense for Lee to do, and Camara felt she was having to force Lee to do the trainings in Mandarin. (Camara Dep. 39:24-25, 40:1-12, Spesock Dep. 22:9-15.) Camara spoke to Lee on several occasions, asking her to work together with the team, and conduct the trainings in Mandarin if needed. (Camara Dep. 35:13-19, 36:1-8.) Even though there were no written warnings in Lee's file, it was a known issue between Camara and her supervisor, Sherry Spesock, that Lee was not working well with the training team. (Camara Dep. 36:13-25, 37:1-4.)

Therefore, the only evidence by all accounts, including Lee's, is that she was terminated for the legitimate reason of poor performance and not being a team player. Because Market America has provided a legitimate reason for termination, which Lee also confirmed, the Court must dismiss this case.

### C. Market America's legitimate reason for terminating Plaintiff is not pretextual.

Market America's bases for termination is not pretextual and therefore this case must be dismissed. If an employer provides a legitimate reason for termination, then the burden shifts back to

25

the Plaintiff to show that the termination explanation is not worthy of consideration. *Bibichev v. Triad Int'l Maint. Corp.***,** 951 F. Supp. 2d 839, 847-48 (M.D.N.C. 2013). "The summary judgment standards mesh comfortably with the McDonnell Douglas framework. To establish pretext, a plaintiff cannot focus on 'minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.'" *Bibichev v. Triad Int'l Maint. Corp.,* 951 F. Supp. 2d 839, 845-46 (M.D.N.C. 2013), *quoting Hux v. City of Newport News*, 451 F.3d 311, 315-16 (4th Cir.2006). The Court only determines whether the reason given by the employer is "truly the reason for the plaintiff's termination." *Neal v. Green Ford, LLC*, No. 1:17-CV-569, 2018 WL 6003547, at *6 (M.D.N.C. Nov. 15, 2018), *aff'd,* 763 F. App'x 331 (4th Cir. 2019). In addition, Plaintiff cannot use conclusory statements with regard to her manager's state of mind to survive summary judgment. *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988).

Here, Plaintiff can only show one minor discrepancy that does not affect the actual motivation for Lee's termination. In unemployment filing paperwork, Market America noted that the position of Lee was eliminated. (Spesock Dep. 46:19-25.) However, while the title itself was eliminated, the job duties were assumed by a new employee, Rose Chaffin, and the submission to the

26

unemployment commission was a miscommunication. (Spesock Dep. 47:4-15.) As noted previously, Lee's position title itself was eliminated, but she was terminated for poor performance. (Spesock Dep. 50:1-7.) This mismarking of a box on the unemployment paperwork does not rise to the level of casting doubt on the validity of Lee's termination. It is clear Lee was under-performing and refusing to coordinate with her manager. For these reasons alone she was terminated and replaced by an individual who did 80% of her work from day one and took on the project of Confluence data management that Lee continuously refused to do. (Camara Dep. 83:13-21, 86:3-10.)  For these reasons, the termination reason given by Market America is not pretextual, and this case, in its entirety, must be dismissed.


II.  THE 1981 CLAIMS OF PLAINTIFF MUST BE DISMISSED UNDER THE SAME
     ANALYSIS OF THE TITLE VII CLAIMS

     Plaintiff's § 1981 claim for discrimination based upon race must be dismissed for the reasons outlined in the Title VII claim analysis.  A court, however, uses the same analysis for § 1981 claims as it does for Title VII claims for race discrimination or national origin discrimination, and the Fourth Circuit has combined the review of § 1981 claims into an analysis under Title VII analysis. *Guessous v. Fairview Prop. Invs., LLC,* 828 F.3d 208, 219 (4th Cir. 2016). Market America through counsel therefore

27

incorporates by reference the arguments contained in the paragraphs above with regard to the Title VII claims as the bases for dismissal of the § 1981 claims.

III. THE NORTH CAROLINA BASED CLAIM OF WRONGFUL DISCHARGE MUST ALSO BE DISMISSED UNDER THE SAME ANALYSIS OF THE TITLE VII CLAIMS ABOVE.

North Carolina is an at-will employment state, but an employee can pursue a wrongful discharge claim in limited circumstances, including based on some activity by the employer contrary to law or public policy. *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 350, 353, 416 S.E.2d 166, 168, 169 (1992). This is referenced and codified in North Carolina General Statute § 143-422.2. *id.* "North Carolina law relies on federal authority to establish the standards applicable to state law wrongful discharge claims." *North Carolina Dep't of Correction v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 82 (1983); see also *Phillips v. J.P. Stevens & Co.*, 827 F.Supp. 349, 353 (M.D.N.C.1993). *Mumford v. CSX Transp.*, 878 F. Supp. 827, 832 (M.D.N.C. 1994), aff'd sub nom. *Mumford v. CSX Transp., Inc.*, 57 F.3d 1066 (4th Cir. 1995), *Bibichev v. Triad Int'l Maint. Corp.*, 951 F. Supp. 2d 839, 844-45 (M.D.N.C. 2013).

Therefore, based upon the arguments outlined in the Title VII section contained herein and the arguments with regard to § 1981 claim for racial discrimination, Plaintiff's state law claim for

28

wrongful discharge should also be dismissed, and Market America incorporates those arguments herein by reference.

CONCLUSION

Wherefore, Defendant respectfully requests the Court grant its motion for summary judgment as a matter of law and for such other relief as the Court deems just and proper.


Respectfully submitted this the 21st day of May, 2021.

/s/Camilla F. DeBoard
Camilla F. DeBoard
Attorney for Defendant
NC Bar No. 41265


OF COUNSEL:

Teague Rotenstreich Stanaland Fox & Holt, P.L.L.C.
Post Office Box 1898
Greensboro, NC  27402-1898
Telephone:  (336) 272-4810
Facsimile:  (336) 272-2448
E-mail: cfd@trslaw.com

## CERTIFICATE OF WORD COUNT

The undersigned counsel hereby certifies that this response memorandum complies with the word count requirement pursuant to Rule 7.3(d)(1) and does not exceed 6,250 words, as counted by the word processing software utilized by counsel for Defendant.

Respectfully submitted this the 21st day of May, 2021.

/s/Camilla F. DeBoard
Camilla F. DeBoard
Attorney for Defendant
NC Bar No. 41265

OF COUNSEL:

Teague Rotenstreich Stanaland Fox & Holt, P.L.L.C.
Post Office Box 1898
Greensboro, NC  27402-1898
Telephone:  (336) 272-4810
Facsimile:  (336) 272-2448
E-mail: cfd@trslaw.com

CERTIFICATE OF SERVICE

     I hereby certify that on May 21, 2021, I electronically filed the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of filing to the following:

     Angela N. Gray
     Gray Newell Thomas, LLP
     7 Corporate Center Ct, Ste. B
     Greensboro, NC 27408
     Email: angela@graynewell.com

     This the 21st day of May, 2021.


                         /s/Camilla F. DeBoard
                         Camilla F. DeBoard
                         Attorney for Defendant
                         NC Bar No. 41265


OF COUNSEL:

Teague Rotenstreich Stanaland Fox & Holt, P.L.L.C.
Post Office Box 1898
Greensboro, NC  27402-1898
Telephone:  (336) 272-4810
Facsimile:  (336) 272-2448
E-mail: cfd@trslaw.com