IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:18-cv-1046

| | | |
|---|---|---|
| HUI MINN LEE, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | *Plaintiff's Memorandum in Opposition to* |
| vs. | ) | *Defendant's Motion for Summary Judgment* |
| | ) | |
| | ) | |
| MARKET AMERICA, INC., | ) | |
| *Defendant*. | ) | |

## STATEMENT OF RELEVANT FACTS

The plaintiff, Hui Minn Lee, also known as "Nadine", began her exceptional career with Market America in September, 2000 when she was hired as a Distributor Service Representative working from the Greensboro, NC office. She is of Taiwanese origin, and speaks multiple languages, including English, Mandarin (Chinese) and Taiwanese. (Exhibit A, Lee Declaration @ ¶¶4-5). From the onset, Lee was recognized by her superiors as an exceptional and proven asset to the company. Upon review of Lee's job performance evaluations as far back as 2000, she was highly regarded and acknowledged by Market America executives as knowledgeable of her job priorities, for having wonderful working relationships with co-workers and others, inside and outside of her department, and for strong contributions to Market America's worldwide success. (Exhibit B, Job Performance Evaluations). These attributes were rewarded throughout Lee's long service at Market America with monetary increases in salary and job promotions.

In or around October 2002, Market America recognized the advantages of placing Lee in a training position because of her exemplary language skills. She was promoted to the position of Trainer in the Training and Development Department. In that capacity, she was responsible for

Case 1:18-cv-01046-WO-JLW   Document 36   Filed 06/04/21   Page 1 of 21

developing training materials for special projects in both English and Chinese, as well as training Market America's employees nationally in Asia, the United Kingdom and the United States. (Exhibit A, Lee Declaration @ ¶6).

In or around November 2013, Market America hired Liliana Camara ("Camara"), an employee of Colombian origin as an entry-level Spanish-speaking Training Specialist. Lee was tasked with training and supervising Camara. Lee continued to assist Camara as Camara progressed into a training position. However, from the beginning of Camara's employment with Market America, Camara expressed discriminatory beliefs and opinions about her preference for hispanic employees. For example, Camara informed Lee that she would "always try to take care of every hispanic in the company" and would "despise anyone not taking care of his or her own", meaning that Camara felt it was her responsibility to "take care" of other hispanic employees of Market America. (Exhibit A, Lee Declaration @ ¶¶11-12).

At the same time Camara expressed a preference for hispanic employees, she expressed her dislike for Lee. For example, and among other things, Camara negatively referred to "culture" issues between them. The culture differences referenced by Camara included racial and national origin issues because Lee is Taiwanese. (Exhibit A, Lee Declaration @ ¶13). Camara does not flat-out deny that she made comments regarding cultural differences between she and Lee, rather she testified that she could not recall such comments. (Exhibit C, Camara depo. @ p. 97, lines 7-20).

As Camara's attitude continued to negatively impact Lee, in mid-December, 2016, Lee complained about Camara's conduct to Sherry Spesock, the Director of Human Resources for Market America. (Exhibit D, Spesock depo. @ p. 7, lines 14-24; Exhibit A, Lee Declaration @ ¶26). Lee informed Spesock that she believed Camara had created a hostile work environment

2

for her because of her race and national origin. (Exhibit A, Lee Declaration @ ¶26). Spesock confirmed that Lee reported to her that Camara had made statements that Camara felt there were cultural differences between she and Lee that impacted their ability to work together. Spesock admitted that Lee's report prompted her to have a conversation with Camara wherein she warned Camara to manage everybody the same. (Exhibit D, Spesock depo. @ p. 40, line 23- p. 42, line 16).

Likewise, Lee complained to her then supervisor, Colbert Trotter ("Trotter"), that Camara's discriminatory treatment of her was negatively impacting her job. Notwithstanding, in or around August 2016, Trotter promoted Camara to a supervisory position that had not been posted or otherwise been open to applications. Upon learning of Camara's promotion, Lee again complained to Trotter that she should have been informed of the open position and felt Camara had been handpicked for the supervisory position. Further, Lee complained to Trotter that Camara had a discriminatory animus toward her based on race and as a result, Camara would negatively affect Lee's employment. (Exhibit A, Lee Declaration @ ¶¶15-16). In response to Lee's complaints and in an effort to decrease Camara's authority over Lee, Trotter agreed to retain supervisory authority over Lee. Trotter also re-titled Lee's position to Global Training Project Manager. (Exhibit A, Lee Declaration @ ¶16; Exhibit C, Camara depo. @ p. 31, line 25- p. 32, line 10).[1]

Lee remained the most accomplished and highest-ranking employee in the Training and Development Department until her discriminatory discharge in October 2017. Throughout her tenure with Market America, she created, developed and trained staff in the three (3) languages

[1] Lee was not involved in the hiring of Camara. At the time of Camara's hire, Lee had been an employee of the Defendant for over thirteen (13) years and possessed a higher-ranking position than Camara. Camara was the Plaintiff's subordinate. Yet, the Plaintiff was required to fulfill Camara's job responsibilities during Camara's extensive absences from work. (Lee Declaration @ ¶14).

3

throughout three (3) different departments within Market America, including Distributor Service, Computer Support, and Preferred Customer Support. In addition to creating, developing, and revising such trainings, Lee personally conducted Distributor Service Training, PIM Training, MPCP Training (the most critical corporate-level training at Market America) in multiple languages, as well as additional trainings in Mandarin. Lee conducted an average of thirty (30) trainings per year, with responsibilities for said trainings expanding to include additional overseas training when Market America commenced international operations. (Exhibit A, Lee Declaration @ ¶¶7-9).

Lee also conducted start-up and advanced training in their international offices, which often required international travel for weeks or over one (1) month including, without limitation:

a.    Taiwan Call Center Start-Up and Follow-Up Training in 2005 and 2006;

b.    Creating training materials to support Market America's opening of an office in Hong Kong in 2007;

c.    Philippine Call Center Start-Up Training in 2010;

d.    United Kingdom Call Center Start-Up Training in 2012;

e.    Singapore Call Center Start-Up Training in 2014;

f.    Hong Kong and Taiwan Advanced Trainings in 2014;

g.    Malaysia Call Center Start-Up Training in 2017.

(Exhibit A, Lee Declaration @ ¶10).

After Trotter left Market America in November, 2016, Camara was promoted to Head of the Training Department[2], and Lee was informed that Camara was "going to be [her] boss."

---

[2] In or around December 2016, while Plaintiff was taking personal time off work ("PTO"),  Camara was awarded a *de facto* promotion to "head" of the Training Department. Again, prior to Camara's second promotion, Lee was unaware that there was an open supervisory position. The Defendant had not posted or otherwise informed its staff that an open supervisory position existed for which it was seeking applications. (Exhibit A, Lee Declaration @ ¶18).

4

Lee's job responsibilities were discussed during a January, 2017 meeting with Spesock and Camara. Lee's responsibilities remained the same with the concentration of her efforts on "anything that had to do with Mandarin or Asian country markets." (Exhibit C, Camara depo. @ p. 68, line 7- p. 69, line 4; Exhibit A, Lee Declaration @ ¶¶17, 19). Lee likewise continued to perform her role of domestic and international trainings for employees of Market America, and was responsible for setting her own schedule which did not have to be approved by Camara. (Exhibit C, Camara depo. @ p. 18, lines 12-17). Lee was responsible for preparing all of the materials related to Mandarin training. (Exhibit C, Camara depo. @ p. 57, line 23- p. 58, line 2).

After Camara became Lee's immediate supervisor beginning in approximately January, 2017, she had the authority to terminate and replace Lee, and immediately started a campaign to do just that. Camara testified that she, Spesock and Brandi Foster had concerns about the overall quality of Lee's trainings, however, she admits that none of these concerns were addressed to Lee. (Exhibit C, Camara depo. @ p. 21, lines 2-10). Furthermore, Camara admits that she never observed Lee perform or conduct any trainings. (Exhibit C, Camara depo. @ p. 9, lines 15-23; p. 12, line 16- p. 13, line 3; p. 14, lines 10-25; p. 15, lines 1-5). In addition, with all of the trainings conducted by Lee throughout the US, Malaysia, Singapore, Taiwan and Great Britain, Camara could only identify one individual who complained about Lee. (Exhibit C, Camara depo.@ p. 24, line 8-p. 26, line 10).

Camara testified that Lee was not a team player and refused to work on the Confluence Project, though Camara says she never disciplined her for that failure. (Exhibit C, Camara depo. @ p. 42, line 25- p. 43, line 18). Furthermore, Lee's alleged refusal to work on the Confluence Project occurred while Trotter was Lee's supervisor and Camara had no authority to direct Lee's assignments. (Exhibit C, Camara depo. @ p. 53, lines 6-19). Trotter never disciplined Lee for

5

failing to learn how to use Confluence. (Exhibit C, Camara depo. @ p. 54, lines 2-5). In fact, many of Camara's complaints about Lee's job performance occurred in 2016 when Lee was supervised by Trotter. And, upon review of Trotter's job performance evaluations of Lee between 2013 and 2016, Trotter reflects a belief that Lee was a very competent, very knowledgeable and well-regarded employee. (Exhibit B, Job Performance Evaluations; Exhibit C, Camara depo. @ p. 44, lines 6-25). Trotter stated in Lee's job performance evaluation for the 2015-2016 year review, "Nadine does an exceptional job managing the needs of all markets. … Nadine is a yes person who does not have the word no in her vocabulary. … with almost sixteen years with Market America, she sets the bar high as her work is flawless and her knowledge of Market America is extensive. … she is a go-to person for many in the company… . (Exhibit C, Camara depo. @ p. 36, lines 9-19; p. 45, lines 4-11; Exhibit B, Job Performance Evaluations, MA286). Prior to Camara's hire, Lee had never received a job performance evaluation below "meets expectations" on teamwork-related sections of performance evaluations and was indeed awarded ratings of "exceptional" or "exceeds expectations" on a frequent basis. (Exhibit A, Lee Declaration @ ¶23).

Camara testified that she wanted her trainers to be cross trained, yet Lee was the only member of the training team who was able to conduct training in Mandarin. (Exhibit C, Camara depo. @ p. 57, lines 5-11, 20-22). In an effort to engage in Camara's cross training initiative, Lee consistently requested that Camara hire a mandarin speaking trainer to assist her; however, Camara refused. (Exhibit A, Lee Declaration @ ¶28). Instead, in May 2017, Camara hired Delia Zepeda, a Spanish-speaking junior trainer under the age of forty (40) years and not of Taiwanese origin. Zepeda could not speak Mandarin. (Exhibit A, Lee Declaration @ ¶29).

During the month of August, 2017, Lee was required to conduct training for Market America's Malaysian staff via teleconference. Due to the significant time difference, Lee worked late night hours through the very early morning hours. Nonetheless, Camara informed Lee that she was still expected to maintain normal office hours of 9am-5pm in the Greensboro, NC office. In fact, Camara demanded that Lee be available to work twenty-four (24) hours, seven (7) days per week. (Exhibit A, Lee Declaration @ ¶32).

As a result of the foregoing work demands and Camara's continued discriminatory attitude toward Lee, Lee requested a leave of absence from work between the end of October through early December, 2017 using the thirty (30) days of PTO she had accumulated. The leave request was approved and Lee was scheduled to begin leave in approximately mid-October, 2017. (Exhibit A, Lee Declaration @ ¶33). However, on October 5, 2017, Lee was called into Spesock's office where, along with Camara, she was terminated. (Exhibit C, Camara depo. @ p. 75, line 17- p. 76, line 24). Prior to her termination, the Plaintiff had neither been reprimanded nor received any warnings or progressive discipline for poor job performance. (Exhibit A, Lee Declaration @ ¶; Exhibit D, Spesock depo. @ p. 27, lines 6-15). Further, Lee was never told that she was in jeopardy of losing her job because she was not performing it properly. (Exhibit C, Camara depo. @ p. 40, line 23- p. 41, line 2).

According to Spesock, she and Camara determined that Lee's position was not something they needed for the department and decided they needed more of a training specialist who would do multiple trainings for the department. (Exhibit D, Spesock depo. @ p. 21, line 2-6). Yet, Spesock testified that she NEVER supervised Lee and only knew about Lee's job responsibilities and performance based on information provided to her by Camara. (Exhibit D, Spesock depo. @ p. 8, lines 17-25). Spesock admits that she observed Lee perform training only once. (Exhibit D,

7

Spesock depo. @ p. 17, line 10- p. 18, line 2). Spesock has no first-hand knowledge Lee's job duties, day-to-day activities or interactions with other employees. (Exhibit D, Spesock depo. @ p. 18, line 25- p. 19, line 15). Spesock participated in only one job performance review of Lee's job performance in 2016, solely because Camara had not supervised Lee throughout the entire performance period and therefore could not assess Lee's job performance during that time. (Exhibit D, Spesock depo. @ p. 9, lines 1-5; p. 12, lines 14-15). There was no job performance evaluation for the year 2017. (Exhibit D, Spesock depo. @ p. 12, lines 17-25). Also, in the 2016 performance evaluation, Lee was given an "exceeds expectations" as it pertained to co-worker interactions. (Exhibit D, Spesock depo. @ p. 13, lines 6-16). As it pertained to business knowledge, Spesock admitted that Lee received the highest rating of "exceptional". (Exhibit D, Spesock depo. @ p. 11, lines 8-24). In fact, in 2015, Lee was considered to have been doing an "exceptional job as Global Trainer" for Market America. (Exhibit D, Spesock depo. @ p. 17, lines 3-8).

Without posting for a training specialist position, Spesock and Camara identified Rose Chaffin ("Chaffin") as the individual who would replace Lee. (Exhibit D, Spesock depo. @ p. 21, line 14- p. 23, line 12; Spesock depo. @ p. 27, line 3-5). Spesock admitted that Chaffin did not have any experience in training at the time she was hired to the training specialist position. (Exhibit D, Spesock depo. @ p. 58, line 10- p. 60, line 4).

After her termination, Lee asked Spesock if there was another position she could be transferred to within Market America, even if it required her to return to a lesser position. Despite job postings seeking applicants who possessed Lee's bilingual ability and Lee applying for those positions, she was never again contacted by Market America. (Exhibit A, Lee Declaration @ ¶36; Exhibit D, Spesock depo. @ p. 52, line 7- p. 57, line 6).

## ARGUMENT

### I. PLAINTIFF'S CLAIMS FOR WRONGFUL TERMINATION BASED ON RACE AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF THE EEPA (N.C.G.S. §143-422.2), TITLE VII AND 42 U.S.C. §1981 SHOULD NOT BE DISMISSED[3]

Given the similar language and underlying policy of N.C.G.S. §143–422.2 (the EEPA) and Title VII, 42 U.S.C. § 2000e *et seq.,* the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under § 143–422.2 insofar as they do not conflict with North Carolina statutes and case law. *North Carolina Dep't of Correction v. Gibson,* 308 N.C. 131, 301 S.E.2d 78, 82–85 (1983). The Plaintiff here has also filed a claim of race discrimination in violation of 42 U.S.C. §1981. The Fourth Circuit has held that § 1981 actions also serve to protect at-will employees from race discrimination. *Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1018–19 (4th Cir.1999), and the required elements of a prima facie case of employment discrimination are the same under Title VII and § 1981. *Gairola v. Com. of Va. Dep't of Gen. Servs.,* 753 F.2d 1281, 1285–86 (4th Cir.1985). Based on the foregoing, the plaintiff's claims for wrongful termination based on race and national origin discrimination are evaluated in the same fashion under the EEPA[4], Title VII and 42 U.S.C. §1981[5].

---

[3] For purposes of summary judgment, Lee concedes that the evidence produced during discovery supports race and national origin discrimination. Therefore, the plaintiff stipulates to a dismissal of her age discrimination claims under the EEPA and Title VII.

[4] The EEPA provides that [i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees. "Our Supreme Court has directed that we look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." *Youse v. Duke Energy Corp.,* 171 N.C.App. 187, 193, 614 S.E.2d 396, 401 (2005) (quotations omitted) (citing *Dept. of Correction v. Gibson,* 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983)). *Johnson v. Crossroads Ford, Inc.,* 230 N.C. App. 103, 110, 749 S.E.2d 102, 107 (2013). "… we have held … that a North Carolina state cause of action for wrongful discharge is stated by a claim that an employee is separated from employment because of her sex when the cause of separation is her refusal of sexual favors to her supervisor, then, when the record indicates, as it does in this case, that her separation may have been caused because

Under the *McDonnell Douglas* framework, a plaintiff's prima facie case of discrimination creates an inference that the adverse employment action was based on unlawful discrimination. To establish a prima facie case of discriminatory discharge, Lee must show: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) at the time of the adverse employment action, she was performing at a level that met the Defendant's legitimate job expectations; and 4) the position was filled by a similarly qualified applicant outside the protected class or remained open. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Bibichev vs. Triad Int'l Maint. Corp*., 951 F. Supp. 2d 839, 846 (M.D.N.C. 2013). Other circumstances giving rise to an inference of unlawful discrimination may also be used to satisfy the fourth prong. *E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 851 n. 2 (4th Cir.2001).

If the plaintiff can establish a prima facie case, the employer must then give a legitimate, non-discriminatory reason for its action in order to rebut that inference. *McDonnell Douglas,* 411 U.S. at 802. An employer's burden is one of production, not of persuasion. *Causey v. Balog,* 162 F.3d 795, 800 (4th Cir.1998). If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by

---

of her race, we are of opinion and hold that she has stated a cause of action under the state law of North Carolina under § 143–422.2." *McLean v. Patten Communities, Inc.,* 332 F.3d 714, 721 (4th Cir. 2003).
[5] 42 U.S.C. § 1981 prohibits, *inter alia,* "discrimination in employment on the basis of race." *Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 551–52 (4th Cir.2006). 42 U.S.C. § 1981(a) provides: "All persons within the Jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Unlike Title VII however, there is no administrative filing requirement and the statute of limitations under 42 U.S.C. §1981 is four (4) years. *See* 28 U.S.C. § 1658. In *Johnson,* the Supreme Court emphasized that a party proceeding under §1981 is not restricted by the administrative and procedural requirements of Title VII. *See also James v. Circuit City Stores, Inc.,* 370 F.3d 417, 420–21 (4th Cir.2004)(applying four-year statute of limitations under § 1658 to claims of post-contract-formation employment discrimination under § 1981).

discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *McDonnell Douglas,* 411 U.S. at 804.

Here, the defendant argues that the plaintiff's claims for wrongful termination based on national origin and race discrimination should be dismissed because her job performance was substandard, she was replaced by an individual in the same class, and it had a legitimate reason to terminate her.

As to Lee's job performance, the facts show that she has produced sufficient evidence to show that she was performing to her employer's expectations at the time of her termination. The "flexibility" of the *McDonnell Douglas* framework contemplates that a plaintiff may meet her burden on summary judgment by evidence that creates a question of fact whether the "proffered 'expectation' is not, in fact, legitimate at all." *Id .; see also Inman v. Klockner Pentaplast of America, Inc.,* 347 F. App'x 955, 960 (4th Cir.2009) (reversing grant of summary judgment because plaintiff presented sufficient evidence where jury could conclude that deficiencies claimed by defendant "were exaggerated to cover up the [improper] motivation ... and that any such deficiencies were not sufficient to prevent his performance from being adequate").

In the present case, Market America never alleged that Lee was terminated for poor or substandard job performance. Rather, her immediate supervisor, Camara, testified that she terminated Lee because Lee was not a team player. (Camara depo. @ p. 78, lines 1-23; Spesock depo. @ p. 27, line 23- p. 28, line 8). Typically, an allegation by an employer of an employee not being a team player would fall into the category of insubordination. Here, however, no such assertion is made. Camara testified that Lee was never reprimanded for insubordination. (Camara depo. @ p. 36, lines 13-15).

11

Market America maintains an employee handbook which addresses issues related to dismissals from employment. It lists acts and conduct which would typically rise to the level warranting immediate termination; however, pursuant to that policy, there is no allegation that Lee engaged in any conduct which would fall into that category. (Exhibit F, Handbook p. MA738).

The company's policy related to discipline other than immediate dismissal is likewise documented in its Employee Handbook.  (Exhibit F, Handbook p. MA738-739). Pursuant to Market America's policy, and as corroborated by Camara's testimony, verbal warnings were required to be documented and dated with the content of any discussions the manager had with the employee. (Exhibit C, Camara depo. @ p. 79, line 20- p. 80, line 4; Exhibit F, MA739). Camara admits that she never documented any verbal warnings regarding Lee because she never gave Lee any verbal warnings. (Exhibit C, Camara depo. @ p. 80, lines 7-11).

Furthermore, Market America's policy regarding written warnings required that a written warning be presented to the employee by the manager to clearly identify specific conduct or performance warranting a warning. Again, Camara admits that neither she nor Spesock ever provided such to Lee. (Exhibit C, Camara depo. @ p. 80, line 12- p. 81, line 14; Exhibit F, MA739). Here again, no such discipline was issued to Lee which infers that she did not engage in conduct which merited either dismissal or discipline other than immediate dismissal.

Market America argues that Lee was the only person who perceived her job performance as satisfactory; however, the facts show that not only did Lee perceive her job performance to be satisfactory, so did her superiors (except for Camara). In support of its argument of dismissal based on poor job performance, Market America relies on the court's holding in *Mitchell vs. Data Gen. Corp.*, 12 F.3d 1310, 1316-17 (4th Cir, 1993). Its reliance is misplaced since the facts

in *Mitchell* are clearly distinguishable from the present facts. Unlike in *Mitchell,* where the facts showed that the plaintiff had positive job ratings, but had been documented for failing to show initiative and other deficiencies, the plaintiff here never received such documented deficiencies.

Evidence that the plaintiff was not a team player is solely based on Camara's conclusory allegations which are unsupported by any other employee or document. Camara admitted that she had received no complaints from anyone regarding Lee's job performance. (Camara depo. @ p. 75, lines 12-16). Spesock testified that she NEVER supervised Lee and only knew about Lee's job performance based on information provided to her by Camara. (Spesock depo. @ p. 8, lines 17-25). Spesock admits that she had no first-hand knowledge of Lee's interactions with other employees. (Spesock depo. @ p. 18, line 25- p. 19, line 15). There was no job performance evaluation for the year 2017 (Spesock depo. @ p. 12, lines 17-25); and, in the 2016 performance evaluation, Lee was given an "exceeds expectations" as it pertained to co-worker interactions. (Spesock depo. @ p. 13, lines 6-16). As it pertained to business knowledge, Spesock admitted that Lee received the highest rating of "exceptional". (Spesock depo. @ p. 11, lines 8-24). In 2015, Lee was considered to have been doing an "exceptional job as Global Trainer" for Market America; (Spesock depo. @ p. 17, lines 3-8) and, in August 2017, Lee received a letter from Brandi Quinn commending Lee for an outstanding job performance at the 2017 International Conversation. (Exhibit G, MA 280).

Camara testified that Lee's lack of teamwork was evidenced by two incidences when Lee refused to conduct new-hire training in Mandarin for customer service representatives who spoke predominately Mandarin; however, the plaintiff's rebuttal that she was a team player and performed her training well is supported not only by her testimony, but also by the testimony of Qilin Cheng, a new-hire trainee who was trained by Lee. Cheng attended the March, 2017

Unfranchise Services Mandarin-Speaking new hire training that was taught by Lee. The training was conducted in Mandarin for customer service representatives who predominately spoke Mandarin and could not understand the English training. During the training, Cheng declares that Lee was exceptional, very informative and eager to teach. Cheng found Lee's training style to be very engaging and well performed. Cheng also declared that Lee was always available to answer questions and explain issues in detail. Moreover, Cheng found Lee to be a team player who worked well with others. (Exhibit H, Cheng Declaration). The only other alleged complaint against Lee, according to Camara, was made by Rose Chaffin. This conclusory, hearsay, self-serving statement must be disregarded. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Moreover, for purposes of summary judgment, the facts most be viewed in the light most favorable to Lee, the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Market America seems to argue that Lee's lack of teamwork is evidenced by her suggestion that Market America hire another training specialist to assist her because of the significant demands placed upon her, including travel to Asia and late-night training to accommodate the Asian market which was on a time difference. However, that was not an articulated reason for Lee's termination.

The facts in this case are analogous to those in *Murry vs. Jacobs Technology, Inc.* 2012 WL 1145938. In *Murry*, the court held that there was a question of fact regarding whether Mr. Murry was meeting AT&T's *legitimate* expectations where Mr. Murry provided evidence that, prior to his termination, no one at AT&T had alerted him that his performance was deficient. *See Reed v. Buckeye Fire Equip.,* 241 F. App'x 917, 927 (4th Cir.2007) (finding that there was a triable issue of fact where there was no documentation of the alleged problems with plaintiff's

performance or work habits).

Finally, there is no evidence that Lee's alleged poor job performance created the potential for significant damage. Camara admits in her testimony that she had no evidence of, and no way of determining any loss of clients or financial revenue to the company based on Lee's alleged lack of teamwork. (Exhibit C, Camara depo. @ p. 54, lines 10-16).

The defendant next argues that Lee was replaced by an individual within her protected class of age and national origin, and therefore the case must be dismissed. The facts, however, show otherwise. According to Spesock, after Lee was terminated from the position of Global Training Projects Manager, the position was eliminated and no one was *ever* hired to that position. (Spesock depo. @ p. 29, lines 4-10). In *Dyer v. City of Gastonia*, 164 F.Supp.3d 777 (W.D.N.C. 2016), the court held in this wrongful termination case that the plaintiff had not technically been replaced because her position had been eliminated. Thus, the position remained open. Although Camara allegedly replaced Lee with Chaffin, Camara admits that Chaffin was not qualified to work at Market America as a Global Training Projects Manager. (Exhibit C, Camara depo. @ p. 94, lines 19-22). We believe the facts in this case create a genuine dispute as to whether the position remained open after Lee's termination and therefore summary judgment must be denied.

Alternatively, the plaintiff has produced sufficient evidence to show that she was replaced by an unqualified employee within her protected class; and/or, she was replaced by someone outside of her protected class. Camara testified that after Lee's termination, she replaced her with Rose Chaffin, primarily because Chaffin is bilingual in Mandarin and English. (Exhibit C, Camara depo. @ p. 81, lines 15-24). Yet, Camara admits that Chaffin was not hired to take Lee's position as the Global Training Projects Manager. (Exhibit C, Camara depo. @ p.

83, lines 13-21). In fact, Camara testified that Lee's job responsibilities were divided between herself, Henri Hue, Abby and Chaffin. (Exhibit C, Camara depo. @ p. 85, lines 2-25).

At the time Camara transferred Chaffin to the training specialist position, she was unaware of Chaffin's overall qualifications. In fact, the only application on file with Market America by Chaffin was for the position of Unfranchised Services Representative. (Exhibit C, Camara depo. @ p. 90, lines 12-21). Likewise, Spesock did not review Chaffin's application, did not hire her and stated that "[Rose] was able and capable of doing the job based on her previous experience as a teacher." Chaffin's application, however, indicates that the only teaching experience she had was working part-time teaching Chinese for students K-11[th] grade from 2014-2016 in Kernersville, North Carolina. (Spesock depo. @ p. 24, line 9- p. 25, line 15). Further, Chaffin stated on her application that she had worked as a cashier, waitress, retail sales associate, retail store manager and restaurant manager. (Spesock depo. @ p. 25, line 16- 23;). She identified no previous experience as a corporate trainer. (Exhibit I, Chaffin Application).

In addition, Lee's job responsibilities were numerous and encompassed much more than new hire trainings in Mandarin. (Exhibit A, Lee Declaration @ ¶¶7-10). By Camara's own admission, Chaffin replaced only the Mandarin training aspects of Lee's position. (Exhibit C, Camara depo. @ p. 94, lines 19-22).

Finally, even though Market America articulated an alleged legitimate reason for terminating Lee, Lee has produced sufficient evidence that the alleged reason lacks veracity and was motivated based on discriminatory reasons. The burden a plaintiff bears in meeting a prima facie case "is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To show pretext, a Plaintiff may introduce evidence to show

16

that "the employer's proffered explanation is unworthy of credence," *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir.2007).

The facts show that Camara could not have terminated Lee prior to Colbert's separation from employment with Market America in November, 2016 because Camara did not have the authority to do so. The time within which Camara had the authority to terminate Lee and the actual date of Lee's termination was a relatively short window of time. Between approximately December, 2016 and October 5, 2017 when Lee was ultimately terminated, Camara clearly set out on a path to terminate Lee. In December 2016, Camara quickly stripped Lee of her MPCP training responsibilities, and Camara then gave those responsibilities to Henri Hue, a male of African origin who was under age forty (40) years, whom Camara had hired approximately one (1) year prior. At the time Hue was given the MPCP training responsibilities, he was a junior trainer and was subordinate to Lee. (Exhibit A, Lee Declaration @ ¶¶19-20).

Camara likewise began to make unreasonable demands of Lee. During the month of August, 2017, Lee was required to conduct training for the Market America's Malaysian staff via teleconference. Due to the significant time difference, Lee worked late night hours through the very early morning hours. Nonetheless, Camara informed Lee that she was still expected to maintain her normal office hours of 9am-5pm in the Greensboro, NC office. In fact, Camara demanded that Lee be available to work twenty-four (24) hours, seven (7) days per week. (Exhibit A, Lee Declaration @ ¶32).

Camara also accused Lee of "dumping UFO Services Training on [Camara]" despite the fact that Lee had been told to cease conducting UFO Services Training by Trotter in order to cover some of the duties previously held by Trotter's predecessor, Amanda Clarida. In response, Camara repeatedly described these and other problems to Lee as "cultural differences." In each

instance cited by Camara, she inferred that the racial differences between she and Lee were a root source of Camara's inability to work with her. (Exhibit A, Lee Declaration @ ¶¶24-25).

Camara's subjective and conclusory allegations against Lee are the only facts Market America has to support its "legitimate" reason for termination. Thus, Lee's evidence allows a jury to conclude that the deficiencies claimed by the defendant were exaggerated to cover up the [improper] motivation ... and that any such deficiencies were not sufficient to prevent her performance from being adequate.

Finally, contrary to the defendant's argument that Lee's statements regarding discriminatory animus are conclusory, the facts show that Camara admits to making statements regarding the cultural differences between she and Lee in the context of Lee's job performance.

## II. PLAINTIFF'S CLAIM FOR RETALIATION IN VIOLATION OF 42 U.S.C. §1981 SHOULD NOT BE DISMISSED

At the summary judgment stage, the movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the present case, the defendant has failed to move for summary judgment on this claim. Therefore, the plaintiff's claim for retaliation must succeed to trial.[6]

This the 4th day of June, 2021.

GRAY NEWELL THOMAS, LLP

---

[6] In this court's memorandum opinion and order on the Defendant's Partial Motion to Dismiss entered March 17, 2020, it recognized that the plaintiff had brought eight claims against Market America, including a claim for retaliation under 42 U.S.C. §1981. (Order, pg. 1, ¶1). It further acknowledged that the defendant did not move to

18

BY:    /s/ Angela Gray
       Angela Newell Gray
       7 Corporate Center Court, Suite B
       Greensboro, NC  27408
       Telephone:    (336) 285-8151
       Facsimile:    (336) 458-9359
       Email:        angela@graynewell.com
       *Attorney for Plaintiff*
       NC Bar # 21006

---

dismiss plaintiff's § 1981 claims. (Order, pg. 11, ¶3). Therefore, the retaliation claim under 42 U.S.C. §1981 remains viable.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:18-cv-1046

| | | |
|---|---|---|
| HUI MINN LEE, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| vs. | ) | *Certificate of Service* |
| | ) | |
| | ) | |
| MARKET AMERICA, INC., | ) | |
| *Defendant*. | ) | |

I, Angela Newell Gray, Attorney for the Plaintiff, do hereby certify that I served the foregoing Plaintiff's Memorandum in Opposition to the Defendant's Motion for Summary Judgment upon counsel for the Defendant shown below by electronically filing the same with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following attorney of record;

Camilla DeBoard; cfd@trslaw.com

This the 4th day of June, 2021.

/s/ Angela Gray
Angela Newell Gray
Gray Newell Thomas, LLP
7 Corporate Center Court, Suite B
Greensboro, NC  27408
Tel:     (336) 285-8151
Fax:     (336) 458-9359
Email: angela@graynewell.com
NC State Bar #21006

Case 1:18-cv-01046-WO-JLW   Document 36   Filed 06/04/21   Page 20 of 21

## VERIFICATION OF COMPLIANCE WITH LOCAL RULE 7.3(d)(1)

The undersigned hereby verifies that the foregoing brief does not exceed 6,250 words.

This the 4th day of June, 2021.

> /s/ Angela Gray
> Angela Newell Gray
> Gray Newell Thomas, LLP
> 7 Corporate Center Court, Suite B
> Greensboro, NC  27408
> Tel:     (336) 285-8151
> Fax:     (336) 458-9359
> Email: angela@graynewell.com
> NC State Bar #21006