Exhibit A

Hui Minn Lee Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:18-cv-1046

HUI MINN LEE,  )
   *Plaintiff*,  )
)
)
vs.  )    *Hui Minn Lee Declaration*
)
)
MARKET AMERICA, INC.,  )
   *Defendant*.  )

I, Hui Minn Lee, declare under penalty of perjury pursuant to 28 USC §1746 as follows:

1. My name is Hui Minn Lee, and I am over the age of eighteen (18) years. I am also known as "Nadine".

2. I give this declaration freely and voluntarily, and I am mentally competent to attest to the facts stated herein.

3. The statements herein are based on my personal knowledge, and are true to the best of my knowledge.

4. I began employment with Market America in September, 2000 when I was hired as a Distributor Service Representative working from the Greensboro, NC office. My position primarily involved responsibility for distributive services' policies, rules and regulations.

5. I am of Taiwanese origin, and speak multiple languages, including English, Mandarin (Chinese) and Taiwanese.

6. In or around October 2002, Market America recognized the advantages of placing me in a training position because of my exemplary language skills. Thus, I was promoted to the position of Trainer in the Training and Development Department. In that capacity, I was

1

responsible for developing training materials for special projects in both English and Chinese, as well as training Market America's employees nationally in Asia, the United Kingdom and the United States.

7. Between October 2002 and October 2017, I was consistently promoted within the Training and Development Department until I held the title of Global Training Project Manager. I remained the most accomplished and highest-ranking employee in the Training and Development Department until my discriminatory discharge in October 2017. Throughout my tenure with Market America, I created, developed and trained staff in the three (3) languages throughout three (3) different departments within Market America, including Distributor Service, Computer Support, and Preferred Customer Support.

8. In addition to creating, developing, and revising such trainings, I personally conducted Distributor Service Training, PIM Training, MPCP Training (the most critical corporate-level training at Market America) in multiple languages, as well as additional trainings in Mandarin. During my tenure with Market America, I conducted an average of thirty (30) trainings per year.

9. My responsibilities for said trainings expanded to include additional overseas training when Market America commenced international operations.

10. During my tenure with Market America, I also conducted start-up and advanced training in their international offices, which often required international travel for weeks or over one (1) month including, without limitation:

    a. Taiwan Call Center Start-Up and Follow-Up Training in 2005 and 2006;

    b. Creating training materials to support Market America's opening of an office in Hong Kong in 2007;

    c. Philippine Call Center Start-Up Training in 2010;

2

d.  United Kingdom Call Center Start-Up Training in 2012;

e.  Singapore Call Center Start-Up Training in 2014;

f.  Hong Kong and Taiwan Advanced Trainings in 2014;

g.  Malaysia Call Center Start-Up Training in 2017.

11. In or around November 2013, Market America hired Liliana Camara ("Camara"), an employee of Colombian origin as an entry-level Spanish-speaking Training Specialist. I was tasked with training and supervising Camara. I continued to assist Camara as Camara progressed into a training position.

12. From the beginning of Camara's employment with Market America, she expressed discriminatory beliefs and opinions about her preference for Hispanic employees. For example, Camara informed me that she would "always try to take care of every Hispanic in the company" and would "despise anyone not taking care of his or her own", meaning that Camara felt it was her responsibility to "take care" of other Hispanic employees of Market America.

13. At the same time Camara expressed a preference for Hispanic employees, she expressed her dislike for me. For example, and among other things, Camara negatively referred to "culture" issues between us. The culture differences referenced by Camara included racial and national origin issues because I am Taiwanese.

14. I was not involved in the hiring of Camara. At the time of Camara's hire, I had been an employee of Market America for over thirteen (13) years and possessed a higher-ranking position than Camara. Camara was my subordinate. Yet, I was required to fulfill Camara's job responsibilities during Camara's extensive absences from work.

15. In or around August 2016, my then-manager, Colbert Trotter ("Trotter"), a white female, promoted Camara to supervise me. Prior to Camara's promotion, I was unaware that there was

3

an open supervisory position. Market America had not posted or otherwise informed its staff that an open supervisory position existed for which it was seeking applications.

16. Upon learning of Camara's promotion, I complained to Trotter that I should have been informed of the open position and felt Camara had been handpicked for the supervisory position. Further, I complained to Trotter that Camara had a discriminatory animus toward me based on race and as a result Camara would negatively affect my employment. In response, Trotter agreed to retain supervisory authority over me and re-titled, without promoting me to the position of Global Training Project Manager.

17. When Trotter left the Training Department at Market America in or around November 2016, the Human Resources Director, Sherry Spesock ("Spesock"), began supervising both the me and Camara.

18. Thereafter, in or around December 2016, while I was taking personal time off work ("PTO"), Spesock awarded Camara a *de facto* promotion to "head" of the Training Department. Again, prior to Camara's second promotion, I was unaware that there was an open supervisory position. Market America had not posted or otherwise informed its staff that an open supervisory position existed for which it was seeking applications.

19. After Camara's promotion to Head of the Training Department, I was informed that Camara was "going to be my boss." Thereafter, during a meeting in December 2016, Camara stripped me of my MPCP training responsibilities. Camara then gave those responsibilities to Henri Hue, a male of African origin who was under age forty (40) years, whom Camara had hired approximately one (1) year prior.

20. At the time Hue was given the MPCP training responsibilities, Hue was a junior trainer and was subordinate to me.

4

21.     I expressed concern to Camara about this change due to the importance of the MPCP Training to Market America's business, the need for consistency in the MPCP Training, and the fact that Hue had never been trained in how to properly conduct the MPCP Training.

22.     Despite my concerns, Camara informed me that Hue needed to be given the opportunity to "build his network, just like she did." Camara further accused me of lacking teamwork and being disobedient to former bosses. Camara again expressed her belief to me that our cultural, meaning racial, differences were problematic for her.

23.     Prior to Camara's hire, I never received a job performance evaluation below "meets expectations" on teamwork-related sections of performance evaluations and was indeed awarded ratings of "exceptional" or "exceeds expectations" on a frequent basis. In fact, during the entirety of the time to which Camara referred, I had received positive performance evaluations and merit pay increases.

24.     Camara also accused me of "dumping UFO Services Training on [Camara]" despite the fact that I had been told to cease conducting UFO Services Training by Trotter in order to cover some of the duties previously held by Trotter's predecessor, Amanda Clarida.

25.     Camara repeatedly described these and other problems to me as "cultural differences." In each instance cited by Camara, she inferred that the racial differences between she and I were a root source of Camara's inability to work with me.

26.     Thereafter, in mid-December, 2016, I complained about Camara's conduct to Spesock. I informed Spesock that Camara had created a hostile work environment for me because of my race and national origin.

27.     Spesock responded by informing me that "if she could survive hostile environment, I should be able to."

5

28.     After Camara assumed responsibility for hiring new personnel within the Training Department, I began repeatedly requesting additional Mandarin-speaking trainers and employees due to the fact that Market America earned the majority of its revenue from Mandarin-speaking customers both domestically and internationally. In Market America's history, Mandarin-speaking training had been considered a major component of the Training Department.

29.     Instead, in or around May 2017, Camara hired Delia Zepeda, a Spanish-speaking junior trainer under the age of forty (40) years and not of Taiwanese origin. Further, Zepeda could not speak Mandarin.

30.     After Camara was given the authority to hire employees on behalf of the Defendant Company, she began consistently hiring individuals under the age of forty (40).

31.     Camara was aware of my complaints to Spesock about her discriminatory acts. As a result, Camara did not have a good working relationship with me and she made every effort to diminish my role within the company.

32.     During the month of August, 2017, I was required to conduct training for the Defendant's Malaysian staff via teleconference. Due to the significant time difference, I worked late night hours through the very early morning hours. Nonetheless, Camara informed me that I was still expected to maintain my normal office hours of 9am-5pm in the Greensboro, NC office. In fact, Camara demanded that I be available to work twenty-four (24) hours, seven (7) days per week.

33.     As a result of the foregoing work demands and Camara's continued discriminatory attitude toward me, I requested a leave of absence from work between the end of October through early December, 2017 using the thirty (30) days of PTO I had accumulated. The leave request was approved and I was scheduled to begin my leave in approximately mid-October, 2017.

34. Notwithstanding, I was terminated on October 5, 2017 while conducting training for the United Kingdom employees. Prior to her termination, I had not received any warnings or progressive discipline for poor job performance.

35. Contrary to what Camara has said about me, I was always a team player as evidenced by statements in my job performance evaluations. I also never resisted the changes Camara wanted to make in the training department once she became my manager. Rather, Camara did not understand how the training department functioned because she lacked experience. She had no significant experience in management and as a result, she made impossible demands. She also did not understand how I conducted my job and she never made an effort to understand it. I never refused to do a training unless it was not a part of my job duties or conflicted with an already scheduled training.

36. After my termination, I asked Spesock if there was another position I could be transferred to within Market America, even if it required me to return to a lesser position. Despite job postings seeking applicants who possessed my bilingual ability and my applying for those positions, I was never again contacted by Market America. (Exhibit E, Job Postings).

*********************************************************************

I declare under penalty of perjury that the foregoing is true and correct.

This the 4th day of June, 2021.

_____
Hui Minn "Nadine" Lee

7