Exhibit C

Liliana Camara Deposition Transcript

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No.: 1:18-cv-1046


HUI MINN LEE,                          )
                                       )
                         Plaintiff,    )    D E P O S I T I O N
                                       )
        vs.                            )
                                       )    * C O P Y *
MARKET AMERICA, INC.,                  )
                                       )
                         Defendant.,   )
                                       )
_____

_____

**LILIANA CAMARA**
_____


101 South Elm Street
Greensboro, North Carolina


Tuesday, April 27, 2021
10:03 o'clock a.m.

_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter



Atlantic Professional Reporters, Ltd.
P. O. Box 11672
Winston-Salem, NC 27116-1672
(336) 945-9047
(800) 717-0001

NOTES

PAGE LINE          SUBJECT MATTER          RELATES TO          ACTION

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____



## APPEARANCES OF COUNSEL

Angela Gray, Esq.
**GRAY NEWELL THOMAS, LLP**
7 Corporate Center Court, Suite B
Greensboro, North Carolina 27408

Camilla F. Deboard, Esq.
**TEAGUE ROTENSTREICH STANALAND FOX & HOLT, LLP**
101 South Elm Street, Suite 350
Greensboro, North Carolina  27401

OTHER APPEARANCES

Hui Minn Lee


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 4 of 110

<u>I N D E X</u>

STIPULATIONS                                              5
EXAMINATION

    Ms. Gray                                          6

─────────────────────────

CONFIDENTIAL PORTION                                 88-94
ADJOURNMENT                                            107
CERTIFICATE OF TRANSCRIPT                              108
CERTIFICATE OF OATH                                    109

<u>E X H I B I T S</u>

<u>Name</u>                    <u>Offered By</u>              <u>Identified</u>

None offered


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 5 of 110

## STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated before *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large.

The deposition was conducted for use in accordance with and pursuant to the applicable rules or by order of any court of competent jurisdiction.

Reading and signing of the testimony was not requested prior to the filing of same for use as permitted by applicable rule(s).

Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 6 of 110

1                    The witness, LILIANA CAMARA, being first

2          duly sworn to state the truth, the whole truth and

3          nothing but the truth, testified as follows:

4              (10:03 o'clock a.m.)

5                              EXAMINATION

6          BY MS. GRAY:

7              Q.    Good morning, Ms. Camara.

8              A.    Good morning.

9              Q.    How are you?

10             A.    Doing fine.

11                   How are you.

12             Q.    Good.

13                   So my name is Angela Gray, and I am

14         representing Nadine Lee in a lawsuit that she's

15         filed against Market America regarding her

16         termination of employment.

17                   Are you aware that you are here today to

18         give deposition testimony with regard to that case?

19             A.    Yes, I am.

20             Q.    Okay.  Great.

21                   And we'll just let you state your full

22         name on the record.

23             A.    Liliana Camara.

24             Q.    Okay.  Now, are you currently employed at

25         Market America?



1       A.   No.

2       Q.   Okay.  How long have you been separated

3   from employment at Market America?

4       A.   Over three years now.  March 2018, I

5   believe it was.

6       Q.   2018?

7       A.   Yes.

8       Q.   Okay, and where are you currently

9   employed?

10      A.   I am self-employed.

11      Q.   Oh, I see.

12           And do you still live here in this area?

13      A.   Yes.

14      Q.   Okay, and what's your company name?

15      A.   Spanish Speaking, LLC.  I own two

16   companies.  And then Atvara Hot Yoga Lounge.

17      Q.   Okay.

18      A.   It's a yoga studio.

19      Q.   Okay, and is that the only work you've

20   primarily done since you left Market America in

21   2018?

22      A.   Yes.

23      Q.   Okay.  Now, what, if anything, did you do

24   to prepare for today's deposition?

25      A.   I reviewed some emails.



```
1          Q.    Anything else?

2          A.    That's it.

3          Q.    That's it?

4          A.    That's it.

5          Q.    Have you looked at the pleadings in this

6    case?

7          A.    No.

8          Q.    And have you looked at a document that's

9    entitled Defendant's Initial Disclosures?

10          A.    No.

11          Q.    You haven't?

12          A.    No.

13          Q.    Okay.  Well, just according to that

14    document, I would submit to you that you have been

15    identified as a witness who has knowledge of various

16    things pertaining to Ms. Lee.  And I'm going to talk

17    to you about those various things that pertain to

18    Ms. Lee.  And just one at a time.  Okay?

19                Because there's about four or five things

20    that you have been identified as having knowledge

21    of.

22                And so that's primarily what I want to

23    talk to you about today.  Okay?

24          A.    Okay.

25          Q.    Now, my understanding is that at the time
```



1    Ms. Lee left Market America in October of 2017, you

2    were her supervisor.  Is that correct?

3          A.   Correct.

4          Q.   Okay, and as her supervisor, what was your

5    interaction with Ms. Lee generally on a day-to-day

6    basis?

7          A.   We would be in meetings, talk personally

8    or exchange emails about whatever was going on for

9    the training department.

10         Q.   Did you physically work in the same

11   office?

12         A.   Yes.

13         Q.   So did you see Ms. Lee on a daily basis?

14         A.   Yes.

15         Q.   And when Ms. Lee was performing her job

16   responsibilities, did you observe her performing

17   those job responsibilities?

18         A.   Do you mean like -- I knew she was in her

19   cubicle, I knew she had trainings going on.  But I

20   would never be like in her trainings, in the room

21   where she was doing it, no.

22         Q.   So you never observed her trainings?

23         A.   No.

24         Q.   And in terms of Ms. Lee's job

25   responsibility of training, do you have an estimate



1    of what percentage of her time she spent on

2    trainings?

3         A.   What percentage of the time?  I do not

4    remember exactly what percentage it was.  No, I

5    don't.

6         Q.   Do you think maybe 50 percent of her work

7    schedule required her to do trainings?

8         A.   It varied.  It depended on the season,

9    because we were sort of like a seasonal type

10   company.

11        Q.   Uh-huh.

12        A.   And so sometimes it could be 50 or more,

13   or sometimes it could be less than 50.

14        Q.   Okay.  Well, as you sit here today, do you

15   think Ms. Lee has a better knowledge and

16   understanding of how much of her time she spent

17   training while she was at Market America?

18        A.   Yes.

19        Q.   All right.  Now, in terms of the trainings

20   that Ms. Lee conducted, would you agree with me that

21   some of those trainings were conducted by Zoom or

22   some type of Internet type profile?

23        A.   We used to use GoToMeeting.

24        Q.   And then would you agree with me that some

25   of those trainings were actual live, in-person


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 11 of 110

 1    trainings?

 2         A.   Yes.

 3         Q.   Okay, and did some of those live, in-

 4    person trainings happen to be conducted in other

 5    countries?

 6         A.   Yes.

 7         Q.   As you sit here today, do you have a

 8    recollection of what other countries Ms. Lee was

 9    required to perform live, in-person trainings?

10         A.   Malaysia and Singapore and Taiwan.

11         Q.   Was Ms. Lee responsible, to your

12    knowledge, for performing live, in-person training

13    within the United States?

14         A.   Yes.

15         Q.   And what states do you recall that she

16    might have to go to to perform those live, in-person

17    trainings?

18         A.   States other than North Carolina, it was

19    Monterey, the office that we used to have out in

20    Monterey.

21         Q.   California?

22         A.   Yes.

23         Q.   Okay.  Anywhere else that you can think

24    of?

25         A.   Hmm.



1          Q.    Okay, and, then, with regard to the

2    GoToMeetings platform that you all used, was Ms. Lee

3    responsible for conducting the GoToMeetings training

4    for new hires?

5          A.    For the new hires?

6                Probably the only exception for that would

7    be Malaysia.  Other than that, no.

8          Q.    Okay, and on the GoToMeetings format,

9    would it be Ms. Lee's responsibility to set those

10   meetings up?

11         A.    Yes.  It was the responsibility of each

12   trainer to set up their own trainings.

13         Q.    Okay.  Now, aside from her interactions --

14   your interactions with her -- well, let me go back

15   and ask you this.

16                With regard to Ms. Lee's GoToMeeting

17   trainings, did you ever observe any of those

18   trainings?

19         A.    No.

20         Q.    And with regard to her live, in-person

21   trainings in other countries, which you've mentioned

22   Malaysia, Singapore and Taiwan, did you observe any

23   of those trainings?

24         A.    No.

25         Q.    And then, with regard to the live, in-


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 13 of 110

1    person trainings in North Carolina and California,

2    did you observe any of those trainings?

3         A.   No.

4         Q.   And were you required to take any of those

5    trainings as part of your position?

6         A.   Yes.  At the beginning, when I was hired,

7    yes.

8         Q.   Over what period of time were you required

9    to take those trainings?

10        A.   I took the first unfranchise services

11   training that lasted, if I remember correctly, eight

12   weeks.  And then some other trainings, new programs

13   or different things.

14             So I would say within the first probably

15   two to four months that I was there, I would attend

16   her trainings.

17        Q.   During those trainings, was Ms. Lee the

18   only individual who was performing or conducting the

19   training sessions?

20        A.   Yes.  And Cherri would do a segment, maybe

21   like the customer service or soft skills for the

22   representatives.  So she would do that segment.  But

23   it wa a small segment.

24        Q.   Okay, so primarily, the segments or the

25   sessions rather, would be conducted by Ms. Lee.



1      Correct?

2           A.   Yes.

3           Q.   Okay, and you mentioned this.  You said

4      the unfranchise service.  That was considered the

5      UFS training.  Correct?

6           A.   Yes.

7           Q.   And the other training that Ms. Lee also

8      engaged in was the MPCP training.  Correct?

9           A.   Yes.

10          Q.   Okay.  I'm aware that she conducted those

11     trainings regularly.  She also conducted trainings

12     for new hires, as well as refreshers for current

13     employees.  Correct?

14          A.   Yes.

15          Q.   Now, were you ever physically observing

16     any of the trainings that Ms. Lee conducted with

17     regard to the new hires?

18          A.   The first one that I took, yes.

19          Q.   Yeah.  Not for yourself, but for other

20     individuals who were newly hired with the company

21          A.   No.

22          Q.   Okay, and other than the refreshers that

23     you say you actually took, did you observe Ms. Lee

24     in any of her other refresher training courses?

25          A.   No.



1          Q.    Okay.  Now, as you sit here today, do you

2     have a recollection of any other primary job

3     responsibilities that Ms. Lee had other than

4     training?

5          A.    No.

6          Q.    None?

7          A.    No recollection.  No.

8          Q.    Was Ms. Lee required to submit any type of

9     data compilations to you regarding the training that

10    she conducted?

11         A.    I mean, other than -- we would -- I'm

12    fuzzy on this memory.  But we would keep sort of

13    like a little database or an idea map of what

14    everybody was working on or had been working on.  So

15    maybe like a summary or a list, this is what I'm

16    doing, this is what I'm doing.  So we would all do

17    that.

18         Q.    Okay, so was Ms. Lee required to submit

19    that summary of what she was doing to you on a

20    general basis or a daily, regularly, monthly basis?

21         A.    Maybe at least once a year.  If it was

22    more than that, it wasn't too often.

23         Q.    Okay.  Was there a time where you required

24    Ms. Lee to submit any type of written documentation

25    to you about any of her work performance when she


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 16 of 110

 1    failed to do so?

 2         A.   Can you rephrase that question?

 3         Q.   Yes.

 4              Was there ever a time when you required

 5    Ms. Lee to submit something to you in writing

 6    regarding her job performance and she failed to do

 7    that?

 8         A.   Not that I remember.

 9         Q.   Okay, and was there ever a time when Ms.

10    Lee was required to perform a GoToMeeting type

11    training when she failed to do that?

12         A.   Not that I remember.

13         Q.   Was there ever a time when Ms. Lee was

14    required to perform a live, in-person training

15    outside the United States and she failed to do that?

16         A.   Outside of the United States, no.

17         Q.   And was there ever a time when Ms. Lee was

18    required to perform a live, in-person training

19    within the United States ---

20         A.   --- Oh, hold on.  I just remember

21    something ---

22         Q.   --- Okay.

23         A.   --- About the outside of the U.S.

24              So there was a time where Spain, the Spain

25    office had hired someone whose first language was


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 17 of 110

1    Mandarin.  Because they identified that the majority

2    of their unfranchise services people were Mandarin

3    speakers.  So they wanted someone to be able to talk

4    to them in their first language.  And Oriental

5    languages, most of them didn't speak anything other

6    than Mandarin.

7              And, then, she was also -- this person was

8    also tri-lingual.  So she spoke Mandarin, English

9    and Spanish.  Because she had been living in Spain.

10             And so the request that I got from the

11   Spain office was that it was their preference for

12   that training to happen in Mandarin.  So I asked

13   Nadine what her thoughts on that was, and it was

14   something that she could fit in her schedule.

15             And she said that, no, that she suggested

16   it should be the same way in which we did the other

17   trainings in the U.S., which was if the person was

18   bilingual, then do it in the local -- you know, with

19   the local program.  Because it differed slightly

20   country to country.

21             So she did not do that one, even though

22   that would have been the preference from the client,

23   internal client, which was the Spanish office, and

24   myself.

25        Q.   Okay, and in that particular incident, you



1     said Nadine determined that it wouldn't fit in her

2     schedule, and that's partially why she didn't want

3     to do it.  Is that right?

4          A.   What I remember was that it didn't fit in

5     her schedule.  But it was more like she suggested

6     that we should do it the way we did the other

7     trainings, which was in English or in the local

8     language.  In this case, would be in Spanish.

9          Q.   Uh-huh.  Okay, and so was that a problem?

10         A.   No.  I mean -- no.  I would say not

11    necessarily.

12         Q.   Okay.  Now, was Ms. Lee responsible for

13    setting her own schedule?

14         A.   Yes.

15         Q.   Did she have to clear her schedule with

16    you for approval?

17         A.   No.

18         Q.   And at the time, with regard to this

19    incident that you just spoke of, the Spanish

20    individual, did the company lose any money as a

21    result of Ms. Lee's suggestion that the training be

22    conducted like it normally would?

23         A.   No.  Well, I mean, I couldn't say that for

24    sure, but I wouldn't think so.  Because the training

25    was eventually conducted, and everything worked



*Copy*          Lee v. Market America          04/27/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1    fine.

2        Q.   Okay, so I was asking you -- my next

3    question was going to be was there a time when Ms.

4    Lee was required to conduct training within the

5    United States and she failed to do so?

6        A.   Yes.  So that was more of an issue when we

7    hired anyone that spoke Mandarin and very little to

8    none English.  So in that case, she would be asked

9    to perform a different -- sort of like the same

10   training that was happening in this room, she was

11   asked to do it in a different place with the new

12   hires that were not bilingual.  And she would

13   refuse.

14       Q.   Okay, and when do you recall that

15   happening?

16       A.   So there were two instances that I

17   remember very clearly.  There may have been more.

18   One was when I actually was in charge of that

19   unfranchise services training.  And two reps sat on

20   my training for the entire time, and they were

21   eventually falling asleep in the middle of my

22   training because they did not understand a word of

23   what I was saying.  So that was one.

24            And then ---

25       Q.   --- They didn't understand what you were


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 20 of 110

1    saying?

2         A.   Yes.  Because they didn't speak any

3    English.

4         Q.   So how did that affect Nadine?

5         A.   Because she refused to do that training

6    for them in Mandarin.

7         Q.   So are you saying because she refused to

8    do it, you had to do it, or -- I'm not ---

9         A.   --- They have to sit in my training, yes.

10        Q.   Okay, and then go ahead.  I'm sorry.

11        A.   And so that was one.

12             And then another one was when a group --

13   this was a group, and I don't remember exactly the

14   number.  But it may have been maybe five reps.  And

15   all of them were not bilingual.

16             So it was a long back-and-forth basically,

17   almost until the point that were like, I'm sorry,

18   but you are going

19   to have to do it, because they really and truly

20   don't speak English, so there's nothing we can do.

21             But there was a lot of resistance to do

22   it.  And then we had -- when it finally happened

23   that she eventually did the training, we ended up

24   having a lot of concerns about how the quality of

25   that training was.  You know, the performance and



 1     the overall quality of the training.

 2          Q.   Okay, and when you say we had concerns

 3     about the overall quality of the training, who are

 4     you referring to?

 5          A.   I'm referring to myself and Sherry and

 6     Brandi, the head of the unfranchise services

 7     department.

 8          Q.   And did you sit down and talk to Ms. Lee

 9     about it?

10          A.   No.

11          Q.   Why not?

12          A.   Let's see, how do I -- I think that at

13     that point, I was taxed with having tried to

14     communicate with Nadine in the past, and getting a

15     lot of resistance as far as, I'm not going to do

16     that, you don't need to know about that.  There

17     would be -- I would always try to get her involved

18     in what the team was doing, or get like decision-

19     making.

20               And in my leadership style, decisions

21     should be a group.  You know, as a team, we're going

22     to look at the advantages, disadvantages, and decide

23     what is best for the team.  And I never felt like

24     that was her mode of operating.

25               So it was whatever she decided to do,


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 22 of 110

1    that's what she was going to do.  And she was doing

2    it right, and there was no questions.  You know,

3    there was no question about that.  So that's part of

4    it.

5              And then, the other part was that the

6    person who raised the concern about the quality of

7    the training was very adamant.  When she raised the

8    concern to us, and by us I mean Brandi first, then

9    myself.  And Brandi and I had a conversation with

10   Sherry.  She asked please do not share that I was

11   the person bringing this up, because I am afraid

12   this is going to affect, you know, my work

13   environment.

14             So we -- I mean, I wasn't going to sit

15   down with Nadine and say, oh, this person is saying

16   -- is raising concerns about the content and the

17   quality and what's happening.  Because we had agreed

18   to respect that person's request or desire of not,

19   you know -- or whatever she was saying to not be

20   discussed out in the open.

21        Q.   When did this occur?

22        A.   I am really fuzzy on those dates.  But it

23   was -- it was that last training.  Then there has to

24   be documentation on when that last training

25   happened.


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 23 of 110

1          Q.    Well, give me specifics of when that last

2     training would have happened or where it would have

3     happened, how -- the context of that last training

4     so I can see if I can figure out ---

5          A.    --- So it happened, it was -- if I

6     remember correctly, there were going to be third

7     shift reps, and -- which was another issue.  Because

8     unfranchise services was requesting for their

9     training to happen sort of like close to a third

10    shift.  So that it wouldn't be comfortably working

11    an eight-to-five or six-to-eight weeks and then all

12    of a sudden going into the night.

13              So they request that if we could shift the

14    training hours.  That was another thing that Nadine

15    was very

16    resistant of, which I understood that.  And nobody

17    wants to work on weird hours.  But it was the nature

18    of the business.

19              So whenever we had to do, you know,

20    certain adjustments, we were all willing to do that,

21    because we knew it was temporary.  It was just for

22    that period of time.

23              So it was third shift employees.  It was,

24    if I remember correctly, at least five.  And the

25    training happened in the building.  So in the Market

1    -- in the Greensboro office.  And it'll be in one of

2    the big conference rooms, not in the training.

3              Because I think the training room was

4    occupied at the time, because this was -- the

5    training was happening simultaneously.  So we had

6    one group here, and then Nadine was training this

7    other group.

8         Q.   Okay, so who was the person that

9    complained?

10        A.   Rose.

11        Q.   Rose?

12        A.   Uh-huh.

13        Q.   What's Rose's last name?

14        A.   It completely escaped my mine.

15        Q.   Rose complained to you.  Is that correct?

16        A.   First to Brandi.

17        Q.   Okay.

18        A.   And then Brandi reached out to me.  And

19    then I sat down with Rose.  Because she was being

20    trained.  She was bilingual.

21        Q.   What were her two languages?

22        A.   Mandarin and English.

23        Q.   Okay, so she sat down with Brandi first.

24    And what was Brandi's title?

25        A.   Franchise services director.



1        Q.    And then she spoke to you?

2        A.    Yes.

3        Q.    Without Brandi being present?

4        A.    I can't -- I don't remember exactly the

5    order.  All I remember is Brandi reaching out to me,

6    saying there's this concern, this is happening.  And

7    from that point, I may have talked to Rose by

8    myself, or Brandi may have been there.  I just -- I

9    do remember all of us being -- you know, talking

10    about it together.

11        Q.    Uh-huh.  And did you say that Cherri --

12    was it Sherry Spesock or was it Cherri Watson who

13    was present?

14        A.    Sherry Spesock.

15        Q.    Okay, so it was you, Brandi and Sherry

16    Spesock?

17        A.    Uh-huh.

18        Q.    And at the time, what was Sherry Spesock's

19    role?

20        A.    The director of human resources.

21        Q.    All right, so this incident, you can't

22    remember exactly when it happened.  But you know it

23    pertained to the third-shift employees having some

24    training in the Greensboro conference room?

25        A.    Yes.



1        Q.   And you believe that the person who
2    complained was Rose?

3        A.   Yes.

4        Q.   Was there anyone else who complained?

5        A.   No.

6        Q.   She was the only one?

7        A.   Yes.

8        Q.   And you say you all did not talk to Nadine
9    about this at all.  Correct?

10       A.   Yes.  Uh-huh.

11       Q.   Do you know if Sherry talked to Nadine
12   separately about it?

13       A.   I don't know.

14       Q.   Okay, and also, before we go on to the
15   next point, you talked about another instance before
16   you talked about the third-shift employees.  You
17   talked about another incident.

18       A.   Yes.

19       Q.   Okay.  What is your recollection of when
20   that incident occurred?

21       A.   It was before the last one I talked about,
22   but I cannot remember exactly when that one was.

23       Q.   When that incident occurred, did you speak
24   to Nadine about it?

25       A.   Yes.  I would tell Nadine several times,


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 27 of 110

1      you know, are you sure we're not reconsidering this.

2      I mean, they are falling asleep.  And I don't even

3      feel like I should tell them to wake up, because to

4      wake up for what, you know.

5          Q.    Uh-huh.

6          A.    They could not understand anything.

7                And she said, well, this is how we've been

8      doing it.  And I'm not -- you know, they have to --

9      like it was very -- that was very frustrating.

10     Because I felt like I could never send my point

11     across of they don't understand the language.

12               It's not that I don't want to -- I mean, I

13     already had six other people in the room.  Two more

14     didn't matter to me.  It's not -- I mean, I don't

15     want somebody to spend the exact same amount of time

16     I'm spending doing something, doing the same thing

17     just for the, you know, fun of it.

18               It was because they were not getting --

19     they were not being trained.

20         Q.    And were these new hires?

21         A.    Yes.

22         Q.    Okay, so you can't remember when it

23     happened, but you remember that the individuals were

24     new hires?

25         A.    Yes.



*Copy*          Lee v. Market America          04/27/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

 1          Q.    And I believe you said that the ---

 2          A.    --- This was an eight-week training.

 3          Q.    Okay, and I believe you said that the

 4    training ultimately did happen.  But it was that the

 5    people -- you felt like the individuals didn't

 6    understand.

 7          A.    Uh-huh.

 8          Q.    And this was during the time that you also

 9    were getting your new-hire training, or not?

10          A.    I was doing that new-hire training.  I was

11    teaching that training for eight weeks.

12          Q.    And Ms. Lee's role was just teaching a

13    segment of that session?

14          A.    No.  She didn't teach any of it.

15          Q.    Okay, and did you complain about that to

16    anyone other than the verbal complaints that you

17    made to Ms. Lee?

18          A.    To Colbert.

19          Q.    Okay, so you recall that this happened

20    during the time when Colbert was Ms. Lee's manager?

21          A.    Yes.

22          Q.    So it was before you became Ms. Lee's

23    manager.  Is that right?

24          A.    It must have been, because -- yes, I

25    believe so.



1       Q.   So, then, we agree that it could not have

2  happened after 2016?

3       A.   I am -- I really don't remember.  I'm very

4  fuzzy on the specific dates.

5       Q.   Okay, but what you do recall and what

6  you're certain of is that Colbert was Ms. Lee's

7  manager at the time this incident occurred.

8  Correct?

9       A.   So Colbert started -- let's see.  I came

10  in November of 2013.

11       Q.   Uh-huh.

12       A.   And then for a while, and I don't remember

13  how long that while was, we did not really had a

14  head of training.  Because Amanda wasn't replaced

15  immediately.  But then a few months later, and I

16  wish I could remember when that was, Colbert came

17  in.

18       Q.   Okay.  Let me just hand you this document,

19  it might help to refresh your recollection about

20  when everything happened.  Okay?

21            What I'm handing you is the Declaration of

22  Liliana Camara.  And it is -- it has been marked ---

23       A.   --- Oh, this one from a while ago.  Okay.

24  Never mind.

25            Is this the thing you asked me at the


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 30 of 110

1    beginning if I remember seeing or have seen?  No.

2          Q.    No.

3          A.    Okay.

4          Q.    Okay.  What I've handed you is the

5    Declaration of Liliana Camara, which, unfortunately,

6    I do not see a date on this document.  Now, I mean,

7    I could be wrong.  If you see one, you can point it

8    out.  So I'm not sure when you would have prepared

9    this document.

10               But I'm assuming that it was after

11   Nadine's termination ---

12         A.    --- Yes.

13         Q.    --- In October of 2017.

14         A.    Uh-huh.

15         Q.    It had to have been made sometime after

16   October 5th of 2017.

17         A.    Yes.

18         Q.    Can we agree to that?

19         A.    Yes.

20         Q.    Okay, and, then, perhaps you can review

21   it, and it might refresh your recollection of when

22   Colbert was there.

23         A.    Do you have a date for when Colbert was

24   hired?

25         Q.    I do not.



1          MS. GRAY:  For the record, this

2    document that I've handed you, the Declaration of

3    Liliana Camara, has already been produced to counsel

4    as part of a request for production of documents.

5    It's Bates stamped MA012 through MA014.

6          I'm not going to attach it as an exhibit

7    to this deposition because it would just be

8    duplicitous.

9          MS. DEBOARD:  That's fine.

10    Q.    (Ms. Gray)  If you would like, please just

11    take a minute to review this document, because I'm

12    going to ask you some questions about it.

13    (Witness examined document)

14    A.    Okay.  I'm done.

15          So going back, unfortunately, I don't see

16    anything here that can help me remember when the

17    issue with the two reps that were in my training

18    class happened.  But what I do see here is that in

19    2017.

20          So we talked about this training that

21    needed to happen separately for these reps for third

22    shift in February of 2017.  And the other issue was

23    way before.  So it had to have been somewhere around

24    2016, maybe late 2015.  I don't know.

25    Q.    Okay.  Well, it says in paragraph number


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 32 of 110

1     five, on August 15th, 2016, I was promoted to global

2     training manager.  Nadine refused to report to me.

3     So an accommodation was reached where Nadine

4     reported to Colbert Trotter, director of global

5     talent and organizational development.

6              This continued until Colbert left Market

7     America on November 11, 2016.  At that time, I took

8     over all training responsibilities and Nadine

9     reported to me.

10         A.   Correct.

11         Q.   So based on that paragraph, would you

12    agree that this incident, the first incident you

13    talked about, could not have occurred after November

14    ---

15         A.   --- Oh, yes.  Yes.

16         Q.   Let me finish my question.

17         A.   I'm sorry.

18         Q.   November 11, 2016?

19         A.   Yes.

20         Q.   Okay.  All right.  Good.

21              Now, let's go back and talk about -- those

22    are the only two instances that you're

23    aware of where Nadine was asked to do some type of

24    live, in-person training within the United States,

25    and there was some problem associated with it or she


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 33 of 110

1     refused to do it.  Correct?

2          A.    Those are the two that I have best

3     recollection of it.  But it seems to me like every

4     time there was a Mandarin speaker rep that wasn't

5     fluent in -- that wasn't bilingual, we would ask,

6     and the answer will always be no.

7          Q.    Did you document that?

8          A.    No.

9          Q.    Why not?

10         A.    This is not -- what I'm about to say is

11    probably not a good reason for why not documenting.

12    But I had a sense -- and this was from my experience

13    from the very first day on the job.  That Nadine did

14    whatever she decided she was going to do in her work

15    duties.

16              Like this is what I do, that's it.  Nobody

17    tell me what I need to do.  This is -- I decide my

18    workload, my trainings, my everything.  This is what

19    I do.  And I'm not going to do what I'm being told

20    by anybody, supervisor, anybody.

21              And so it was almost to me like that was

22    it.  That was the law of the land, sort of, in that

23    department.  And it honestly never occurred to me to

24    say let's document this thing that I see from day

25    one.



1          Q.   Well, did it occur to you to document it

2     after you became her supervisor?

3          A.   What I did do after I became her

4     supervisor was I created a separate folder.  When

5     every time I would ask

6     for something and the answer would be no, I'm not

7     going to do that, or no -- or somebody else do it,

8     then I would put that in a separate folder as a way

9     to, if I needed -- because we will be interchanging

10    several emails for several things.  So that if I did

11    -- you know, if I have to explain that refusal or

12    that attitude, I had an easy place to find it.

13         Q.   And what happened to this separate folder?

14         A.   I gave that to Sherry when I left.

15         Q.   Sherry Spesock?

16         A.   Yes.

17         Q.   So just so I'm clear, you had a separate,

18    secret folder?

19         A.   No, not a secret, no.

20         Q.   Who knew about the folder while you were

21    there?

22         A.   It must have been like an Outlook folder

23    where you put stuff, like when you organize your --

24    so that was it.  It wasn't secret or anything like

25    that.



1          Q.    Who had access to see it?

2          A.    I mean, the company has access to all of

3     our emails, so....

4          Q.    Well, what I don't understand from you, as

5     a supervisor, Nadine's supervisor specifically, are

6     you saying to me that rather than speak to Ms. Lee

7     or document what she wasn't doing and sharing it

8     with, say, human resources, you just decided to keep

9     a separate folder just in case you might need it at

10    some point in the future?

11         A.    No.  No.  That's not what I said.

12         Q.    Okay.

13         A.    So we did actually -- so I did talk to

14    Nadine several times about can we work together, can

15    we work as a team, can we agree -- you know, kind of

16    -- I would reach out to her several times.  And I

17    will explain to her, I don't understand why you're

18    refusing to conduct these trainings in Mandarin if

19    they do not speak English.

20               And the answer would always be the same.

21    Well, no, because that -- I'm not doing those

22    trainings.  You know like it will be that refusal.

23    We will talk about it with Colbert, of course.  We

24    will talk about it after.  I did talk about it with

25    Sherry.



1          But it was very -- I did complain to

2     Nadine that I did not feel I was getting the

3     teamwork environment that I was hoping for.  That

4     she -- in a lot of ways I felt like she was imposing

5     her will on what she was going to do and wasn't

6     going to do, and that I did not want to run the

7     training department in that way.  But nothing change

8     anyway.  So I did talk to her several times.

9          Q.   Uh-huh.  So when you talked to Nadine, did

10     you ever give her a written reprimand for poor job

11     performance?

12          A.   Not that I remember.

13          Q.   Did you ever give her a written reprimand

14     for insubordination?

15          A.   No.

16          Q.   Did you ever go to Sherry and instruct

17     Sherry or discuss with Sherry your need to issue a

18     written reprimand to Nadine?

19          A.   No.

20          Q.   For any reason, you never spoke to Sherry

21     about Nadine's job performance until you decided to

22     terminate her.  Correct?

23          A.   Oh no, no, no, no.  We did talk about it.

24     I just didn't say here's what I need to do, or do I

25     reprimand or write her or anything like that.



1          But it was very -- it was like a known

2    issue that Nadine would impose whatever she decided

3    that she was going to do.  It was a known issue for

4    all of us that worked with her.

5          Q.   Uh-huh.

6          A.   And so I did talk about it with Sherry,

7    with Colbert, even with Amanda.

8          Because just as an example, the first day

9    on my job when I was introduced to the group, Amanda

10   discussed, okay, here's how we're going to do this.

11   Here's how we're going to divide up the workload.

12   And Nadine, in front of the entire group, refused

13   and challenged Amanda and said I'm not going to do

14   that.

15          And so we had to end the meeting with

16   Amanda saying, okay, Nadine, you and I are going to

17   discuss this, and then we'll get back to the group.

18   So it was always like that.

19          So I'm not going to do that, I don't

20   agree.  I'm not going to do it.  This is what I'm

21   going to do, and that's it.  So it was -- that was

22   the sense always.

23          Q.   That was your sense always.  Correct?

24          A.   Yes.

25          Q.   And a sense that you never really shared


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 38 of 110

1     in a way that could have been documented to affect

2     Nadine's job performance, i.e., written performance

3     evaluations or written reprimands.  Correct?

4          A.   Written?  No.

5          Q.   So you just say you just tolerated it.  Is

6     that what you're saying?

7          A.   Yes.

8          Q.   Why?  Why would you just tolerate that?

9          A.   So honestly, this was a pretty tough job.

10    Right?  So ---

11         Q.   --- Wait.  Wait.  Whose job are you

12    referring to was ---

13         A.   --- Working in the job ---

14         Q.   --- Nadine's or yours?

15         A.   So the -- I'm going to talk specifically

16    about the unfranchised services training.

17         Q.   Okay.

18         A.   It was the toughest part of that job.  And

19    one thing that was very evident was that after doing

20    that job for a while, you became burned out.

21              So part of the reasons why Nadine will

22    refuse, and she'll talk about this a lot, is I've

23    been doing this for too long, I'm tired.  I don't

24    want to do this anymore.  And honestly, I totally

25    understood.


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 39 of 110

1            Because with -- I mean, it was super

2    taxing.  And I would try to put myself in her shoes

3    as much as I could.  I mean, like I would be like if

4    I had been doing this for 17 years, I would be

5    wanting to not do it either.  You know what I mean?

6            So it wasn't -- so tolerating to me was,

7    to a degree, you know, that tolerance ended at some

8    point.  But it was because I understood the human

9    aspect of, man, you've been doing this for too long.

10            And it was almost like an inside joke

11    whenever we were doing that training, my husbands

12    knew to not even talk to us when we got home because

13    we were taxed.

14            And so it was a little bit of me trying to

15    be understanding of Nadine's history, and respecting

16    the fact that she had been there for a long time,

17    doing it mostly by herself.  So she was sick and

18    tired of it.

19        Q.   So your testimony is that you overlooked

20    what you thought were issues regarding Nadine's job

21    performance because you were looking at the human

22    aspect of what Nadine was going through?

23        A.   Yes.  That was a part of it, yes.

24        Q.   And in doing so you ultimately decided to

25    fire her, though, didn't you?

Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 40 of 110

1          A.   No.   That's not how I would put it.   When
2     the decision at the end was you keep refusing to do
3     a thing that makes sense for you to do.   You're the
4     only one that speaks that language in this
5     department.   Right?

6               So you keep refusing to do it, and it's
7     pulling teeth, and it's taking so much effort to
8     finally almost having to tell you whether you're
9     wanting to do it or not, you are going to do it.
10    Which is not the management style I like.   I like to
11    work with people, not bark orders and say because I
12    say so.   Right?

13              But it eventually ended up -- with this
14    particular last training, it eventually ended up
15    being the case.   Because I'm not going to have five
16    people sitting in a training that do not speak
17    English.   You know, it's just ridiculous.

18              And then, at the end, you're doing it, and
19    you're doing it poorly.   So we've tried.   We've
20    given you enough chances to reconsider your attitude
21    and work with us as a team.   And you're still not
22    doing it, so we don't see another option.

23         Q.   Well, when you said you've given her
24    enough chances, you never told her that she was in
25    jeopardy of losing her job because she was not doing

Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 41 of 110

1     it or performing it properly.  Correct?

2          A.   Correct.

3          Q.   So when you say you've given her enough

4     chances, what are you talking about?

5          A.   Pointing out that we needed her to do

6     this, that it makes sense for her to do this.  That

7     I complained several times directly to her, can you

8     be a team player.  I need a team.  We're not going

9     to be able to deliver all of this workload if we

10    don't work as a team.

11         Q.   What kind of job repercussions did you

12    suffer because of Nadine's deficiency in terms of

13    performing training?

14         A.   We -- I knew that the unfranchised

15    services reps that were not being trained in English

16    were doing a poor job at their job, at their job,

17    because they were not trained properly.

18         Q.   And so how did that affect your department

19    or how did that affect you?

20         A.   It affected the quality of what we did.

21    We were supposed to deliver these reps ready to take

22    calls and answer the customer's questions.  And they

23    were not equipped to do that because their training

24    did not happen optimally.

25         Q.   And how many people are you talking about?


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 42 of 110

1          A.   At least the two that I talked about

2     before.  And then the other five.  And I can't

3     recall the exact number.  But it was either five or

4     six.

5          Q.   So are you telling me that Nadine's,

6     quote, poor job performance affected up to seven

7     people in the department?

8          A.   So seven people in the unfranchised

9     services department.

10          Q.   Uh-huh.

11          A.   And then on our end, particular in our

12     department, it'll be that whatever she refused to

13     do, then we'll have to do it.  And there was a huge

14     project that we undertake at some point of creating

15     like a data -- like a learning management system, a

16     Wiki type documenting platform for all of the

17     training, documenting everything training-wise.

18               And so we needed the entire team to work

19     on that project.  It was a huge project.  And Nadine

20     refused to work on it.

21               So whatever, you know, could have been her

22     thing to do, it was, Henri, you do it, Abby, you do

23     it.  Somebody else do it, because I'm not going to

24     do that.

25          Q.   Now, you're saying she refused to work on


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 43 of 110

     1     this huge project.  Did you reprimand her written

     2     then?

     3          A.   No.

     4          Q.   And when did that occur?

     5          A.   The Confluence project, that was -- when

     6     was that?  I want to say we worked on that project

     7     at least for about two years by the time I left.

     8     And I left in March ---

     9          Q.   --- Of 2018.

    10          A.   --- Of 2018.

    11               So it should have been at some point in

    12     2016.

    13          Q.   So you're saying that the project that

    14     Nadine refused to work on was the Confluence

    15     project?

    16          A.   Uh-huh.

    17          Q.   But you never reprimanded her for that?

    18          A.   No.

    19          Q.   And it went on for two years prior to you

    20     leaving.  So then it would have happened at some

    21     point in 2016?

    22          A.   I believe so.

    23          Q.   Beginning in 2016, at least.

    24          A.   Uh-huh.

    25          Q.   And during that period of time, we've



1      agreed that Colbert was, partially during that time

2      ---

3          A.    --- Yes.

4          Q.    --- Was Nadine's supervisor.  Correct?

5          A.    (Witness indicated affirmatively)

6          Q.    Did you ever go back and look at the

7      employee performance review that Colbert gave to

8      Nadine in April of 2016?

9          A.    No.

10         Q.    Did you ever talk to Colbert about the

11     performance review she gave Nadine in 2016?

12         A.    No.  That I remember.

13         Q.    According to Colbert, Nadine did a good

14     job of building relationships with her coworkers in

15     2016.  Are you aware of that?

16         A.    No.

17         Q.    In fact, Colbert gave Nadine a very good

18     job performance evaluation in 2016.  Are you aware

19     of that?

20         A.    No.

21         Q.    And the complaints that you've made here

22     today about what Nadine did or didn't do in 2016,

23     are you aware that it's not documented at all by

24     Colbert in any review that she gave Nadine?

25         A.    No.


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 45 of 110

1         Q.    So is it possible that the only person who

2    had a problem with Nadine was you?

3         A.    I don't believe so.  I don't ---

4         Q.    --- Was it documented by anyone else that

5    she was not performing her job well that you know

6    of?

7         A.    No.

8         Q.    And it would have been your

9    responsibility, as her supervisor, to document her

10   job performance deficiencies.  Correct?

11        A.    Yes.

12        Q.    Now, let's just go back to your

13   declaration.  Okay?

14        A.    Okay.

15        Q.    In looking at number three, you've

16   indicated that -- paragraph number three, that is.

17   You've indicated that you had a master in

18   translation studies from the University of North

19   Carolina at Charlotte.

20        A.    Yes.

21        Q.    When did you receive that?

22        A.    2017.  End of 2016, I believe.

23        Q.    Okay, and then, you also indicated that

24   you had a degree from the University of North

25   Carolina at Greensboro.  Correct?


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 46 of 110

1          A.    Uh-huh.

2          Q.    And then, according to my records, you

3     attended UNCG for two years.  Is that right?

4          A.    Uh-huh.

5          Q.    Now, how were you able to get a bachelor's

6     degree in two years from UNCG?

7          A.    There is a organization called the World

8     Education Services.  And so what they do is that

9     when you have a degree from another country, you

10    submit all of your documentation about that degree,

11    and then they make an evaluation of what that is

12    equivalent to in the U.S.

13          So I had a bachelor's degree, a four-year

14    college degree from Colombia.  And when I submitted

15    all of my transcripts and my paperwork to the World

16    Education Services, they came to me and said you

17    have an equivalent of a bachelor in arts.

18          So that put me in a position where I could

19    only do the major, which was psychology, and then

20    complete that, because I transfer my credentials

21    from my four-year college from out of the country to

22    here.

23          Q.    Okay, and let's just make sure the record

24    is clear.  When you say you had a degree from

25    Colombia, you mean the country.  Correct?



1      A.    Yes.  Yes.

2      Q.    Not the university?

3      A.    No, no, no.

4      Q.    All right, and then, in number four, you

5    say Nadine Lee was a staff member of the corporate

6    training group when you joined the company.

7      A.    Uh-huh.

8      Q.    Do you see that?

9      A.    Yes.

10     Q.    Nadine was in a management position when

11   you joined the company, wasn't she?  Or do you know?

12     A.    That I know.  So the manager from that

13   team, when I was hired, was Amanda.  And then Amanda

14   had Nadine and Sherry under her.  And it was my

15   understanding that they were both in the same level

16   and reported to Amanda, and that was it.

17     Q.    All right.  Let's go to the second page of

18   your declaration and look at paragraph six.  I

19   championed a number of initiatives in an effort to

20   streamline the corporate training program.  For

21   example, I decided that the corporate training group

22   would transition from Microsoft Office to a

23   Microsoft program known as Confluence.  Confluence

24   promoted team collaboration, Nadine objected and

25   refused to learn or work with the tool.


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 48 of 110

1              Do you see that?

2         A.    Uh-huh.

3         Q.    Now, is that what you were testifying

4    about earlier about Nadine refusing to work on

5    Confluence?

6         A.    Yes.

7         Q.    Okay, and I note that in your paragraph

8    six, you don't provide any type of date or anything

9    of that nature.

10   Correct?

11        A.    Huh-uh.

12        Q.    Was anyone on the training team using

13   Confluence at the time that you wanted to transition

14   to Confluence?

15        A.    Was anyone on the team?

16        Q.    Yes.  Was anyone else familiar with

17   Confluence when you transitioned and decided to

18   exact this initiative?

19        A.    So we found out that the company was

20   already paying for this tool as a part of a package.

21   And it was not being utilized a lot by different

22   people.  So there was only like a group of engineers

23   using it.

24              And so we -- Henri and I looked at that

25   software, or that platform, and thought that we


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 49 of 110

1    could accommodate it or make it into the learning

2    management system that we wanted to have.  And so we

3    learned as we -- so the potential for that, we

4    learned -- or we just had to learn how to use it.

5         Q.   Okay, and who did you bring in to teach

6    the staff about how to use Confluence?

7         A.   So we talked to -- we got word of this as

8    a platform from one of the engineers.  And he gave

9    us an overview of how it worked and what he could

10   do.  That was basically all he did.

11             And then, Henri and I started working with

12   it, and just watching videos on how to build it, how

13   to create the documents inside, how to do all of

14   that.  So it was like we were doing it by ourselves.

15             And then, the idea was that we were going

16   to show the rest of the team, which basically at

17   that point was Abby and Nadine, how to -- you know,

18   the basics of here is how you start building things.

19        Q.   Uh-huh.

20        A.   So here is how you start building things.

21   And she had the resources, the tutorials, the

22   videos.  Because we were just learning it by

23   ourselves.

24             And Abby complied.  She did it.  And then,

25   Nadine said that she was not in agreement with us


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 50 of 110

1     doing that because she considered that that was us

2     fixing a problem that it was not up to us to fix.

3               That is, the company did not want to spend

4     any money paying for an LMS for an actual tool that

5     was designed for that.  It was not up to us to use

6     another platform for that goal.

7          Q.   Okay, so just so I'm clear and I

8     understand what your testimony is today.

9               You said an engineer at Market America

10    gave you an overview.  Is that correct?

11         A.   Uh-huh.

12         Q.   Who was the engineer?

13         A.   Paul Dumas.  Paul Dumas.

14         Q.   And when he gave you the overview, when

15    was that?

16         A.   I cannot remember.

17         Q.   2017?

18         A.   No.  It was before that.

19         Q.   2016?

20         A.   Probably in 2016.

21         Q.   Was Colbert still at ---

22         A.   --- Yes.

23         Q.   She was?

24         A.   Uh-huh.

25         Q.   Was she your manager at the time?


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 51 of 110

1          A.    Yes.

2          Q.    Did you discuss this with her?

3          A.    Yes.

4          Q.    And did she give you written authority to

5     do it?

6          A.    Yes.

7                Written?  There was not a lot -- I mean,

8     we worked a lot like verbal, like this is what we're

9     going to do.  Okay, this is what we're going to do.

10    I mean, it wasn't like it was a -- always written --

11    no.

12         Q.    Okay, so when Paul Dumas gave the

13    overview, who was present?

14         A.    Henri and I.

15         Q.    And why did you schedule it so that only

16    you and Henri would be present?

17         A.    Because we were only -- so what we did was

18    we asked Tim if he knew of anything.  So we said

19    basically, we need to pick your brain, and that,

20    here's what we need to do.  Do you know of anything

21    that we can use to accomplish this goal.

22                Because I remember that the other option

23    that we talked about was what if we request that the

24    engineers at Market America will help us build the

25    actual elements so that the company didn't have to



1    go pay thousands of dollars for something that was

2    too big for what we needed.

3              And it was an idea that we really liked.

4    But we also knew that, because of the two big

5    conferences that we have a year, a lot of the other

6    projects that are not related to conferences never

7    actually end up happening.  So the engineers know

8    they have to build this for whatever reason.

9         Q.   Uh-huh.

10        A.   But the minute they get told to build the

11   things or work on the things that have to do with

12   the conferences, everything -- I mean, it could be

13   years before this got done.  So we're like that's

14   probably not a good idea.

15             So then he said why don't you guys look at

16   this tool that we have as a part of Atlassian, which

17   was a big software package that the company was

18   paying for.  And Jira was the thing that was being

19   used by the whole company.  It was a huge part of

20   the company.  And then, Confluence was like that

21   little other thing that nobody uses.

22             And he said I think you could use this.

23   And then he showed us what you could do with it.

24   And then, Henri and I run with it.  We were like, oh

25   boy, this -- this is it.



1          Q.   So when did you schedule for Nadine and

2     Abby to learn how to use Confluence?

3          A.   With Nadine, we could never schedule how

4     to use it.  Because she was not -- she said I'm just

5     not going to do that.

6          Q.   Okay.  Well, let me ask the question this

7     way.

8               Once you, as the manager, made the

9     decision to use Confluence, did you set a specific

10    schedule for your staff to learn how to use it?

11         A.   So if we're being technical on that

12    portion, I wasn't Nadine manager when I did that.

13    Because, remember, she refused to report to me when

14    I got promoted to training manager.

15         Q.   Uh-huh.

16         A.   And so I could schedule things and do

17    things with Abby and Henri.  But technically, I

18    couldn't with Nadine, because at that point she was

19    still reporting to Colbert.

20         Q.   So with that thought in mind, then, Nadine

21    was not insubordinate by not learning Confluence.

22    Correct?

23               MS. DEBOARD:  Objection to form.  You

24    can answer.

25               THE WITNESS:  So at that point,



1    because she was not reporting to me, no.

2        Q.    (Ms. Gray)  And did Colbert ever indicate

3    to you that Nadine was being disciplined for failing

4    to learn how to use Confluence?

5        A.    No.

6        Q.    And how long did you continue to use

7    Confluence?

8        A.    For the entire time that I was there, up

9    until I left.

10        Q.    And during that period of time, did you

11    lose -- did the company lose any clients or any

12    financial revenue as a result of Nadine's failure to

13    learn Confluence that you're aware of?

14        A.    I mean, that is something that I cannot --

15    I don't have the expertise or the knowledge to know

16    how to do that.

17            But, I mean, her input on whatever we

18    wanted for her to do did not happen.  So how do you

19    account for something that didn't happen?  I don't

20    know how to calculate something like that.

21        Q.    Right.  And that's my point.  Her not

22    learning how to do it didn't affect you in any way,

23    did it?

24        A.    Me personally or the company?

25        Q.    You.



 1          A.    The way I would say it affected me was

 2     that I was not being able to produce from the

 3     training department what I wanted to produce.

 4                A cohesive -- like in that particular

 5     example, in that very specific example.  I wanted

 6     for that tool to house everything that we were doing

 7     on training.  And that was going to include all of

 8     the content in English, content in Spanish, content

 9     in Mandarin.

10                So like right off the bat the Mandarin

11     content wasn't going to happen because she was not

12     going to upload it, and she was not going to do it.

13     So it was going to be incomplete.  So I felt like

14     what I was delivering as a whole department wasn't

15     happening because of that.  In that sense, yes.

16          Q.    And you did what about it?

17          A.    I did not document it, if that's what

18     you're asking.  No, I did not.

19          Q.    What did you do about it?

20          A.    I would discuss it.

21          Q.    With whom?

22          A.    With Nadine, with Colbert and with Sherry.

23          Q.    And that's it?

24          A.    Yes.

25          Q.    Okay.  Going down to paragraph seven, you



1     said you wanted all corporate trainers to be cross-

2     trained in all learning programs rather than have

3     one person solely responsible and capable with the

4     material.

5               Did you see that?

6          A.   Uh-huh.

7          Q.   Now, how did you come up with the decision

8     that you wanted to have the trainers to be cross-

9     trained?

10         A.   I think it's more efficient -- for our

11    case?

12         Q.   Uh-huh.

13         A.   It was more efficient to have people to be

14    able to deliver a training if somebody else wasn't

15    available, somebody -- you know, if somebody was on

16    vacation, and this training needed to happen,

17    somebody else was able to do it.  And that was one

18    reason.

19               The other reason was because there were so

20    many things happening in the company all the time.

21    New programs, new products, new things.  And so if

22    you were not to a degree almost forced to have to

23    look at that and review that, you became obsolete

24    pretty quick.

25               Like if you did not update and refresh



1     your knowledge on what was happening, all you knew

2     was this little part here.  And I didn't think that

3     was a good use of our human potential in the

4     department.

5          Q.    Who else was able to conduct Mandarin

6     training?

7          A.    Nobody.

8          Q.    Just Nadine.  Correct?

9          A.    Uh-huh.

10               MS. DEBOARD:  Was that a yes?

11               THE WITNESS:  Yes.  Sorry.

12          Q.   (Ms. Gray)  You say Nadine objected to

13     this, claiming that she was the only expert in

14     certain aspects of the company, and that she would

15     only allow another trainer to conduct her trainings

16     every once in a while, as long as she could monitor

17     the training, and only her materials were used.

18               Do you see that?

19          A.    Uh-huh.

20          Q.    You agree that Nadine was the only expert

21     in Mandarin training for the company.  Correct?

22          A.    Yes.

23          Q.    And up until the time that you came in as

24     Nadine's manager, Nadine was the one who was

25     responsible for preparing all of the materials


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 58 of 110

1    related to Mandarin training.  Correct?

2          A.   Yes.

3          Q.   All right.  Go down to number eight.  And

4    it says in 2017, there were numerous issues with

5    Nadine's work performance.

6               Do you see that?

7          A.   Uh-huh.

8          Q.   In February, I explained to her that

9    despite her refusal to conduct the account services

10   training, she was going to have to do it since we

11   had several trainees who needed the training in

12   Mandarin, and she was the only Mandarin speaker in

13   the training team.  She reluctantly agreed and

14   planned to end the class two weeks earlier.

15   Attendees complained to me that the material was

16   rushed and incomplete.

17              Do you see that?

18         A.   Uh-huh.

19         Q.   Who complained to you?

20         A.   Rose.

21         Q.   Rose was the only one?

22         A.   Uh-huh.

23         Q.   Is that ---

24         A.   --- Because the others don't speak English

25   or anything else.  And I don't speak Mandarin.


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 59 of 110

1          Q.   So Rose complained to you in English?

2          A.   Yes.

3          Q.   And is that the issue that you previously

4     discussed with me in this deposition about the

5     concerns you had about the quality of training?

6          A.   Yes.

7          Q.   Okay.  Other than Rose, was there anyone

8     else who complained?

9          A.   No.

10         Q.   Ultimately, you agree that the training

11    was conducted?

12         A.   It was conducted, yes.

13         Q.   By Nadine.  Correct?

14         A.   Yes.

15         Q.   Okay, and do you know -- I believe you

16    said that Rose complained to you in English.  And

17    she also complained to Brandi about this.  Correct?

18         A.   Yes.

19         Q.   Okay, and then, here again, in number

20    nine, you say Nadine was required to train the third

21    shift in account services responsibility.  The

22    training would take place outside of MA's standard

23    operating hours.  Yet Nadine refused to account for

24    her hours to me.

25              Do you see that?



1        A.    Uh-huh.

2        Q.    Now, I don't believe you've told me about

3    that.  You did talk earlier about the third-shift

4    reps needing training at the Greensboro office, and

5    they were trained in the conference room.

6              Is that what number nine is referencing?

7        A.    Uh-huh.  Yes.

8        Q.    Okay, and what were Market America's

9    standard operating hours?

10       A.    It was eight to five for the regular

11   employees.  But we also had a second shift and a

12   third shift.  But that was specifically for

13   unfranchised services reps, and a second shift --

14   yeah, unfran -- that I know of, just for

15   unfranchised services reps.

16       Q.    Okay, and then you said Nadine refused to

17   account for her hours to me.

18             What does that mean?

19       A.    So she would just let me know, I'm going

20   to be out.  I'm going to be -- I'm not going to be

21   in tomorrow, or I'm not going to be in.  But it was

22   very difficult to get her to say here are the hours

23   I'm working on this, and here are the hours I'm

24   going to take.

25             It was -- it was -- so working with Nadine


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 61 of 110

1    was always very frustrating communicating-wise in

2    terms of she was extremely secretive with what she

3    did.  And you couldn't ask for too many details

4    because she would not give them to you.  So it would

5    be just like she will let you know what she was

6    going to do, period.

7         Q.   Did you require her to provide you with a

8    written timesheet?

9         A.   I think I did at some point.  But I don't

10   remember what the outcome of that was.

11        Q.   Did you ever write Nadine up for failing

12   to account for your hours to her?

13        A.   No.

14        Q.   Did you warn her that her job was in

15   jeopardy if she didn't account for her hours to you?

16        A.   No.

17        Q.   Now, during this time, was Nadine also

18   working with her accounts in Malaysia?

19        A.   I cannot remember now.

20        Q.   Are you aware that Nadine was still

21   working with her accounts in Singapore?

22        A.   I do not remember.

23        Q.   Well, are you aware that Nadine was still

24   working with her accounts in Taiwan?

25        A.   And we're talking about around this

1     particular time ---

2          Q.   --- Yes.

3          A.   --- That her shift was happening?

4          Q.   Yes.

5          A.   No, I don't remember.

6          Q.   Okay.  You do know, and you would agree

7     with me, that Malaysia, Singapore and Taiwan are on

8     a different time frame than North Carolina?

9          A.   Yes.

10         Q.   Okay, and did you ever ask Nadine if her

11    responsibilities related to Malaysia, Singapore

12    and/or Taiwan interfered with her ability to work

13    with the third shift employees?

14         A.   Can you repeat that question?

15         Q.   Did you ever ask Nadine if her

16    interactions or her work responsibilities related to

17    Malaysia, Singapore and/or Taiwan interfered with

18    her ability to work with the third shift employees?

19         A.   So the -- the way we scheduled our work

20    wasn't -- how do I put this.  So if something had to

21    happen, it would have not been an imposition of I

22    don't care if you're working 12 -- you know, 24

23    hours a day.  Never.  Never.

24              It was -- even if you go back to the email

25    that I sent Nadine about training this rep in Spain



1    in Mandarin, I specifically asked is this something

2    you can put in your schedule.  So there was always

3    that.  What are you working on?  Is this feasible?

4    Can you do this.  And this happened with all of us.

5            And like if there was something that I

6    needed to do, and it was conflicting with something

7    else that I was doing, I would adjust or ask

8    somebody else for help.  And that's why the teamwork

9    thing was so important to me.  Because this was a

10   moving target.

11           This job was always, like -- new programs

12   will come up here.  New requests will come up here.

13   New hires will come up here.  So we will always have

14   to be juggling.  Who's doing what, who can do this,

15   can you do this because I'm working on this.  And

16   so, it was never something like, I'm going to impose

17   or make you work 20 hours a day.  No.

18   Q.   So I'm not sure if that answers the

19   question that I asked you.

20           But it sounds like what you're saying is

21   that you would take into consideration Nadine's

22   other schedule ---

23   A.   --- Yes.

24   Q.   --- As it pertained to what she might be

25   doing with her overseas clients in the context of


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 64 of 110

1      her ability to do something here in the U.S.  Right?

2           A.   Yes.

3                And I also knew that she would be in

4      charge of making sure she wasn't, you know, working

5      more hours than she needed to.  Because, again, it

6      was very difficult to get an answer of what are you

7      doing, what are you working on.  She was very

8      secretive with what she did.

9           Q.   And when you say she was secretive, did

10     she ever refuse to provide you with any written

11     documentation to verify her schedule?

12          A.   So my sense like my initial reaction to

13     that is yes.  I cannot tell you exactly, oh, I

14     remember sending her this email asking for this.  I

15     can't remember.  But it was -- I wasn't going to get

16     anything out of her.

17          Q.   Well, I mean, when you say that you

18     weren't going to get anything out of her, were you

19     responsible -- you've said you weren't responsible

20     for scheduling her -- her training sessions

21     overseas.  Correct?

22          A.   No.  Because all of the trainers will

23     schedule their own trainings.

24          Q.   So when you say she was being secretive,

25     is it that she just normally scheduled her own


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 65 of 110

1    trainings and just that -- that was her policy, and

2    that had been Market America's policy all the time

3    that she had been working in that position?

4        A.   But we always discussed what we were

5    doing.  We always talked about the things that we

6    were doing.  And Nadine wouldn't.

7        Q.   Well, you never reprimanded her for not

8    providing you with information pertaining to her

9    schedule.  Correct?

10       A.   Correct.

11       Q.   And so she had to deal with overseas

12   markets in Malaysia, Singapore and Taiwan.  Correct?

13       A.   Correct.

14       Q.   You don't speak Mandarin.  Correct?

15       A.   Correct.

16       Q.   And you were feeling that she was being

17   secretive about something, but yet, you weren't

18   telling her this, and you weren't reprimanding her

19   for this.  Correct?

20       A.   Correct.

21       Q.   All right.  Let's go to paragraph 11.

22            MS. DEBOARD:  Is now a good time to

23   take a quick bathroom break?

24            MS. GRAY:  Yes, ma'am.

25       (11:20-11:24 a.m. - recess)



Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 66 of 110

1          Q.    (Ms. Gray)   Okay.   Now, before we stopped,

2     we were talking about paragraph number 11 on your

3     declaration.   And you said simply stated, Nadine did

4     not accept the new vision of the corporate training

5     group.

6               Do you see that?

7          A.    Uh-huh.

8          Q.    Did you ever document, in terms of an

9     email to your staff or any type of a newsletter or

10    an announcement, what your new vision was for

11    corporate training -- for the corporate training

12    group?

13         A.    Written?   No, that I remember.

14         Q.    Right.

15              So any announcement that you would have

16    made did not come in the form of something written

17    that would have been disseminated throughout the

18    company.   Is that correct?

19         A.    Correct.

20         Q.    So then, the only evidence you have of

21    what your new vision for the corporate training

22    group was would have been a verbal announcement or a

23    statement to the members of that staff.   Correct?

24         A.    Correct.

25         Q.    Did you collectively meet as a group



1    together at once to talk about your new group

2    vision?

3        A.   Yes.

4        Q.   When was that?

5        A.   When we talked about it, when we -- when

6    Colbert left.  We had two meetings.  We had one

7    meeting as a team.  I mean -- team, I mean Nadine,

8    Cherri, Henri, Abby and myself.

9             And then, we had basically the same

10   meeting with Sherry.  Because Sherry wanted to get

11   more acquainted with what the training department

12   was doing since Colbert never really got replaced in

13   terms of -- because Colbert used to report to Mark.

14            And so, when I -- this was -- so after

15   Colbert left, I was going to be promoted as managing

16   the department, but reporting to Sherry.  So it was

17   almost like Sherry was going to be the new Colbert,

18   but Sherry didn't know what Colbert did or didn't

19   do, a lot of what Colbert did.  So she needed to

20   know exactly what we were all working on and were

21   going to do.

22            So we had that second meeting, and we

23   basically went over the same thing that we had

24   already discussed without Sherry.

25       Q.   Are you aware that there was a job

Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 68 of 110

1    responsibilities meeting in September of 2016?

2             And that was the one that was held by

3    Colbert.

4         A.    2016?  Yeah.  I mean, we had several

5    meetings.  I cannot say that I remember that one

6    specifically.

7         Q.    But was that the meeting where Colbert

8    talked about what she did and what the transition

9    was going to look like with her being gone?

10        A.    September of 2016?

11        Q.    Yes.

12        A.    But she left in ---

13        Q.    --- November.

14        A.    Oh.  So yes.  So then, there must have

15   been one before she left, yes.

16        Q.    And then, was there also a meeting in

17   January of 2017 where Sherry was present?

18        A.    Yes.

19        Q.    And during that meeting, isn't it true

20   that you all discussed the job responsibilities for

21   the individuals in the corporate training group?

22        A.    Yes.

23        Q.    And do you have a recollection of what job

24   responsibilities were assigned to Nadine?

25        A.    So yes.  Basically the same -- the same



1    that we have been doing -- it was almost like

2    nothing big changed after Colbert left in terms of

3    what we were doing, the way we were operating.

4    Right.

5              So Nadine was going to be in charge of

6    anything that had to do with Mandarin or Asian

7    country markets.  And whatever else she was doing

8    before, it was going to continue to be the same,

9    with one exception probably.  Well, two exceptions.

10   The new -- sort of new thing, that was Confluence.

11   That was going to be something that was not

12   happening before.

13             And then, I also had a suggestion, and

14   that's what -- maybe point seven -- where there was

15   training, the MPCP training that was done for new

16   hires in the company in general.  That was in a

17   training that was a big, huge spider web the

18   training department did in general.  Because, again,

19   the bulk of it was unfranchise services, the reps.

20             But we did need for the whole company, our

21   employees, to know high-level idea of what the

22   company was about.  And so Nadine was in charge of

23   doing that training solely before, entirely.  That

24   was her training.

25             And I saw an opportunity for growth for



1    all of us, actually, in the department to deliver

2    that training.  So that was the only suggestion.  So

3    other than Confluence and that change, nothing else

4    changed.

5         Q.   Okay.  Now, let me ask you about the

6    cross-training.  What was the ultimate result of

7    your cross-training vision within the department?

8         A.   So a couple of things.  So what I talked

9    about before, where if somebody was caught up with a

10   project and that training needed to happen, other

11   people could do it.  That was one.

12             With the MPCP, specifically -- so the

13   company, as I've mentioned before, has two big

14   conferences a year.  And there's a lot of prepping

15   that goes on that.  It's about, I don't know, two or

16   three months before those conferences, a lot of

17   people put aside whatever they're doing, and they

18   only work on those things.

19             So in training we have to at the same time

20   be prepared to deliver trainings for those new

21   programs as soon as they came up.  And so for us to

22   be able to get screenshots or material on what those

23   programs were, because they were happening so

24   quickly, it was better to have connections in the

25   company to know who does what.

1            It's not the same -- like if you send an

2    email to a graphic designer, saying I'm so-and-so

3    from the training department, and I need these

4    screenshots for a training.  They were almost

5    excused to not respond to you if they were working

6    on conference stuff.  And conference stuff was what

7    we needed to be training on, as well.  Right?

8            So different than -- I was training, I

9    kind of sort of have a personal, you know,

10   connection with you, and that you and I -- it was

11   700 people, about 700 people in that building.  So

12   you could go for years without knowing who was next

13   to you.

14           And so if we were able to develop that

15   network and those connections, I thought that in the

16   training department we were going to be more

17   efficient at producing material.  And so that was a

18   golden opportunity.

19   Q.    Uh-huh.

20   A.    It was a laid-back training in the sense

21   that if you help deliver the unfranchise services

22   training to the unfranchise services reps, you are

23   pretty much qualified to do this other training for

24   sure, because this other training wasn't even 10

25   percent of what this other big training was.

1          Q.    Well, when you talk about the conferences,

2    and I think you said you all had two major

3    conferences?

4          A.    Uh-huh.

5          Q.    Was one of them the International

6    Convention?

7          A.    Yes.

8          Q.    And did Ms. Lee participate in the

9    International Convention in 2017 to your knowledge?

10         A.    Yeah.  I think we all did, yes.

11         Q.    Uh-huh.  And are you aware that she

12   received a letter from Brandi Quinn which commended

13   her for an outstanding job at the 2017 International

14   Convention?

15         A.    I think that was a letter that was sent to

16   all of the people that participated in that.

17         Q.    And that would have included Nadine.

18   Correct?

19         A.    Yes.

20         Q.    Okay, so according to Brandi Quinn, the

21   efforts that Nadine made caused the convention to

22   run smoothly and was considered a huge success.  Are

23   you aware of that?

24         A.    Yes.  You're talking about the letter that

25   every single person that worked in the convention


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 73 of 110

1    received.

2         Q.   I don't know if ---

3         A.   --- If three hundred people went to the

4    convention, 300 people received the exact same

5    letter.

6         Q.   Okay.  Let me show you what I'm talking

7    about.

8              MS. GRAY:  And I'll just tell you for

9    purposes of today's deposition, this document is

10   marked as Market America 280.  Okay?

11             I can show it to her on my computer, but

12   just so you can have it.

13             MS. DEBOARD:  Let me see if I can

14   pull this up here.

15             MS. GRAY:  Can you see what I'm

16   showing you?

17             THE WITNESS:  Oh, yes.  That was a

18   letter that everybody received.  All of us that

19   participated, yes.

20        Q.   (Ms. Gray)  Okay, and would you agree with

21   me that this letter is specifically written to

22   Nadine?

23        A.   Yes.

24        Q.   Okay.  It doesn't say to every one of you

25   all that participated.  It specifically is directed


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 74 of 110

1    to Nadine.  Correct?

2          A.   Yes.  The content -- the body of the

3    letter was the same for all of the employees.  The

4    name will change to each employee, yes.

5          Q.   Well, regardless of how many other people

6    got this letter, you agree that Nadine received the

7    letter?

8          A.   Of course.  Yes.

9          Q.   And it was for her outstanding job.

10   Correct?

11         A.   Correct.

12         Q.   So regardless of whatever complaints you

13   have about what Nadine did or didn't do, at least

14   Brandi thought in 2017 that Nadine had done an

15   outstanding job with regard to the 2017

16   International Convention?

17         A.   Yes.

18         Q.   And are you aware of any document that

19   Nadine received that was contrary to this?

20         A.   No.

21         Q.   All right.  At some point, you have said

22   that the only complaints you received regarding

23   Nadine's job performance were from Rose.  Correct?

24         A.   On that particular training, yes.

25         Q.   Well, did you receive any other emails



1      from anybody complaining about Nadine's job

2      performance?

3           A.    From -- at the time -- what was her name?

4      Two managers of the unfranchise services department

5      would complain to me that ---

6           Q.    --- Let me just stop you for one second

7      before you answer.

8                My question is specifically about an email

9      from these individuals.  I'm not talking about a

10     verbal complaint.

11          A.    No.

12          Q.    So do you have any written complaints,

13     i.e., emails, newsletter, memo, anything of that

14     nature from anyone who complained about Nadine's job

15     performance?

16          A.    Written emails, no.

17          Q.    All right.  Let's talk about Nadine's

18     termination.  Now, according to the documentation

19     that I have, Nadine was terminated by you.  Is that

20     correct?

21          A.    Correct.

22          Q.    Was anyone else involved in the decision

23     to terminate Nadine?

24          A.    Yes.

25          Q.    And who was that?



1          A.    Sherry Spesock.

2          Q.    Anyone other than Sherry?

3          A.    We also had Brandi Foster in a couple of

4    meetings to discuss this, yes.

5          Q.    When you say to discuss this, what do you

6    mean?

7          A.    To discuss our concern that this is our

8    main client in the training department was

9    unfranchise services.  And the director of

10   unfranchise services was the first person that

11   received the complaint, or the comment that the

12   training that was happening for the third-shift

13   employees was not being complete.

14          She was worried that future trainings --

15   or the department was going to be affected by the

16   lack of quality in future trainings in Mandarin.

17          Q.    Okay, and this is back to the statements

18   that you told me about between Rose and Brandi.

19   Correct?

20          A.    Correct.

21          Q.    Okay.  I'm not interested in that.

22          What I'm interested in is who all made the

23   decision to terminate Nadine?

24          A.    Sherry and I.

25          Q.    That's it?



 1          A.    Yes.

 2          Q.    Just you and Sherry?

 3          A.    Uh-huh.

 4          Q.    And did you go to Sherry and tell her that

 5    you were planning to terminate Nadine?

 6          A.    No.  I think this was a decision that both

 7    of us ended up concluding at the end of a meeting.

 8          Q.    When was that meeting?

 9          A.    I cannot remember that.  It wasn't too far

10    from the actual termination date.

11          Q.    So did you go to Sherry and say you're

12    thinking about terminating Nadine, or was it vice

13    versa, or how did it -- how did this meeting come

14    about?

15          A.    We had several -- Sherry and I had several

16    conversations about the concerns we had with

17    Nadine's attitude.  And given that it had been so

18    consistent, and given that she had refused or

19    challenged the authority of her last three managers,

20    myself included, we concluded that it was in the --

21    the best interest for the company was to not have

22    Nadine in the team.

23          Q.    Okay, and you and Sherry made that

24    decision?

25          A.    Yes.



1          Q.    And who communicated the decision to

2     Nadine?

3          A.    I did.

4          Q.    How did you do that?

5          A.    In a meeting at Sherry's office.

6          Q.    Okay.  How did you set the meeting up?

7          A.    I was in Sherry's office, and Sherry

8     called Nadine at her cubicle and asked her to come

9     to the office.

10         Q.    And once she came to the office, what was

11    said?

12         A.    I don't remember exactly.  But I

13    communicated to Nadine that we have reached the

14    decision to let her go because of issues with her

15    performance.

16         Q.    Issues with her performance?  Job

17    performance?

18         A.    Yes.

19         Q.    And that's what you told her?

20         A.    Well, so my -- the core of my argument was

21    that Nadine was not being a team player, basically.

22    That we were having a lot of trouble getting her to

23    work as a part of the team.  That she was just doing

24    whatever she decided she was going to do, and that

25    was it.  And that we could not continue to operate



1     the team -- the training team under those

2     circumstances.

3          Q.   Okay.  Now, I asked you earlier if you had

4     given Nadine any verbal warnings about her job

5     performance.  And I believe your answer was no.  Is

6     that correct?

7          A.   Uh-huh.  Correct.

8          Q.   Okay.  Are you aware that the company has

9     an employee handbook that contains policies related

10    to various aspects of the job, including policies

11    that pertain to disciplining an employee other than

12    dismissal?

13         A.   No.

14         Q.   You never knew about these policies?

15         A.   I don't remember reviewing them, no.

16         Q.   Did you have any training on the policies?

17         A.   I received a handbook, and I should have

18    read as much as I could when I was first hired.  But

19    that was it.

20         Q.   Okay.  I have been provided documents by

21    the company that are Bates stamped MA725 through

22    740.  And these are the employee policies that I'm

23    referring to.

24              And according to their employee policies,

25    verbal warnings, although they are verbal in nature,


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 80 of 110

1    the manager is required to document and date the

2    content of any discussions that that manager had

3    with an employee regarding to, you know, performance

4    issues.

5            Are you aware of that policy?

6    A.   No.

7    Q.   Okay, and even if you were aware of that

8    policy, you would agree, that would not have come

9    into play in this particular instance, because you

10   never gave Nadine any verbal warnings.  Correct?

11   A.   Correct.

12   Q.   Okay, and then, the company has what they

13   call a written warning policy.  And the written

14   warning policy indicates that a written warning is

15   presented to the employee by the manager, and it is

16   intended to clearly identify the specific conduct or

17   performance for the reason for a warning.  And to

18   tell specific performance or conduct improvements

19   that must be made.  Okay?

20   A.   Okay.

21   Q.   Are you aware that that was a policy?

22   A.   No.

23   Q.   And you agree with me, as you sit here

24   today, that you never provided such a written

25   warning to Nadine.  Correct?



1        A.   Correct.

2        Q.   And to your knowledge, Sherry never

3   provided any type of written warning to Nadine.

4   Correct?

5        A.   Correct.

6        Q.   And as you sit here today, you would agree

7   with me that you've never produced any such a

8   writing that would have been included in Nadine's

9   personnel file.  Correct?

10       A.   Correct.

11       Q.   And to your knowledge, did Sherry ever

12   produce any written warning that would have been

13   included in Nadine's personnel file?

14       A.   Not that I know of.

15       Q.   At the time that you terminated Nadine,

16   you indicated that you replaced her with Rose.  Is

17   that true?

18       A.   Uh-huh.

19            MS. DEBOARD:  Is that a yes?

20            THE WITNESS:  Yes.

21       Q.   (Ms. Gray)  Why did you replace her with

22   Rose?

23       A.   So during Rose's training -- so first of

24   all, Rose was bilingual.  And finding a Mandarin and

25   English combination of bilingual person around here



Atlantic Professional Reporters, Ltd. – (336)945-9047

1    is not that easy.  That was a huge advantage.

2              And during Rose's training, she displayed

3    a great amount of work ethic, interest in the job,

4    interest in learning.  In fact, she asked -- we

5    never asked her to attend meetings, training,

6    because she was having that training in English.  So

7    we didn't deem it necessary.

8              But she asked Brandi for permission to

9    attend that training so she could get more of what

10   she was already being trained on, right.  The more

11   exposure, the more she could learn.

12             And then, when she was attending that

13   training, she realized, oh, they're reviewing

14   material that has screenshots that are not updated.

15   Some of the things that are being said here conflict

16   with the other thing that I'm learning in that

17   training.

18             And so she displayed a great interest in

19   properly learning the job duties and being

20   proactive.

21        Q.   Okay, so at the time that Nadine was

22   terminated, her title was global training projects

23   manager.  Correct?

24        A.   Correct.

25        Q.   And are you telling me that you hired Rose



1     to a management position to take Nadine's place?

2          A.   So Rose was not going to take the complete

3     -- so Rose was not going to take the complete

4     portfolio of what Nadine was doing.  It was going to

5     be mainly -- and Nadine had experience -- I mean,

6     Rose had experience as an instructor.  I believe she

7     had been -- she had had a teaching position in

8     China, if I remember correctly.  So she was trained

9     as a trainer.

10             And so she was not going to take -- at

11     least to begin with, it was not going to be one

12     hundred percent of what Nadine did.

13          Q.   So you agree with me that Rose was not

14     hired to take Nadine's position as the global

15     training projects manager?

16             MS. DEBOARD:  Objection to form.

17          Q.   (Ms. Gray)  Correct?

18             MS. DEBOARD:  Objection to form.  You

19     can answer.

20             THE WITNESS:  She was not given the

21     exact same title, no.

22          Q.   (Ms. Gray)  And you would agree with me

23     that the training Rose received prior to taking

24     Nadine's job was training that she received from

25     Nadine?



1          A.    Not only from Nadine, no.  That was a

2     small part of it.

3          Q.    Who else trained her?

4          A.    Henri and I.

5          Q.    You didn't train her in any of the global

6     aspects of teaching Mandarin in Malaysia, Singapore,

7     Taiwan ---

8          A.    --- No.

9          Q.    --- Any of that aspect.  Correct?

10         A.    Correct.

11         Q.    Henri didn't do that either, did he?

12         A.    No.

13         Q.    So the only training that included

14    bilingual training, with English and Mandarin being

15    the two languages, that Rose would have received

16    would have had to come from Nadine.  Correct?

17         A.    Correct.

18         Q.    Did you make the decision to place anyone

19    else in Nadine's position, i.e., in terms of the job

20    responsibilities, besides Rose?

21         A.    I'm not following the question.  What do

22    you mean?

23         Q.    Well, because you said in your affidavit

24    that when you terminated Nadine, you hired Rose --

25    you replaced her with Rose.

Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 85 of 110

1          A.    Uh-huh.

2          Q.    But you have admitted that you didn't

3    replace the entire position, you just replaced the

4    Mandarin-speaking portion of the position with Rose.

5    Correct?

6          A.    Correct.

7          Q.    So who made the decision to have any of

8    Nadine's other job responsibilities performed?

9          A.    Oh.  So we were going to rotate -- so say,

10   for example -- well, first of all, a huge portion of

11   what we

12   needed to be done was Confluence.  So we were going

13   to do it among Henri, Abby and myself and Rose,

14   because Rose was on board with working with

15   Confluence.  So that was going to be Colbert.  And

16   then, say, for example ---

17          Q.    --- Wait.  Wait.  And who made that

18   decision?  That's my question.

19                Who made the decision about how ---

20          A.    --- Oh.  Me.  Sorry.  Me.

21          Q.    Did you make the decision about how Rose

22   -- I'm sorry, Nadine's job was going to be divided

23   up within the responsibilities for each team member

24   that you had?

25          A.    Yes.



1          Q.   Just you made that decision.  Correct?

2          A.   Yes.

3          Q.   What portion of Nadine's job was assigned

4     to Rose?

5          A.   I would say -- so it gets tricky because

6     since Nadine was refusing to work on Confluence, I

7     cannot count that as part of her job, because she

8     wasn't doing it.

9               But from what she was doing, I would say

10    70 to 80 percent what got transferred to Rose.

11         Q.   Seventy to 80 percent of what Nadine had

12    been doing was transferred to Rose?

13         A.   Uh-huh.  Yes.

14         Q.   Are you sure about that?

15         A.   From the recollection I have today, yes.

16         Q.   Did you interview anyone for -- to take

17    Nadine's position?

18         A.   We interviewed Rose.

19         Q.   When you say we, who do you mean?

20         A.   Brandi, Sherry and I.

21         Q.   Was the position posted?

22         A.   I do not remember.

23         Q.   Did you receive applications for the

24    position?

25         A.   I don't remember.



1          Q.   Did you have a job description for the

2     position?

3          A.   Yes.

4          Q.   All right.  Now, let's talk about Rose's

5     qualifications.

6               Did you review Rose's application before

7     you offered her the job to take Nadine's place?

8          A.   I believe so.

9               MS. GRAY:  Let's just, for the

10    record, reflect that Rose's job application has been

11    submitted by defense counsel, and it is marked Bates

12    stamps MA006, MA007.  And it is marked as a

13    confidential document.

14               And just for the record, do you have

15    any concerns, Ms. Deboard, regarding me asking

16    questions about this application?

17               MS. DEBOARD:  No.  We can mark this

18    portion confidential.  But if we need to waive it,

19    we can.

20               MS. GRAY:  Okay.

21               MS. DEBOARD:  To a later date.

22               MS. GRAY:  Okay.

23               CONFIDENTIAL PORTION BEGINS

24

25



1          Q.(Ms. Gray)   Now, as you sit here today, you're

2              saying you're not sure if you saw Rose's job

3              application, correct, before you gave her the

4              position of global training projects manager?

5          A.   I don't remember.

6          Q.   Okay.  I'm going to let you take a minute

7     to look at it.

8          A.   Okay.

9          Q.   I'm going to show it to you on my

10    computer.

11         A.   Uh-huh.

12         Q.   And maybe that will refresh your

13    recollection as to whether you've seen it or not.

14    Okay?

15              That's where it starts.  Okay?

16         A.   Okay.

17         Q.   So you can tell me to slow down if you

18    need me to.

19              Do you need me to slow down?

20         A.   Uh-huh.

21         (Witness examined document)

22         A.   Could you go back to the work history?

23         Q.   Okay.

24         A.   I don't remember.

25         Q.   You don't remember if you saw that


Case 1:18-cv-01046-WO-JLW  Document 36-3  Filed 06/04/21  Page 89 of 110

1     application?

2          A.    Uh-huh.

3          Q.    So at the time that you made the decision

4     to hire Rose in the position, what did you know

5     about her job performance or her background, other

6     than what you saw in terms of her working under your

7     supervision?

8          A.    She had experience in instruction,

9     teaching ---

10         Q.    --- You saw her -- you saw this.  Is that

11    what you're saying?

12                You observed her having ---

13         A.    --- No.  From her background.

14         Q.    Okay.  Listen to my question.  All right?

15                You said you don't recall if you saw the

16    application before you hired her.  Correct?

17         A.    Correct.

18         Q.    So let's talk about the things you do

19    know.  And that is in terms of what you observed

20    from Rose.

21         A.    Yes.  In terms of what I observed from

22    Rose was her work ethic, her way of being super

23    proactive to learn more things, to make sure that

24    she understood entirely what she's supposed -- she

25    was supposed to know, to go above and beyond what


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 90 of 110

1    she was asked.

2              And I did talk to her at some point about

3    her teaching experience.  So I knew that.  And she

4    did share with me something that I don't see listed

5    there, which was teaching in China.  So I don't know

6    if I saw that in there or not.

7         Q.   Uh-huh.

8         A.   But we did talk about that.  So I knew she

9    had that experience.

10        Q.   Okay.  Anything else?

11        A.   No.

12        Q.   Now, this job application that Rose

13   submitted to Market America was for a position that

14   she was applying for called the unfranchised

15   services representative.  Are you aware of that?

16        A.   That ---

17        Q.   --- Yes.

18        A.   --- Application?

19        Q.   Yes.

20        A.   Oh.  No, that -- I mean, I didn't know

21   that was the application for unfranchise services.

22        Q.   Are you aware that that was the position

23   she applied for when she started, first started ---

24        A.   --- When she started, yes.

25        Q.   --- At Market America?



1          A.   Yes.

2          Q.   Did you interview her for the position of

3     unfranchise services representative?

4          A.   Yes.

5          Q.   You did?

6               According to her application, she

7     submitted this application on ---

8          A.   --- Oh, for unfranchise services?  I'm

9     sorry.  I'm confused.

10               MS. DEBOARD:  Hold on.  Let her

11     finish her question.

12               THE WITNESS:  Sorry.  Yes.

13          Q.   (Ms. Gray)  According to the application

14     that Rose initially submitted to Market America, it

15     was for the position of unfranchise services

16     representative, and it is dated December 27th,2016.

17               Would you have interviewed her for that

18     position?

19          A.   Oh, no.  No.

20          Q.   Did you have anything to do with Rose's

21     initial hire at Market America?

22          A.   No.

23          Q.   Okay, so if Rose didn't interview with you

24     for the position of unfranchise services

25     representative, it's highly unlikely that you would



1    have ever seen her original application.  Is that

2    correct?

3         A.   Correct.

4         Q.   Okay.  Now, according to Rose's original

5    application, she has indicated that she was working

6    for the Kernersville Sister City Association, and

7    that her job was to help Kernersville establish and

8    maintain various sister city relationships with

9    towns and cities across -- around the world.

10             Did you know that?

11        A.   No.

12        Q.   She also indicated that from August of

13   2014 to July of 2016, she had been employed by the

14   North Carolina Leadership Academy as a Chinese

15   teacher.  Okay, and she indicated that her job

16   responsibilities in that regard was teaching Chinese

17   for the students from K through 11 grades.  And that

18   she worked in that capacity on a part-time basis.

19             Do you see that on her application now?

20        A.   Yes.

21        Q.   Is that the teaching that she told you

22   about?

23        A.   Yes.

24        Q.   Did she tell ---

25        A.   --- And I remember something else in


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 93 of 110

1    China.  Because this is here in the U.S.  And she

2    talked about something else in China.

3         Q.   Well, as you can see from looking at this

4    application, she talks about her employment from

5    2000, October of 2000 through the date of this

6    application, which is December 27th, 2016.  Okay?

7              Do you see anything on that application

8    about her teaching in China?

9         A.   No.

10        Q.   And she indicated that from August 2011

11   through May of 2014, she had worked for Sunshine

12   Styles & More, which was a boutique, and that she

13   was the owner of this boutique, and she was self-

14   employed as the owner of this boutique.

15             Do you see that?

16        A.   Uh-huh.  Yes.

17        Q.   And then, prior to that, she said she

18   worked 2005 to 2009 at the China Rose Restaurant,

19   where she was the manager and owner, that her father

20   basically owned.

21             Do you see that?

22        A.   Yes.

23        Q.   She did that from 2005 to 2009.  Then, if

24   you go over to the next page, under skills and

25   qualifications, she says I have worked as a cashier,


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 94 of 110

1    waitress, retail sale associate, retail store

2    manager and restaurant manager.  I have great

3    customer service skills, and I am a fast learner.

4              Do you see that?

5         A.   Yes.

6         Q.   Based on what she has in this application,

7    do you think she was qualified for a position at

8    Market America as a global training projects

9    manager?

10        A.   Based on what it says in that application,

11   without taking into account, seeing her performance

12   during training and other things that was displayed,

13   I cannot tell.

14        Q.   You can't tell?

15        A.   (Witness indicated negatively.)

16        Q.   Well, did you ever look at the global

17   training projects manager job description?

18        A.   I know what it was, yes.

19        Q.   Based on this application from Rose, do

20   you think she was qualified to work at Market

21   America as a global training projects manager?

22        A.   No.

23             END OF CONFIDENTIAL PORTION

24

25



1      Q.Okay.  Now, let's go to -- according to Nadine,

2       you made a comment to her that indicated that you

3      felt there were cultural differences between you and

4                          her.

5            Do you recall making such a comment?

6       A.    I mean, in what context?

7       Q.    According to Nadine, you indicated that

8      part of the possible communication skills that you

9      all were having were related to some type of

10     cultural differences between the two of you.  And

11     the comment was made during a meeting in December of

12     2016, according to Nadine.

13      A.    No.  I had a meeting with Nadine in

14     December which, in my opinion, was an extremely

15     successful meeting where what I recall from that

16     meeting was making sure to express to Nadine that my

17     main goal was for us to work as a team, peacefully

18     and gracefully.

19            And I felt like that was the only meeting

20     that Nadine and I had that we successfully

21     communicated and agreed that we wanted a good work

22     environment.

23            If I remember correctly, I'm pretty sure

24     Nadine offered to give me a hug at the end of the

25     meeting.  And I thought that was the biggest win


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 96 of 110

1    ever.  Because Nadine -- I don't recall Nadine being

2    the hug kind of person.  You know, she's very to

3    herself.  And so when I get a hug from someone that

4    I have had, you know, all of this history, I feel

5    like it's a win.

6              So if that's the meeting you're talking

7    about?

8         Q.   In that meeting, did you discuss what

9    you're talking about now as a cultural difference

10   between you and Nadine?

11             For example, you say she didn't hug and

12   you accepted, I guess, her affection as a win for

13   you.

14             Was that in the context that you made the

15   comments about cultural differences?

16        A.   No, I don't think so.  Because I never saw

17   that she didn't hug as a cultural thing.  It was

18   just as an individual.  You know, she wasn't that

19   kind of person.  Like, Cherri was always, hey, you

20   know, like that demeanor.  But not Nadine.

21             And so that was -- that was my big memory

22   of that meeting, that it ended with a hug.  So I

23   went home happy that day.

24        Q.   Do you know whether this meeting was

25   recorded by Nadine?



1        A.    No.  I don't know.

2        Q.    Are you aware that several meetings

3    between Nadine and individuals at Market America

4    were recorded?

5        A.    Yes.  I know that now.  I didn't know that

6    then.

7        Q.    Okay, so are you denying that you made any

8    comments about the cultural differences between you

9    and Nadine?

10       A.    I don't recall saying anything like that.

11       Q.    Okay, so for purposes of this deposition,

12   I don't recall means I can't remember, it's

13   possible, it's also not possible.

14       A.    Okay.

15       Q.    Is that what you mean, as opposed to a

16   flat-out denial, where you would say I know I didn't

17   say that?

18       A.    Oh, yeah.  No.  So I don't recall.

19       Q.    Okay.

20       A.    Because -- yeah, I cannot think of ---

21       Q.    --- Okay.  All right, now, at some point

22   -- let's talk about your -- the end of your

23   employment with Market America.

24             Did you voluntarily resign?

25       A.    Yes.



1          Q.    And did you give a letter of resignation?

2          A.    Yes.

3          Q.    Do you recall that letter of resignation?

4          A.    No.

5                MS. GRAY:  Okay.  Just bear with me

6     for a second.

7                MS. DEBOARD:  Are you looking for the

8     letter?

9                MS. GRAY:  Yes.

10               MS. DEBOARD:  It's MA427.

11               MS. GRAY:  Okay.  Thank you.

12               Do you mind sharing that with her?

13               MS. DEBOARD:  I do not.

14          Q.    (Ms. Gray)  What we are showing you now

15     has previously been marked as Market America's Bates

16     stamp 427.  And if you would just take a minute to

17     review that document.

18          A.    Yes.

19          (Witness examined document)

20          A.    Okay.

21          Q.    All right, so this document, which is

22     marked as MA427, would you agree that this is your

23     letter of resignation to Market America?

24          A.    Yes.

25          Q.    And it's dated March 15th, 2018.  Correct?



1        A.    Yes.

2        Q.    And I believe you say that you have

3   received an offer to remotely join the translation

4   team at Wells Fargo's headquarters in San Francisco.

5   I realize that this opportunity is too exciting for

6   me to decline.

7              Do you see that?

8        A.    Yes.

9        Q.    Now, I asked you earlier when you came

10  into this deposition with whom you have been

11  employed since you left Market America.  And I

12  believe you said Spanish Speaking, LLC, and the yoga

13  studio?

14       A.    Yes.

15       Q.    Why didn't you include Wells Fargo?

16       A.    Because everything that I do that has to

17  do with translation feels to me that is my Spanish

18  Speaking business.  And that was translating from

19  English to Spanish.

20       Q.    Okay.  Did you ever work for Wells Fargo?

21       A.    For an agency that provided the services

22  to interpret -- translation services to Wells Fargo,

23  yes.

24       Q.    It says I received an offer to remotely

25  join the translation team at Wells Fargo



1    headquarters in San Francisco.  Is that true?

2        A.   So I left out the part that it was an

3    agency that was doing that.  I didn't feel like it

4    was relevant.  Because eventually, my -- the way the

5    progress went, nobody got hired directly for the

6    translations department, they went through the

7    company first and then eventually will join the

8    translations team.

9        Q.   Who is the agency you're referring to?

10        A.   Prolingual, I think it is.  I cannot

11    remember the name.

12        Q.   Say again?

13        A.   Prolingual, I think.  But I'm not sure.

14        Q.   Prolingual?

15        A.   Uh-huh.

16        Q.   Where is that agency located?

17        A.   California.

18        Q.   Where in California?

19        A.   I do not remember.

20        Q.   So are you saying that you received an

21    offer from Prolingual to join the translation team

22    at Wells Fargo's headquarters in San Francisco?

23        A.   Yes.

24        Q.   And did you actually take that position?

25        A.   Yes.



1          Q.    When did you start?

2          A.    April -- at some point in April after I

3    left.  Yes, at some point in April.

4          Q.    April?

5          A.    Yes.

6          Q.    Of 2018?

7          A.    Yes.

8          Q.    And what was your job title?

9          A.    Linguist.

10          Q.    And what did that require you to do?

11          A.    Translate the online content of Wells

12    Fargo from English into Spanish, and review or

13    proofread translations from other translators.

14          Q.    And how long did you do that job?

15          A.    I did that until -- I believe it was the

16    end of September of 2019.

17          Q.    September ---

18          A.    --- It was a few months.

19          Q.    --- From April 2018 to September of 2019?

20          A.    No.  September to -- September of the same

21    year, 2018.

22          Q.    So you think you did this for

23    approximately four or five months?

24          A.    Yes.

25          Q.    And who did you report to?


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 102 of 110

1          A.    I cannot remember the name of the lady.

2     So when I was hired, there wasn't a head for that

3     department.

4          Q.    There wasn't a what now?

5          A.    There was not a head, like a director for

6     that department.  So I join in a team of people that

7     were already translating and reviewing translations.

8     And then, towards the last couple of months, one of

9     the people from that team got promoted to manager.

10    And then I reported to her.  And I cannot remember

11    her name.

12         Q.    Well, maybe it will refresh your

13    recollection if you can tell me how you got the job.

14         A.    So this was a lady that I graduated from

15    with my master's in Spanish and translation.  She

16    was working there, and they needed someone to help

17    them.  They have lost a couple of people, they have

18    lost their manager.  And so they asked around, who

19    knows someone that you already know can do this job.

20              And so she reached out to me, and it was

21    working four hours, four days a week.  And the

22    salary was slightly higher than what I was making at

23    Market America, so -- and it was doing translation.

24    And I have recently graduated from my program, so it

25    felt to me like the perfect thing to do after



*Copy*          Lee v. Market America          04/27/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1    graduating.

2         Q.   You mean after you got your master's?

3         A.   Yes.

4         Q.   Okay, so it sounds like you got your

5    master's in -- you're talking about the master's in

6    translation studies from the University of North

7    Carolina in Charlotte?

8         A.   Yes.  Uh-huh.

9         Q.   And I think you said you got that in 2017?

10        A.   Yes.  The end of 2017 or -- did I graduate

11   in May or in -- I graduated in May.  So it must have

12   been May of 2017.  Yes, May of 2017.  I can go back

13   and look.

14        Q.   So you're saying a year later someone

15   reached out to you from that program?

16        A.   Oh, no.  It was my -- I mean, like I met

17   this lady -- so, wait.

18             When did I graduate from -- can I look?

19        Q.   Yeah.

20        A.   I cannot believe I can't remember when I

21   graduated.  So in 2017.

22        Q.   Okay.

23        A.   Yes.  Now I know the year.

24        Q.   And so you're saying that the person

25   reached out to you a year later about a position



1      with Prolingual?

2           A.   No.   Probably not a year later.   Because

3      if I graduated towards the end of 2017, and then I

4      got this offer in 2018, March, beginning of March.

5      So that wouldn't have been a year.

6                And I remained in contact with her.   This

7      is someone that I graduated with.   So she became my

8      friend.

9           Q.   So what was her name?

10          A.   Alexandra.

11          Q.   Alexandra?

12          A.   Uh-huh.   Yes.

13          Q.   What's her last name?

14          A.   Guevara.

15          Q.   Can you spell that?

16          A.   G-u-e-v-a-r-a.

17          Q.   And she's local, here?

18          A.   Charlotte.   She used to be in Charlotte at

19     that point.

20          Q.   Okay.   You said the name of this company,

21     is it called Prolingual Spanish?

22          A.   Prolingual.   I think it's an agency, and I

23     cannot remember -- maybe I can find that, too.

24                Populus.   Okay.   That was the name.

25          Q.   Can you spell that?



1          A.    P-o-p-u-l-u-s Group.  So Populus Group

2    managed all of the translation for Wells Fargo.

3          Q.    Okay, and so does that refresh your

4    recollection of who you would have been working with

5    at Populus?

6          A.    Reporting to?  No.

7                What's her name?  I cannot remember her

8    name.

9          Q.    Okay.  That's fine.

10               And is this place headquartered in Troy,

11    Michigan?  Do you know?

12          A.    Huh-uh.  I don't know.

13          Q.    Okay.  All right, so going back to your

14    letter of resignation, you also indicated that you

15    would like to help with the transition of your

16    duties so that the operations could continue to

17    function smoothly after your departure.

18          A.    Correct.

19          Q.    Did you do that?

20          A.    I think I did, yes.

21          Q.    Okay, and then, also, going back Nadine's

22    termination.  At the time that she was terminated,

23    did she indicate to you that she was willing to work

24    in any other department at Market America?

25          A.    Yes.


Case 1:18-cv-01046-WO-JLW   Document 36-3   Filed 06/04/21   Page 106 of 110

1          Q.   And what department did she indicate she

2     was willing to work in?

3          A.   Not to me -- hold on.  Let me rephrase

4     that answer.

5               What I'm remembering now is someone saying

6     that Nadine was willing to work in another

7     department.  But I don't remember who said that, and

8     I don't remember what the department was.

9          Q.   Okay, but you can confirm that you at

10    least heard that she was willing to work in another

11    department at the time of her termination?

12         A.   Yes.

13               MS. GRAY:  All right.  I don't think

14    I have anything further.  But if you give me a

15    minute, and we can review, then I'll come back.

16    Okay.

17               THE WITNESS:  Uh-huh.

18               MS. GRAY:  So where can we go?

19               MS. DEBOARD:  So there are -- we can

20    go off the record.

21         (12:22-12:37 p.m. - recess)

22               MS. GRAY:  Thank you, Ms. Camara.  I

23    have no further questions.

24               THE WITNESS:  You're welcome.

25               MS. DEBOARD:  I don't have any



1      questions.

2           WHEREUPON,

3       at 12:37 o'clock p.m. the deposition was adjourned.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Atlantic Professional Reporters, Ltd. - (336)945-9047

<u>CERTIFICATE OF TRANSCRIPT</u>

I, *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify that there appeared before me the foregoing witness;

That the testimony was duly recorded by me, reduced to typewriting by me or under my supervision and the foregoing consecutively numbered pages are a complete and accurate record of the testimony given at said time by said witness;

That the undersigned is not of kin nor associated with any of the parties to said cause of action, nor any counsel thereto, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this the 10th Day of May, 2021.

_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter
Atlantic Professional Reporters
Post Office Box 11672
Winston-Salem, NC 27116-1672



## CERTIFICATE OF OATH

I, *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify that there appeared before me the foregoing witness;

That the witness personally appeared before me at the date, time and location hereon captioned and was personally sworn by me prior to the commencement of the proceeding in the matter hereon captioned.

IN WITNESS WHEREOF, I have hereunto set my hand this the 10th Day of May, 2021.

_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter
Atlantic Professional Reporters
Post Office Box 11672
Winston-Salem, NC 27116-1672

