Exhibit D

Sherry Spesock Deposition Transcript

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No.: 1:18-cv-1046


HUI MINN LEE,                    )
                                 )
                    Plaintiff,   )   D E P O S I T I O N
                                 )
        vs.                      )
                                 )   * C O P Y *
MARKET AMERICA, INC.,            )
                                 )
                    Defendant.,  )
                                 )
-----------------------------------


_____

SHERRY DENISE SPESOCK
_____


101 South Elm Street
Greensboro, North Carolina


Tuesday, May 4, 2021
10:05 o'clock a.m.


_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter



Atlantic Professional Reporters, Ltd.
P. O. Box 11672
Winston-Salem, NC 27116-1672
(336) 945-9047
(800) 717-0001

NOTES

PAGE LINE        SUBJECT MATTER       RELATES TO      ACTION

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____



## APPEARANCES OF COUNSEL

Angela Gray, Esq.
**GRAY NEWELL THOMAS, LLP**
7 Corporate Center Court, Suite B
Greensboro, North Carolina 27408


Camilla F. Deboard, Esq.
**TEAGUE ROTENSTREICH STANALAND FOX & HOLT, LLP**
101 South Elm Street, Suite 350
Greensboro, North Carolina  27401




OTHER APPEARANCES

Hui Minn Lee
Kelly Rotenstreich



Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 4 of 67

### I N D E X

STIPULATIONS                                                5
EXAMINATION

    Ms. Gray                                                6
    Ms. Deboard                                            64

_____


ADJOURNMENT                                                64
CERTIFICATE OF TRANSCRIPT                                  65
CERTIFICATE OF OATH                                        66

### E X H I B I T S

| Name | Offered By | Identified |
|------|-----------|-----------|

None offered


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 5 of 67

<u>STIPULATIONS</u>

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated before *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large.

The deposition was conducted for use in accordance with and pursuant to the applicable rules or by order of any court of competent jurisdiction.

Reading and signing of the testimony was not requested prior to the filing of same for use as permitted by applicable rule(s).

Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 6 of 67

```
1              The witness, SHERRY DENISE SPESOCK, being

2    first duly sworn to state the truth, the whole truth

3    and nothing but the truth, testified as follows:

4         (10:05 o'clock a.m.)

5                        EXAMINATION

6    BY MS. GRAY:

7         Q.   Good morning, Ms. Spesock.

8         A.   Good morning.

9         Q.   My name is Angela Gray, and I am an

10   attorney representing Nadine Lee in a lawsuit that

11   she's filed against Market America.

12        A.   Uh-huh.

13        Q.   And are you aware that you're here today

14   to give deposition testimony with regard to that

15   case?

16        A.   Yes, ma'am.

17        Q.   Okay.  Great.

18             So let's just get your name for the

19   record.

20        A.   Sherry Spesock.

21        Q.   Is that your full name?

22        A.   Sherry Denise Spesock.

23        Q.   Okay.  Thank you.

24        A.   Uh-huh.

25        Q.   And can you just tell me what you did to
```



1     prepare for today's deposition, Ms. Spesock?

2          A.    I spoke with Camilla yesterday.

3          Q.    Did you review any documents?

4          A.    A couple emails.

5          Q.    Is that all?

6          A.    Yes.

7          Q.    Okay.  Great.

8                Have you spoken to Liliana Camara?

9          A.    I have not.

10         Q.    Okay.  You haven't talked to her about her

11    deposition or anything?

12         A.    No, ma'am.

13         Q.    Okay.  All right.  Great.

14               So are you currently employed with Market

15    America?

16         A.    Yes.

17         Q.    And what's your current position?

18         A.    Director of HR.

19         Q.    How long have you held that position?

20         A.    Since November of 2015.

21         Q.    All right, so throughout the time that

22    Nadine, I guess, was terminated from Market America

23    your position was director of HR.  Correct?

24         A.    That is correct.

25         Q.    All right, and when did you start working



1     for Market America?

2          A.    March of 2011.

3          Q.    What was your position when you started?

4          A.    Payroll specialist.

5          Q.    And was it a promotion for you to go to

6     director of HR?

7          A.    Yes.

8          Q.    When were you promoted to that position?

9          A.    So I started as a payroll specialist, I

10    went and progressed through there.  And then I was

11    promoted to director of HR, correct.

12         Q.    When was the promotion?

13         A.    November of 2015.

14         Q.    Oh, I see.  Okay.  I'm sorry.

15               And who is your immediate supervisor now?

16         A.    The president and COO, Marc Ashley.

17         Q.    Okay.  My understanding is that at some

18    point you became Ms. Lee's supervisor.  Is that

19    right?

20         A.    No.

21         Q.    Did you ever work as Ms. Lee's supervisor?

22         A.    I did not.

23         Q.    Okay.  Did Ms. Lee ever report to you in

24    terms of her job performance?

25         A.    No, ma'am.



1          Q.   Did you ever review her job performance?

2          A.   I did a review for her when I took over as

3     director of HR.  I did her review because of Ms.

4     Camara not knowing the full year's past of her job

5     duties.

6               So it was just a -- how do I say -- I

7     can't think of the word.  I'm sorry.  Oh, my gosh.

8               MS. DEBOARD:  An interim review?

9               THE WITNESS:  Yes.

10              MS. BEBOARD:  It's early morning.

11    It's still before noon.  We're good.

12         Q.   (Ms. Gray)  Okay, let me show you a

13    document ---

14         A.   --- Okay.

15         Q.   --- Which might help you to be able to

16    answer some of these questions or refresh your

17    recollection.

18              And what I'm showing to you is a document

19    that has already been submitted to us by Market

20    America's counsel, and it is Bates stamp MA283 to

21    MA284.  And it is the employee performance review

22    for Nadine Lee, and it's dated April 13th, 2017.

23         A.   Okay.

24         Q.   I'm going to show you that document.

25         A.   Okay.


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 10 of 67

1          MS. GRAY:  I'm not going to mark it.

2     It's previously been marked as confidential in this

3     case.  And it's not my intention to mark it as an

4     exhibit to this deposition.  Okay, Camilla?

5          MS. DEBOARD:  Okay.

6     Q.   (Ms. Gray)  And if you would, just take a

7     minute to review that document.  Because I'm going

8     to ask you some questions about it.  Okay?

9     A.   Okay.

10     Q.   And you just let me know when you're done.

11     (Witness examined document)

12     A.   Okay.

13     Q.   Okay, so does this refresh your

14     recollection about when you may have reviewed

15     Nadine's job performance?

16     A.   Yes.

17     Q.   Okay, and the document that you're looking

18     at that I previously identified, is that the one and

19     only performance evaluation that you participated in

20     with regard to Ms. Lee?

21     A.   That is correct.

22     Q.   Okay.  Now, as you can see from this

23     document, Nadine's job performance was evaluated on

24     the scale from one to four.  Correct?

25     A.   Correct.


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 11 of 67

1          Q.    In various ways as it pertains to what she

2    did and how she interacted with her clients and her

3    coworkers.  Correct?

4          A.    Uh-huh.

5          Q.    Did you have any input on the numbers that

6    were attributed to her job performance?

7          A.    Yes.

8          Q.    Okay.  For example, under performance on

9    the first page, the very first thing says, business

10   knowledge.  Do you see that?

11         A.    Uh-huh.

12         Q.    And then there was a number four.  And

13   that means that Nadine was considered to be

14   exceptional in that area.  Correct?

15         A.    Correct.

16         Q.    Was that four given to Nadine because you

17   wanted it there, or because someone else wanted it

18   there?

19         A.    I put it there.

20         Q.    Okay.  Now, how did you make that

21   determination if you had not evaluated Nadine's job

22   performance?

23         A.    It was based off of previous conversations

24   with Ms. Trotter before she left.

25         Q.    I see.



*Copy*           Lee v. Market America           05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1           Were any of the numbers attributed to Ms.

2    Lee on this performance evaluation provided to you

3    by Liliana Camara?

4        A.   No.

5        Q.   Okay, so these numbers were all based on

6    communications that you had with Ms. Trotter.

7    Correct?

8        A.   Correct.  And that was prior to her

9    leaving.

10       Q.   I see.

11           My understanding is that Ms. Trotter left

12   somewhere in November of 2016.  Is that right?

13       A.   Correct.

14       Q.   And this evaluation covers the review of

15   the year of 2016.  Correct?

16       A.   Correct.

17       Q.   Now, I did not see and have not seen

18   provided to me in any documentation a review for Ms.

19   Lee for the year of 2017.

20           Do you know if such document exists?

21       A.   Not that I'm aware of.  It would have been

22   done in April of 2018.

23       Q.   I see.  And by that time, Ms. Lee was no

24   longer employed at Market America.  Correct?

25       A.   Correct.



1          Q.    Okay.  All right, now, if you roll down to

2     the second bracket, I guess, if you will, of

3     information, it says relationship consistencies.

4              Do you see that?

5          A.    Uh-huh.

6          Q.    And it looks like Ms. Lee was given a

7     three for coworker interactions.  Correct?

8          A.    Correct.

9          Q.    And that means she exceeded expectations

10    with regard to her coworker relationships.  Correct?

11         A.    Correct.

12         Q.    And that three was attributed to Ms. Lee

13    by Ms. Trotter, based on Ms. Trotter's interactions

14    and supervision of Ms. Lee during that year.

15    Correct?

16         A.    Correct.

17         Q.    And as you sit here today, have you seen

18    any of the previous reviews that Ms. Trotter may

19    have given to Ms. Lee for her job performance?

20         A.    I may have seen them at some point, but I

21    do not recall them.

22         Q.    Are you aware that Ms. Trotter gave Ms.

23    Lee very high marks with regard to her job

24    performance at Market America?

25         A.    I am not aware.



1           Q.   So when you prepared this evaluation in

2     2017, in addition to talking to Ms. Trotter, did you

3     look at any of the other reviews that Ms. Trotter

4     had given Ms. Lee?

5           A.   Not that I recall.

6           Q.   And on the document we just talked about,

7     the 2016 evaluation, that is your signature on the

8     second page.  Correct?

9           A.   That is correct.

10          Q.   As you sit here today, do you have any

11    changes or any concerns about that document?

12          A.   No.

13          Q.   Any concerns about the accuracy of that

14    document?

15          A.   No.

16          Q.   Now, I'm going to show you a document

17    which has been marked by -- I'm sorry, which has

18    been submitted to me by counsel for Market America,

19    and it's Bates stamped MA286 through MA287.

20               And I'm just going to hand you a copy of

21    it so you can review it.

22               MS. GRAY:  That's my copy.  I didn't

23    make a copy.

24               MS. DEBOARD:  That's fine.  I've got

25    it right here.



 1              MS. GRAY:  Okay.  Good.

 2         Q.   (Ms. Gray)  And, Ms. Spesock, would you

 3    just take a minute to review that?

 4         A.   Sure.

 5         (Witness examined document)

 6         A.   Okay.

 7         Q.   Okay.  Thank you.

 8              Now, would you agree with me that this

 9    document represents the last full evaluation that

10    Colbert Trotter performed for Ms. Lee while she was

11    working at Market America?

12         A.   Yes, that's correct.

13         Q.   And that was for the year of 2015, and

14    it's signed April of 2016.  Correct?

15         A.   Correct.

16         Q.   And I don't see your signature on that.

17    And that is because, as you previously indicated,

18    Ms. Trotter was not there the full year of 2016, or

19    at least at the time when the evaluation was done.

20         A.   That is correct.

21         Q.   And so this one, she was.

22         A.   Yes.

23         Q.   And therefore, you didn't have to sign off

24    on it.

25         A.   That is correct.



Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 16 of 67

1        Q.    Okay.  Great.

2              And you would agree with me that Ms.

3    Trotter made a number of comments in the performance

4    comments section on this evaluation.

5        A.    Yes, ma'am.

6        Q.    But on the last evaluation, which was the

7    one done in 2017, there were no written comments.

8    Do you know why?

9        A.    Because I didn't feel like I could give a

10    true evaluation for her in the interim.

11        Q.    Okay, and, then, Ms. Trotter, I'm

12    assuming, and you can correct me if I'm wrong,

13    didn't provide you with any comments ---

14        A.    --- Correct.

15        Q.    --- To put on that evaluation.

16        A.    Correct.

17        Q.    Right.  And that's the 20 -- the one

18    that's dated 2017?

19        A.    Yes, ma'am.

20        Q.    All right.  Do you have any reason to

21    believe that any of the performance comments on the

22    document MA286 through 287 are inaccurate?

23        A.    I cannot speak for her evaluation for

24    2015.

25        Q.    And in your opinion, you believe this is a



1    true and accurate document.  Correct?

2         A.   I would have -- yes.

3         Q.   Okay, and based on some of the performance

4    comments that I've read, it sounds like Ms. Trotter

5    thought that Nadine was doing an exceptional job for

6    Market America in her capacity as the senior global

7    trainer.  Correct?

8         A.   The way it's written, that is correct.

9         Q.   Okay.  Great.

10        So I take it that you never physically

11   observed -- you never physically observed Ms. Lee

12   perform her job at Market America.  Is that right?

13        A.   The only time that I had any observation

14   was when we went to California together back in

15   2016.

16        Q.   How long were you there?

17        A.   We flew in on Monday.  We were in the

18   office Tuesday, Wednesday, Thursday, and flew back

19   on Friday.

20        Q.   And what did you observe?

21        A.   Ms. Lee would do the training that she was

22   required to do for the team, and then just sit and

23   wait for me to finish working.

24        Q.   So that was the one and only time that you

25   were actually in her presence while she was


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 18 of 67

1     performing her job?

2          A.    Correct.

3          Q.    So as you sit here today, you have -- or

4     maybe you do.  I don't know.  Do you have an opinion

5     about how Ms. Lee performed her job based on your

6     firsthand knowledge?

7          A.    Just from what I observed, just -- she was

8     just quick to leave, not willing to do any

9     additional work.

10          Q.    And you're talking about from the incident

11     in September of 2016.  Correct?

12          A.    In June.

13          Q.    I'm sorry.  June of 2016.

14          A.    That is correct.  That is the only time

15     I've ever observed her.

16          Q.    Okey-dokey.  What I want to show you is --

17     or what I want to ask you about, rather, is a

18     document that was presented to me by counsel for

19     Market America.  It's called the defendant's initial

20     disclosures.

21               And what they have indicated to me is that

22     you have knowledge of the plaintiff's work

23     performance.  And I

24     believe I've asked you about that already.

25               And so we're clear and the record is



1     clear, the only knowledge that you have -- and I'm

2     talking about personal, firsthand knowledge of the

3     work performance is the June 2016 incident.

4     Correct?

5          A.   That is correct.

6          Q.   Do you have any knowledge, based on your

7     personal, firsthand information of what Ms. Lee's

8     job duties were?

9          A.   No.

10          Q.   Do you have any knowledge of what her day-

11     to-day activities were?

12          A.   No.

13          Q.   Do you have any knowledge of her

14     interaction with other employees?

15          A.   No.

16          Q.   It also says on the defendant's initial

17     disclosures, Spesock has knowledge of the trainings

18     performed by the plaintiff, meaning Ms. Lee.

19               And is that the one training that you

20     talked about in June of 2016?

21          A.   Yes, that is correct.  That and MPCP.

22          Q.   Okay.  It says that you also have

23     knowledge of any discipline of the plaintiff.  Is

24     that correct?

25          A.   Only if it's been brought to my attention,



*Copy*        Lee v. Market America        05/04/21

Atlantic Professional Reporters, Ltd. – (336)945-9047

1    that is correct.

2         Q.   What discipline do you know about with

3    regard to ---

4         A.   --- I don't have any.  It would have only

5    -- I would only have knowledge of it if it was

6    brought to my

7    attention.

8         Q.   So are you saying that none was brought to

9    your attention?

10        A.   Not -- no.  None was brought to my

11   attention.

12        Q.   Okay.  It says that you have knowledge of

13   Ms. Lee's work reviews and evaluations.

14             Is that the evaluation we talked about

15   that you performed in 2017?

16        A.   I have the one -- or I was the one that

17   did the -- for 2017.  But I had access to the prior

18   reviews.

19        Q.   Okay.  It says Spesock also has knowledge

20   regarding the termination of the plaintiff.  Is that

21   true?

22        A.   Yes.

23        Q.   Okay.  Can you tell me what knowledge you

24   have of Ms. Lee's termination?

25        A.   We started evaluating in 2017 her overall,



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1    based on the evaluation from Ms. Camara of her job

2    performance.  And we decided that the position that

3    she was holding was not something that we needed for

4    the department.  We needed more of a training

5    person, a training specialist who would do multiple

6    trainings for the department.

7              And so the decision was made to start

8    having someone else train the trainer to take that

9    position.

10        Q.   The decision was made to have someone

11   train the trainer?

12        A.   Uh-huh.

13        Q.   What does that mean?

14        A.   To -- we had identified somebody to take

15   that position as a training specialist.  So we were

16   training her for her to show that she could do the

17   job.  Meaning that she was training the trainer that

18   was teaching her the role.

19        Q.   Okay.  Let's put names on the pronouns.

20   Okay?

21        A.   Okay.

22        Q.   When you say we, you're talking about

23   whom?

24        A.   So Liliana Camara was the manager who was

25   training, or assisting in training Rose Chaffin, who



1    was the individual that we were wanting to have take

2    that position as a training specialist.

3        Q.   Did you have a training specialist

4    position open at the time?

5        A.   No.

6        Q.   So why were you training someone for a

7    position that wasn't open?

8        A.   It was going to replace Ms. Lee.

9        Q.   Okay, so at some point there was a

10   decision made that Ms. Lee would be replaced?

11       A.   That is correct.

12       Q.   Because of what?

13       A.   Not being a team player and not doing the

14   trainings that were asked, or giving pushback for

15   the trainings that were asked.

16       Q.   Okay.  When did you learn that Ms. Lee was

17   not being a team player?

18       A.   It was through one-on-ones that I had with

19   Ms. Camara.

20       Q.   And so Ms. Camara reported to you that Ms.

21   Lee was not being a team player.

22            Do you recall when she first told you

23   this?

24       A.   I do not recall.

25       Q.   Was it in 2016 or 2017?



*Copy*         Lee v. Market America            05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1          A.    It would have been in 2017.

2          Q.    And would it have occurred after the

3    evaluation was given to Ms. Lee in April of 2017?

4          A.    I do not recall.

5          Q.    Okay, so you recall that at some point in

6    2017, assuming Rose had already been hired by Market

7    America at that point.  Correct?

8          A.    Correct.  Rose was hired and was going

9    through training.  And Ms. Lee was asked to do the

10   Mandarin training.  Ms. Chaffin actually did both

11   trainings to make sure that she was understanding

12   the material that was being presented.

13         Q.    Do you know what position Rose applied for

14   at Market America when she first started working

15   there?

16         A.    From what I recall, it was an account

17   services rep.

18         Q.    According to the information I have, she

19   was applying for a position as an unfranchise

20   services representative.

21         A.    Yes.  It's the same thing, it's just a

22   different -- we call them account services reps now.

23         Q.    Okay, and it looks like the date of her

24   application was December 27, 2016.  Does that sound

25   right to you?


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 24 of 67

1          A.    Say that one more time.

2          Q.    Her date of application was December 27th,

3    2016.

4          A.    That sounds correct.

5          Q.    And on her application she indicated that

6    she would not be available for work until January of

7    2017.  Correct?

8          A.    Correct.

9          Q.    Okay, so why is it that Ms. Chaffin

10   applied for an account representative position, but

11   as early as a few months into her tenure in that

12   position, a decision was made that she was going to

13   be trained to become a training specialist?

14         A.    We -- it was found that she was able and

15   capable of doing the job based on her previous

16   experience as a teacher.

17         Q.    Did you review her application?

18         A.    I did not.

19         Q.    Did you hire her?

20         A.    I did not.

21         Q.    So what did you know about her teaching,

22   her previous teaching, if you didn't review her

23   application and you didn't hire her?

24         A.    It was a decision made by the current

25   customer service manager and Ms. Camara.



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1          Q.    Who was the customer service manager?

2          A.    Brandi Foster.

3          Q.    Okay, so looking at Ms. Chaffin's job

4    application, she indicated that she was a Chinese

5    teacher, teaching Chinese for students from K

6    through eleventh grade for part-time of a school

7    year from 2014 to 2016 in Kernersville, North

8    Carolina.

9                Are you aware of that?

10         A.    I don't recall seeing that.

11         Q.    It looks like from her job application,

12   that she had exactly 23 months of teaching

13   experience prior to coming to Market America.

14               Are you aware of that?

15         A.    Like I said, I didn't see that.

16         Q.    And in fact, on her application, she

17   indicated that she had worked as a cashier, a

18   waitress, a retail sales associate, a retail store

19   manager and a restaurant manager.  And she didn't

20   say anything about teaching skills on her

21   application.

22               Are you aware of that?

23         A.    Again, I did not see the application.

24         Q.    Okay.  In spite of that, Ms. Chaffin was

25   identified by Liliana Camara and Brandi Foster as

Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 26 of 67

 1    someone who Market America wanted to train to become

 2    a training specialist.  Correct?

 3         A.   Correct.

 4         Q.   And in her role as a training specialist,

 5    what was she going to do?

 6         A.   She would be handling the MPCP, the new

 7    account services rep trainings and any other

 8    trainings that were asked to perform.

 9         Q.   And was that something that was already on

10    Ms. Lee's job description?

11         A.   It's my understanding, yes, that she was

12    going to be taking over that position.

13         Q.   And did you ever articulate to Ms. Lee

14    that this was the plan?

15         A.   No.

16         Q.   Do you know if anyone ever articulated

17    this to Ms. Lee as that being the plan?

18         A.   I do not know.

19         Q.   And your understanding of why this was

20    going to happen was solely based on what was told to

21    you by Liliana Camara and/or Brandi Foster?

22         A.   The observations of Ms. Camara.

23         Q.   Brandi Foster didn't have any input with

24    you about it?

25         A.   About Ms. Chaffin or about Ms. Lee?


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 27 of 67

1          Q.    About Ms. Lee.

2          A.    It was more Liliana Camara.

3          Q.    Okay.  At some point did you ever post a

4    position for a training specialist?

5          A.    We did not.

6          Q.    And to your knowledge, was Ms. Lee ever

7    reprimanded for poor job performance during this

8    period of time?

9          A.    I do not recall.

10         Q.    Did you ever reprimand her?

11         A.    I did not.

12         Q.    Do you know if Brandi Foster ever

13    reprimanded her?

14         A.    She did not report to Ms. Foster, so I

15    would not imagine that Ms. Foster ever reprimanded.

16         Q.    All right, so was the plan, then, that

17    Rose would take over the training specialist

18    position, but then who would take -- well, let me

19    rephrase that.

20               Rose would take over the training

21    specialist aspect of Ms. Lee's position.  Correct?

22         A.    Correct.

23         Q.    But, then, was the thought that Ms. Lee

24    would then be terminated?

25         A.    Correct.


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 28 of 67

1          Q.    And the reason being that Ms. Lee was not

2     a team player.  Correct?

3          A.    She was not a team player and not willing

4     to do the trainings that were asked by Ms. Camara.

5          Q.    Okay.  All right, so was there any other

6     reason that you were aware of for why Ms. Lee would

7     be terminated?

8          A.    Not that I recall.

9          Q.    Did you specifically hire Ms. Chaffin?

10          A.    I did not.

11          Q.    Who hired Ms. Chaffin?

12          A.    Ms. Foster.  Actually -- I'm sorry.  I

13     take that back.  It was -- I believe that we were in

14     -- we were in -- my apologies.

15                You know, we were in between managers for

16     account services.  And so I believe it would have

17     been either the account services manager at the

18     time.  I don't recall if that was who truly hired

19     her.

20          Q.    And that was at the initial hiring?

21          A.    Correct.

22          Q.    Okay.  Then who hired Ms. Chaffin for the

23     training specialist position?

24          A.    We would have promoted her from within.

25          Q.    I see.



1          A.    And it would have been done by the
2     training department.  So it would have been her
3     reporting to Ms. Camara.
4          Q.    Okay.  At the time of Ms. Lee's
5     termination, her title was global training projects
6     manager.  Is that correct?
7          A.    Correct.
8          Q.    Was anyone ever hired to that position
9     after Ms. Lee was terminated?
10         A.    No, ma'am.
11         Q.    Okay.  It says that you have knowledge of
12    the hiring of the individuals in the training
13    department, including plaintiff's replacement.
14              You're only talking about your knowledge
15    of Rose Chaffin.  Correct?
16         A.    Correct.
17         Q.    Because there was no one who was placed in
18    the position of the global training projects
19    manager.  Correct?
20         A.    That is correct.
21         Q.    No one was hired for that position?
22         A.    That is correct.
23         Q.    Okay, so was the global training projects
24    manager position eliminated?
25         A.    Correct.



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. – (336)945-9047

1        Q.   Okay.  I'm showing you now what has been

2    marked, or what has been provided to me by counsel

3    for Market America, it's Bates stamp marked MA017,

4    and it goes consecutively through page 022.  And it

5    is the position statement that Market America filed

6    in response to Ms. Lee's EEOC charge.

7        A.   Okay.

8        Q.   If you would just take a minute to review

9    that document.

10       (Witness examined document)

11       A.   Okay.

12       Q.   Okay.  Great.  Thank you.

13            So let's just confirm that you

14   participated in preparing the position statement.

15       A.   Correct.

16       Q.   And who is the individual who also

17   assisted in preparing the position statement?

18       A.   Beth Camarick.

19       Q.   And who is she?

20       A.   She was one of our attorneys.

21       Q.   Is she still an attorney for Market

22   America?

23       A.   She is not.

24       Q.   Okay, so now, that document was prepared

25   in response to an EEOC charge of discrimination that



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1      Ms. Lee had filed against Market America.  Correct?

2          A.   Correct.

3          Q.   And I'm going to start off at the very

4      beginning where it says Ms. Lee was terminated from

5      her position as a corporate trainer by Market

6      America on October 15th, 2017.

7               Do you see that?

8          A.   I do.

9          Q.   I don't see anything on that statement

10     about the position being eliminated.

11              Is there any reason why you didn't include

12     that on that first line?

13         A.   I don't recall.  I don't recall why we

14     didn't add that.

15         Q.   Okay, so Ms. Lee also was not a corporate

16     trainer at that time.  She was the global training

17     projects manager.  Correct?

18         A.   Correct.

19         Q.   And that was a management position.

20     Correct?

21         A.   It was not.  She did not have direct

22     reports.

23         Q.   I see.  Okay.

24         A.   It was a manager of a process.

25         Q.   I see.  Okay.



1           Was there a distinction in your mind

2    between the corporate trainer and the global project

3    -- global training projects manager position?

4         A.   Can you repeat that?

5         Q.   In your mind, was there a distinction

6    between a corporate trainer and the global training

7    projects manager position?

8         A.   Sorry.  For some reason I cannot wrap my

9    brain around what you're trying to ask.

10        Q.   As it pertains to the terminology that you

11   used in this response, this position statement, you

12   said she was terminated from her position as

13   corporate trainer.  You didn't use her job title.

14           And my question is, in your mind, is there

15   a distinction between those two positions?

16        A.   No.

17        Q.   Okay.  Then in the last paragraph it says

18   the fact that Ms. Lee was replaced as a corporate

19   trainer by Rose, a 54-year-old Chinese female,

20   demonstrates conclusively the lack of merit to Ms.

21   Lee's charges against Market America.

22           You see that?

23        A.   I do.

24        Q.   Now, you agree that that's incorrect,

25   because you said Ms. Chaffin did not replace Ms. Lee



1      in her position.  Correct?

2            A.   She was -- her duties replaced Ms. Lee.

3            Q.   Only her training specialist duties.

4      Correct?

5            A.   Correct.

6            Q.   And I believe you said that no one was put

7      in the position that Ms. Lee formerly held.

8      Correct?

9            A.   That is correct.

10           Q.   All right.  Now, let's skip over to the

11     page that is identified at 019.

12                Do you see the paragraph where we're

13     talking about Ms. Lee possesses a degree in

14     chemistry and had no managerial experience prior to

15     or during her tenure at Market America?

16           A.   Yes.

17           Q.   What did that have to do with the fact

18     that Ms. Lee's position was eliminated?

19           A.   It is my understanding that it was due to

20     her not being hired as a manager of a department.

21     But I do not recall specifically.

22           Q.   You mean to Ms. Lee not being hired as the

23     manager of the department?

24           A.   Correct.

25           Q.   Oh, I see.



1            Are you -- is it your understanding that

2    Ms. Lee was making such an accusation?

3        A.    That she was applying to be at some point

4    the manager of the department.

5        Q.    Okay.  In the last paragraph, the last

6    sentence of that paragraph, it says Sherry Spesock

7    served as director of human resources from November

8    2015, and was Ms. Lee's upline supervisor and

9    department head.

10           Do you see that?

11       A.    Uh-huh.

12       Q.    What does it mean that she was your -- you

13   were her upline supervisor?

14       A.    It means that the training department

15   reported to me.  And so I was the head of -- over

16   all that entire department, training, HR.

17       Q.    Now, earlier this morning in the

18   deposition you told me that you were never Ms. Lee's

19   supervisor.

20       A.    Never her direct supervisor.

21       Q.    Now, on the next page that starts off with

22   performance issues with Ms. Lee, would it be fair to

23   say that everything you know about the performance

24   issues with Ms. Lee stemmed from communications that

25   you had with Ms. Camara?



1            A.    That is correct.

2            Q.    For example, the second paragraph that

3      starts off with almost immediately, Ms. Lee

4      complained that she did not want to perform training

5      anymore.

6                  Do you see that?

7            A.    Yes.

8            Q.    You would agree that all of that

9      information, including that and the information

10     contained in that paragraph and the next paragraphs,

11     all relate to information that Ms. Camara

12     communicated to you?

13                 MS. DEBOARD:  Objection to form.  You

14     can answer.

15                 THE WITNESS:  Say that again.

16                 MS. DEBOARD:  I'm just objecting to

17     the form of the question.  But you can answer it.

18                 THE WITNESS:  Okay.  Yes, it was from

19     Ms. Camara.

20           Q.    (Ms. Gray)  Then if you go to the next

21     page, which I think is marked as 21, it says --

22     starting with the paragraph that says, meanwhile,

23     the decision was made to streamline the company's

24     training program.

25                 Do you see that?



1          A.    I do.

2          Q.    Is that what you talked about with regard

3    to Brandi Foster and Ms. Camara's input?

4          A.    No.   This is talking about the vision that

5    Ms. Camara had for the training program and the

6    department.

7          Q.    Okay, so it was solely based on what Ms.

8    Camara had communicated to you?

9          A.    Correct.

10         Q.    Is there anything that is written on this

11   position statement that came from your firsthand

12   knowledge as it pertains to Ms. Lee?

13         A.    No.

14         Q.    On the last paragraph, which is on page

15   21, it says taken together, Ms. Lee's supervisors

16   concluded that she was not performing up to

17   standard, was not aligned with departmental goals

18   and was not a team player.   Ms. Lee was terminated

19   on October 5th, 2017.

20               Do you see that?

21         A.    I do.

22         Q.    The supervisors that you're referring to

23   there are Ms. Camara and who else?

24         A.    I do not know.

25         Q.    Okay, and then it says Ms. Lee was


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 37 of 67

1    terminated on October 5th, 2017.

2              Why didn't you say Ms. Lee's position was

3    eliminated?

4         A.   I do not recall.

5         Q.   Do you think there is a distinction

6    between Ms. Lee's position being eliminated versus

7    Ms. Lee being terminated for job performance, or

8    poor job performance?

9         A.   Can you repeat that?  I apologize.

10        Q.   Do you believe that there is a distinction

11   between Ms. Lee being terminated for poor job

12   performance and Ms. Lee being terminated because her

13   position was eliminated?

14        A.   No.

15        Q.   You think it's the same thing?

16        A.   The title was eliminated.  But she was

17   terminated for performance based off of Ms. Camara.

18        Q.   So you think the accurate description of

19   Ms. Lee's separation of employment is that she was

20   terminated for poor job performance?

21        A.   Yes.

22        Q.   Now, in the course of this lawsuit, there

23   have been various documents exchanged between myself

24   and counsel for Market America.  And one of the

25   questions asked of Market America is to provide us



1    with every reason that they were aware of for why

2    Ms. Lee's position was separated from Market

3    America.

4              And according to the documents that I

5    have, the reasons given for Ms. Lee's termination --

6    and I guess I should tell you how the question was

7    worded.  Okay?

8              I said please describe and state with

9    specificity each and every reason for the

10   plaintiff's separation of employment.  Okay?  I

11   didn't use the word termination.

12        A.   Okay.

13        Q.   I just said separation.

14             And it says plaintiff was separated from

15   her job for her repeated failure to work with her

16   direct supervisor, perform tasks assigned to her,

17   work with new software, adapt and change her work,

18   failure to properly complete her training sessions

19   as requested and failure to be a team player.

20             Does that sound accurate to you?

21        A.   Yes.

22             MS. DEBOARD:  Counsel, what

23   interrogatory response was that?

24             MS. GRAY:  That's interrogatory

25   number 12.



1          Q.    (Ms. Gray)  Now, as you sit here today, do
2     you believe that that is accurate?
3          A.    Yes.
4          Q.    And have you told me in the questions that
5     I've asked you what you know about her repeated
6     failure to work with her direct supervisor?
7          A.    Based off of the conversations that I've
8     had with her.  Correct.
9          Q.    Okay, and have you told me everything that
10    you're aware of regarding Ms. Lee's failure to
11    perform a task assigned to her?
12         A.    Yes.  Not doing the trainings, rushing
13    through the trainings.  The account services
14    training that was typically six weeks, she rushed
15    through, ended it in four.  And she didn't want to
16    learn the new programs that we were trying to put in
17    place.
18         Q.    And is that related to where it says her
19    failure to work with new software?
20         A.    Correct.
21         Q.    And adapt and change her work.  Have you
22    told me everything you know about that?
23         A.    Yes.
24         Q.    Ms. Lee's failure to properly complete her
25    training sessions as requested.


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 40 of 67

1              Have you told me everything about that

2    that you know of, and her failure to be a team

3    player?

4         A.    Yes.

5         Q.    Okay, so your position is that Ms. Lee was

6    terminated for these reasons, as well?

7         A.    Correct.

8         Q.    Okay, and I believe you said that the

9    reason for -- that the person who terminated Ms. Lee

10   was Liliana Camara.  Correct?

11        A.    Correct.

12        Q.    Okay.  Now, did you ever receive any

13   emails from any employees complaining about Ms.

14   Lee's job performance?

15        A.    I did not.

16        Q.    Did you receive any emails from any

17   customers or clients, individuals whom Ms. Lee may

18   have trained, complaining about her job performance?

19        A.    I did not.

20        Q.    Do you know if Ms. Camara received such

21   items?

22        A.    I do not recall.

23        Q.    Did Ms. Lee ever make a statement to you

24   that Ms. Camara had said that she felt that there

25   were cultural differences between Ms. Lee and



1    herself that impacted their ability to work

2    together?

3         A.   She had mentioned it originally, yes, when

4    she was going to be reporting to her.

5         Q.   Tell me what you remember about that

6    conversation.

7         A.   Ms. Lee had come to me, stating that she

8    didn't feel comfortable reporting to Ms. Camara

9    because of -- I don't recall what was said.

10   Something that was said when they first started

11   working together.

12             And I told her that I would have a

13   conversation with Ms. Camara.  But as the manager of

14   the department, she would be reporting to Ms.

15   Camara.

16        Q.   And is that the only time that you recall

17   that type of conversation coming up between you and

18   Ms. Lee?

19        A.   I don't recall if there were any others.

20   There might have been, but I don't recall.

21        Q.   Okay, and then you did speak to Ms. Camara

22   about Ms. Lee's communications with you.  Is that

23   right?

24        A.   Yes, ma'am.

25        Q.   And tell me what happened during that



1    conversation.

2         A.    That conversation between Ms. Camara and I

3    was, you know, to, you know, be a professional and,

4    you know, manage everybody the same, and not treat

5    her any different, which she wouldn't either --

6    anyways.

7              And just, you know, to be the best manager

8    that she could be of the department.

9         Q.    Did you have a recollection of when that

10   conversation may have happened between you and Ms.

11   Camara?

12        A.    It was shortly after Ms. Lee and I had

13   met.  I don't remember when it was though.

14        Q.    And you don't remember when you and Ms.

15   Lee met or ---

16        A.    --- I do not.

17        Q.    My understanding is that Ms. Camara

18   supervised an individual by the name of Delia

19   Zapata.

20        A.    Yes, ma'am.

21        Q.    And my understanding is that Ms. Zapata --

22   and I hope I'm saying her name correct -- was hired

23   as a training specialist.  Is that correct?

24        A.    She was promoted within.  She was also --

25   if memory serves correctly, she was also an account



1    services rep to begin.  And then she was promoted

2    into the department.

3         Q.   Okay, and who was she promoted into the

4    department by?

5         A.   At that time it would have been Ms.

6    Trotter.

7         Q.   Okay, and then she would have worked under

8    Liliana Camara.  Correct?

9         A.   Correct.

10        Q.   Okay, and she was a Hispanic individual?

11        A.   Correct.

12        Q.   Does she still work for Market America?

13        A.   She does.

14        Q.   And what is her title now?

15        A.   She's still a training specialist.

16        Q.   Was Ms. Camara involved in her hire in any

17   way?

18        A.   Not that I'm aware of.

19        Q.   Okay.  Do you know an individual by the

20   name of Henri Hue?

21        A.   Yes.

22        Q.   And was he hired by Ms. Camara?

23        A.   Oh, gosh.  He would also have been

24   promoted into the department.  I believe that was

25   done by Ms. Trotter.



1            I'm trying to remember.  I'm sorry.  I'm
2     trying to get my timeline correct to my brain.
3            Ms. Zapata might have been hired by
4     Liliana -- Ms. Camara.  Henri was hired prior -- or
5     promoted prior to Ms. Zapata.
6            I apologize.  I cannot recall exactly when
7     that happened.
8        Q.    Okay.  What is Ms. Zapata's race?
9        A.    She's Hispanic.
10       Q.    And what about Mr. Hue?
11       A.    I don't know what nationality he is, but
12    he's Black.
13       Q.    Okay, and then what about, are you
14    familiar with Cherri Walston?
15       A.    She was Black.
16       Q.    And was she hired by Ms. Camara?
17       A.    Not that I am aware of.  She was there
18    prior to Ms. Camara.
19       Q.    Okay, so based on what you're telling me,
20    it doesn't sound like Ms. Camara hired any of these
21    individuals.  Is that right?
22       A.    Like I said, I can't remember exactly my
23    timeline.  It is possible that Ms. Zapata was
24    promoted by Ms. Camara, but I cannot recall if
25    that's accurate.


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 45 of 67

1          But Ms. -- I'm trying -- no.  Never mind.

2     I'm sorry.  I can't remember if Ms. Trotter was

3     still there or not.

4          Q.   All right.  I believe that I have some

5     documentation that you can refer to that may assist

6     you in answering these questions regarding who was

7     working for whom and when the time frame was.

8          But I'll come back to you with those

9     questions just to confirm.

10         A.   Okay.

11         Q.   All right.  Let me show you what has

12    previously been marked as Bates stamp Market America

13    355 consecutively through 358.  And this is

14    documentation that was submitted to the North

15    Carolina Department of Commerce.

16         Let me have you take a minute to review

17    that document.

18         (Witness examined document)

19         A.   Okay.

20         Q.   Okay.  Now, prior to today, have you seen

21    that?

22         A.   Yes, I saw it in her employment file.

23         Q.   And would you agree that that is the

24    documentation that was submitted to the North

25    Carolina Department of Commerce, which is the



1      unemployment division.  It's the division of

2      employment security, which handles unemployment

3      benefits for individuals.

4           A.   Correct.

5           Q.   Would you agree with me that that is what

6      you're looking at?

7           A.   Yes.

8           Q.   Okay, and it looks like to me, this is

9      documentation that Market America submitted in

10     response to Ms. Lee's request for unemployment

11     benefits.

12               Would you agree with that?

13          A.   Yes, ma'am.

14          Q.   All right.  According to this document, if

15     you look in box number eight, which would be on

16     Bates stamp 357.

17               Do you see that?

18          A.   I do.

19          Q.   Number eight, it says reason why claimant

20     is no longer working.  And then there's a check

21     beside other, and it says complete item 17.

22               Do you see that?

23          A.   Uh-huh.

24          Q.   And then when you go down to item 17,

25     which is on the next page, it says position



       1    eliminated.

       2            Do you see that?

       3        A.   I do.

       4        Q.   If Ms. Lee was terminated for the reasons

       5    that are set forth in these discovery responses, and

       6    you've agreed that they are accurate and correct,

       7    why was the North Carolina Department of Commerce

       8    told that Ms. Lee was separated due to a position

       9    elimination?

      10        A.   I believe it was miscommunication.

      11        Q.   Between whom?

      12        A.   What was documented on the file.  And

      13    there's a reason that's put on the employment file,

      14    on the front.  And I believe that that was

      15    incorrectly documented.

      16        Q.   And who do you think incorrectly

      17    documented it?

      18        A.   I do not recall.

      19        Q.   When you say you believe that there was

      20    documentation miscommunication, you believe that

      21    there was something on Ms. Lee's employee file at

      22    Market America that was inaccurate, which led to

      23    this inaccurate information to the department of

      24    commerce?

      25        A.   Correct.



1           I believe that on the front of the

2    employment file where it asks for the reason behind

3    why they're no longer with the company, it said

4    position eliminated.

5           I believe it also said work performance,

6    but I do not recall.

7      Q.   Was there ever an attempt that you are

8    aware of to correct that information that was

9    provided to the North Carolina Department of

10   Commerce?

11     A.   That, I am not aware of.

12           MS. GRAY:  Camilla, can you show her

13   Bates stamp 279?

14           I can show it to her on mine if you ---

15           MS. DEBOARD:  --- I got it here.

16           MS. GRAY:  You do?

17           MS. DEBOARD:  279?

18           MS. GRAY:  Yes.

19           The very top of the page says confidential

20   employee record.

21           Do you see where I am?

22     Q.   (Ms. Gray)  Ms. Spesock, is that the file

23   cover that you're talking about?

24           MS. DEBOARD:  I'm just showing her

25   the whole....



1                    MS. GRAY:  Uh-huh.  Okay.

2                    THE WITNESS:  Got you.  Yes.

3          Q.   (Ms. Gray)  Okay, and if you scroll down

4      to the very bottom of that page, it says separation

5      record, discharge, 10/5/17, reason,

6      performance/conduct.

7                    Do you see that?

8          A.   I do.

9          Q.   So you would agree that that is what Ms.

10     Lee's file said at Market America.  Correct?

11         A.   I would say yes.  But I'm not -- I don't

12     know if there was anything else on there prior.

13         Q.   Well, this is a document that's been

14     produced to me by your counsel, or by counsel for

15     Market America.

16         A.   No.  I understand what you're saying.

17     Yes.

18         Q.   Are you aware of any other documentation?

19         A.   No.  That's the employment file.

20         Q.   That is her employment file.  Correct?

21         A.   Uh-huh.

22         Q.   And so based on the documentation that is

23     with the department of commerce, your position is

24     that that -- what can I rely on here?

25                    Because there have been instances where



1    you have indicated Ms. Lee was terminated.  And then

2    there was an indication to the department of

3    commerce that her position was eliminated.

4            What can we relay on here in terms of what

5    is accurate and what is true?

6        A.   The role itself was eliminated.  She was

7    terminated based on her performance.

8        Q.   Do you understand that if the employer

9    informs the department of commerce that an

10   employee's position has been eliminated, that that

11   implies there is no wrongful conduct on behalf of

12   that employee that would disqualify that employee

13   from receiving unemployment benefits?

14       A.   Yes, I'm aware of that.

15       Q.   Based on the representations that were

16   made by Market America, are you aware that -- to the

17   department of commerce -- that Ms. Lee was able to

18   get unemployment benefits?

19       A.   I'm sorry.  Can you repeat that?

20       Q.   Based on the information that was provided

21   to the department of commerce by Market America, are

22   you aware that Ms. Lee was able to get unemployment

23   benefits?

24       A.   Yes.

25       Q.   Do you think that Market America is in any



*Copy*        Lee v. Market America        05/04/21

Atlantic Professional Reporters, Ltd. — (336)945-9047

1      way entitled to receive recoupment for those

2      benefits if she received them ---

3                    MS. DEBOARD:  --- Objection.

4           Q.   --- Based on a mistake that Market America

5      says they made?

6                    MS. DEBOARD:  And just objection to

7      form.

8                    And this is just a personal deposition,

9      not a 30(b)(6).  You can answer.

10          Q.   (Ms. Gray)  I'm asking you in your

11     capacity as the HR manager -- or director.  I'm

12     sorry.

13          A.   Do I think that Market America needs to

14     recoup?

15          Q.   Yeah.  Would Market America be entitled to

16     recoup any employment benefits that Ms. Lee received

17     based on the information that Market America

18     provided to the department of commerce?

19                   MS. DEBOARD:  And I'll just object

20     again for the record.  Because it's just a personal

21     deposition, it's not a 30(b)(6).

22                   But you can answer.

23                   THE WITNESS:  No, I don't think that

24     Market America would need to recoup the funds.

25                   MS. GRAY: Okay.  If we can take a



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. – (336)945-9047

1    minute.  This is a good time to stop.

2              I know I still have more, but not much.

3              MS. DEBOARD:  Okay.  Let's take a

4    quick -- are you okay.

5              We can go off the record.

6         (11:14-11:31 a.m. - recess)

7         Q.   (Ms. Gray)  Did you have a conversation

8    with Ms. Lee about her desire to move to another

9    position within the company rather than -- or after

10   she was terminated?

11        A.   She had asked me on her way out if there

12   was any positions open and if I would look for her.

13        Q.   Okay, and you guys had a conversation,

14   telephone call about that.  Correct?

15        A.   We did.

16        Q.   Have you actually heard the telephone call

17   ---

18        A.   --- No.

19        Q.   --- That was recorded?

20        A.   No.

21        Q.   Are you aware that there is a recorded

22   telephone conversation between you and Ms. Lee

23   regarding her looking for another position?

24        A.   No.

25        Q.   Okay.  Tell me what you remember about the



1      telephone conversation you had with Ms. Lee.

2          A.   I had told her that I had reached out to

3      the recruiter and -- Ms. Foster, and at that time,

4      we did not have any positions available.

5          Q.   Okay.  Ms. Lee specifically asked you

6      about any type of translator position for Mandarin.

7      Correct?

8          A.   I do not recall that.  I apologize.

9          Q.   Well, at the time that Ms. Lee was

10     terminated, you agree that there was an open

11     translator position for Mandarin.  Correct?

12         A.   I'd have to confirm what roles were open.

13     At that time I was not aware.

14         Q.   Okay, and I believe you told Ms. Lee that

15     you spoke to Reid.

16         A.   Correct.

17         Q.   And who is Reid?

18         A.   Reid is one of our recruiters.

19         Q.   And I think you said that Reid had

20     indicated that he had hired someone as a

21     supplemental translator at the time.

22              Do you recall that?

23         A.   Reid had told me that they had found

24     somebody to take that position, so there wasn't

25     going to be anything available.



1        Q.   And did he tell you it was an as-needed

2    supplemental translator?

3        A.   No.

4        Q.   Did you talk to Jennifer about her needs

5    for a translator?

6        A.   Jennifer came to my office and asked me

7    about the role for Ms. Lee.  And I told her that it

8    was my understanding from my conversation with Reid

9    that the role was already filled, so there wouldn't

10   be a role available.

11       Q.   And did you tell Ms. -- did you tell

12   Jennifer to tell Ms. Lee that there were no

13   positions available?

14       A.   I told Jennifer that if she was trying to

15   -- that I was told that the role was being filled,

16   and that at that point we would not have any other

17   roles available.

18       Q.   And that was the role of translator

19   Mandarin?

20       A.   Correct.

21       Q.   Okay.  In the documentation that I have,

22   it indicates that -- the question that was asked,

23   number 13 in the interrogatories, it says please

24   identify by job title each and every position that

25   was open and available at the time of or within


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 55 of 67

1     three months after the plaintiff's termination.

2              And one of the positions that is listed is

3     translator Mandarin.

4              Now, was that position filled as of the

5     time that you had a conversation with Ms. Lee?

6     A.    It was -- that role was being filled at

7     that time.

8     Q.    Who took that position?

9     A.    I do not recall.

10    Q.    But it wasn't Rose.  Correct?

11    A.    No.

12    Q.    And are you aware that that position was

13    still on Market America's website, posted on Market

14    America's website as late as the end of October of

15    2017?

16    A.    The translation role?

17    Q.    Yes.

18    A.    It was just -- I was not aware that it was

19    on the website.  It was just, I had a conversation

20    with Reid about what positions were open.  And when

21    I asked him about the translation role, he said that

22    it was being filled.  That they had already found

23    their candidate, and that it was being filled.

24    Q.    And as you sit here today, you don't know

25    who that person is?



1         A.    I do not.

2         Q.    What's Reid's last name?

3         A.    Nifong.

4         Q.    Can you spell that?

5         A.    N-i-f-o-n-g.

6         Q.    Is it R-e-i-d?

7         A.    R-e-I-d.

8         Q.    Is he current -- you say he's a recruiter?

9         A.    He is.

10        Q.    For Market America?

11        A.    He is.

12        Q.    Does he still work for Market America?

13        A.    Yes, ma'am.

14        Q.    In that same role?

15        A.    Yes, ma'am.

16        Q.    Okay, so you're saying that if you did

17   tell Jennifer to tell Ms. Lee that there were no

18   other open positions, it's because of the

19   conversation you had with Reid ---

20        A.    --- That is correct.

21        Q.    --- Where he informed you that the

22   position had been filled?

23        A.    He told me that it was in the process of

24   being filled.

25        Q.    And that person would now, or would have



1     at that time, who would that person have reported

2     to?

3           A.   Jennifer, Jennifer Lynn.

4           Q.   The translator would have reported to

5     Jennifer Lynn?

6           A.   That is correct.

7           Q.   So if Jennifer Lynn says that she never

8     hired such an individual, would she be accurate?

9           A.   I don't know.

10          Q.   Okay.  All right, according to the

11    documentation that I have, there was some concern

12    about the salary that Rose would receive as a

13    training specialist.

14               Do you recall the concerns that were

15    articulated about that?

16          A.   I do not recall.

17          Q.   According to the documentation I have,

18    which is a series of emails between yourself and

19    Marc Ashley, Marc Ashley was asking questions about

20    Rose's pay.  Seems that he was concerned that her

21    pay going from 26K to 40K was a big jump.

22               Do you recall that?

23          A.   I do recall.

24          Q.   Tell me what you recall about it.

25          A.   That he had concerns that it was such a



1    significant bump in pay at that moment in time,

2    instead of doing like a stair step.  He was just

3    questioning the significance in the bump.

4         Q.   All right.  You indicated that you felt

5    the bump was pretty much justified because of Rose's

6    teaching background.  And you felt that that was a

7    good skill set to have in training.

8              Do you recall that?

9         A.   I do.

10        Q.   You would agree with me that Rose didn't

11   have any experience in training.  Correct?

12        A.   In actual training prior.  That is my

13   understanding.

14        Q.   And you previously testified that you did

15   not look at her job application, and you didn't

16   interview her.  Correct?

17        A.   That is correct.

18        Q.   So would it be fair to say that everything

19   you told Marc Ashley about the justification for

20   hiring Rose to

21   the training specialist position came from

22   information you obtained through Liliana Camara?

23        A.   That is correct.

24        Q.   Who trained Rose to train -- to be a

25   training specialist?



1          A.    I believe -- I believe it was a

2     collaboration of the entire training team.

3          Q.    Which would have consisted of whom?

4          A.    It would have consisted of Liliana, Henri

5     and Abby.

6          Q.    And what was Abby's last name?

7          A.    Zapata.

8          Q.    Is that Delia?

9          A.    Sorry.  Yes.  Delia.

10          Q.    Okay, so she also goes by the name of

11     Abby?

12          A.    She goes by Abby.

13          Q.    And correct me if I'm wrong, Delia was

14     Hispanic.  Correct?

15          A.    Correct.

16          Q.    Liliana is Hispanic.  Correct?

17          A.    Correct.

18          Q.    And Rose, Asian.  Correct?

19          A.    Correct.

20          Q.    Liliana didn't speak Mandarin.  Correct?

21          A.    Correct.

22          Q.    Delia didn't speak Mandarin.  Correct?

23          A.    Correct.

24          Q.    And Henri did not speak Mandarin.

25     Correct?



*Copy*          Lee v. Market America          05/04/21

Atlantic Professional Reporters, Ltd. - (336)945-9047

1          A.    Correct.

2          Q.    Was there anyone who spoke Mandarin who

3    assisted in the training of Rose?

4          A.    No.  Not that I'm aware of.

5          Q.    Now, my understanding is, and you can

6    correct me if I'm wrong, that the positions held by

7    Henri and Delia were actually posted on Market

8    America's website.  Is that correct?

9          A.    Not that I can recall.

10          Q.    Okay.  Did they have to apply for the

11    positions that they had with Market America?

12          A.    For their initial or for the promotion

13    into the training department?

14          Q.    Well, for the position -- according to my

15    documentation, Henri Hue was a senior trainer.

16                Was that position ever posted?

17          A.    I do not recall.

18          Q.    And then, Delia, with regard to the

19    training specialist position, was that position ever

20    posted?

21          A.    Not that I recall.

22          Q.    Now, my understanding is that Liliana is

23    no longer employed with Market America.  Is that

24    correct?

25          A.    That is correct.



1        Q.    And do you know why she left?

2        A.    She got another position.

3        Q.    And that's what she told you.  Correct?

4        A.    Yes.

5        Q.    Liliana left Market America in

6   approximately March of 2018.  Is that right?

7        A.    I do not know the exact timing.

8        Q.    Well, if that's what the documents show,

9   you don't have any reason to dispute that.  Correct?

10        A.    That's correct.

11        Q.    When Liliana left, who took her place?

12        A.    We hired Lori Galbreath.

13        Q.    And what was her title?

14        A.    Global training manager.  I believe that's

15   global training manager.

16        Q.    All right.  Now, I just want to switch

17   gears.

18              Are you aware that at the time of Ms.

19   Lee's employment with Market America, she was

20   required to sign a covenant not to compete?

21        A.    Can you repeat that?

22        Q.    Are you aware that at the time that Ms.

23   Lee was hired to work for Market America she was

24   required to sign a covenant not to compete?

25        A.    A noncompete, yeah.  Yes, ma'am.



*Copy*        Lee v. Market America        05/04/21

Atlantic Professional Reporters, Ltd. – (336)945-9047

1        Q.   And the noncompete covenant that I've

2    reviewed extended for a period of six months after

3    termination of employment with Market America.

4             Does that sound like your understanding?

5        A.   Correct.

6        Q.   And during that six-month period of time,

7    she would not be able to directly or indirectly

8    compete with Market America within the state of

9    North Carolina in terms of her previous position.

10   Correct?

11       A.   Correct.

12       Q.   After that six-month period of time, would

13   Ms. Lee have been eligible to seek employment in

14   almost the exact same role as she would have had at

15   Market America with another employer?

16       A.   With another employer?  I would imagine

17   so, yes.

18       Q.   But she would have to wait the six-month

19   period of time.  Correct?

20       A.   Correct.

21       Q.   Do you have any evidence as you sit here

22   today that Ms. Lee breached that agreement?

23       A.   Not that I'm aware of.

24       Q.   Did anyone contact you during that six-

25   month period of time indicating that Ms. Lee was



1    seeking employment with them and they want to verify

2    that the noncompete would not be violated if she was

3    hired?

4         A.   No, ma'am.

5         Q.   Did you ever review any of the information

6    -- and when I say review, I mean verify.  Okay?

7         And this would be in your capacity as the

8    director of HR.

9         Did you ever verify any of the information

10   on Rose Chaffin's application for accuracy?

11        A.   Me personally, no.

12        Q.   Do you know if anyone in the company did?

13        A.   I do not know.

14        Q.   Would that have been your role?

15        A.   No.

16        Q.   For example, on Ms. Chaffin's application

17   she lists her employment history, she lists her

18   education background.  She also listed some

19   professional references.

20        And my question is would it have been your

21   responsibility or your role as the director of HR to

22   verify any of that?

23        A.   No.

24        Q.   Whose role would that have been, if

25   anybody?


Case 1:18-cv-01046-WO-JLW   Document 36-4   Filed 06/04/21   Page 64 of 67

 1          A.   The references would have been done by the
 2     recruiters.
 3          Q.   And at that time, do you know who the
 4     recruiters were?
 5          A.   At that time, I do not know who recruited
 6     Ms. Chaffin.
 7                    MS. GRAY:  All right.  That's all I
 8     have.
 9                    MS. DEBOARD:  Let me check my notes
10     real quick, but I don't think I have any questions.
11               Oh, I do have one.
12                         EXAMINATION
13     BY MS. DEBOARD:
14          Q.   Did Rose attend Nadine Lee's training in
15     Mandarin when she first started at Market America?
16          A.   Yes.
17                    MS. DEBOARD:  I don't have any more
18     questions.
19                    MS. GRAY:  Thank you.
20               I don't have anything to follow up.
21          WHEREUPON,
22      at 11:47 o'clock a.m. the deposition was adjourned.
23
24
25



### CERTIFICATE OF TRANSCRIPT

I, *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify that there appeared before me the foregoing witness;

That the testimony was duly recorded by me, reduced to typewriting by me or under my supervision and the foregoing consecutively numbered pages are a complete and accurate record of the testimony given at said time by said witness;

That the undersigned is not of kin nor associated with any of the parties to said cause of action, nor any counsel thereto, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this the 13th Day of May, 2021.

_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter
Atlantic Professional Reporters
Post Office Box 11672
Winston-Salem, NC 27116-1672



Case 1:18-cv-01046-WO-JLW  Document 36-4  Filed 06/04/21  Page 66 of 67

<u>CERTIFICATE <u>OF</u> <u>OATH</u></u>

I, *Cassandra J. Stiles*, Notary Public in and for the County of Forsyth, State of North Carolina at Large, do hereby certify that there appeared before me the foregoing witness;

That the witness personally appeared before me at the date, time and location hereon captioned and was personally sworn by me prior to the commencement of the proceeding in the matter hereon captioned.

IN WITNESS WHEREOF, I have hereunto set my hand this the 13th Day of May, 2021.

_____

Cassandra J. Stiles, CVR-M
Certified Court Reporter
Atlantic Professional Reporters
Post Office Box 11672
Winston-Salem, NC 27116-1672

